UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                          :
   UNITED STATES OF AMERICA                               :
                                                          :
               - v. -                                     :     S1 17 Cr. 308 (LAK)
                                                          :
   DAVID BLASZCZAK,                                       :
   THEODORE HUBER,                                        :
   ROBERT OLAN and                                        :
   CHRISTOPHER WORRALL,                                   :
                                                          :
               Defendants.                                :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -   x


# GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT, TO SEVER, FOR *BRADY* MATERIAL, A BILL OF PARTICULARS, DISCOVERY RELATING TO POTENTIAL GRAND JURY LEAKS and TO STRIKE CERTAIN LANGUAGE FROM THE INDICTMENT


                                        JOON H. KIM
                                        Acting United States Attorney for the
                                        Southern District of New York


Ian McGinley
Brooke E. Cucinella
Joshua A. Naftalis
Assistant United States Attorneys
      -Of Counsel-

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

I.  Background ................................................................................................................ 2

    *A.  CMS* ........................................................................................................................... *3*

    *B.  Christopher Worrall* .............................................................................................. *4*

    *C.  David Blaszczak* .................................................................................................... *5*

    *D.  Investment Adviser-A, Huber, Olan, and Fogel* ................................................... *5*

    *E.  Investment Adviser-B and Christopher Plaford* ................................................... *6*

    *F.  The Scheme to Convert and Use Confidential CMS Information Involving Investment Adviser-A* ............................................................................................................... *6*

        1.  July 6, 2012 Proposed Radiation Oncology Rule ........................................... 8

        2.  July 1, 2013 Kidney Dialysis Preliminary Rule ............................................ 9

    *G.  The Scheme to Convert and Use Confidential CMS Information Involving Investment Adviser-B (Counts Seventeen and Eighteen)* .......................................................... *10*

    *H.  Discovery* .............................................................................................................. *11*

II.  Argument ................................................................................................................ 12

    *A.  None of the Counts in the Indictment Should be Dismissed.* ....................................... *12*

        1.  Applicable Law ............................................................................................. 12

        2.  Discussion ..................................................................................................... 13

            (1)  The Indictment Properly Alleges Insider Trading in Violation of Section 10(b) (Counts One and Four through Eight) ................................................................. 15

            (2)  The Indictment Properly Alleges Wire Fraud in Violation of Section 1343 (Counts One and Nine) ......................................................................................... 17

            (3)  The Indictment Properly Alleges Securities Fraud in Violation of Section 1348 (Counts Two and Ten) ........................................................................................... 19

            (4)  The Indictment Properly Alleges Theft of Government Property in Violation of Section 641 (Count Three) ...................................................................................... 20

            (5)  The Indictment Properly Alleges Violations of Sections 371 and 641 (Counts Seventeen and Eighteen) ...................................................................................... 22

    *B.  Counts Seventeen and Eighteen Should Not Be Severed* ........................................... *25*

        1.  Applicable law ............................................................................................... 25

         2.  Discussion ..................................................................................................... 27

    *C.  The Court Should Deny the Motion to Strike Paragraph 39 of the Indictment* ........... *29*

    *D.  The Counts Alleging Violations of Sections 641 and 371 are Constitutional* ............ *31*

        1.  Applicable Law ............................................................................................. 32

         a)  Vagueness Doctrine ................................................................................. 32

         b)  Rule of Lenity .......................................................................................... 33

        2.  Discussion ..................................................................................................... 34

         a)  The Indictment Properly Charges 641 ..................................................... 34

         b)  The Indictment Properly Charges 371 ..................................................... 40

    *E.  The Court Should Deny the Defendants' Demands for a Bill of Particulars* .............. *44*

        1.  Applicable Law ............................................................................................. 44

2.    Discussion ................................................................................................ 47

*F.   The Court Should Not Order the Government to Search the Investigative Files of the SEC for Brady Material* ...................................................................................... 55
    1.    Relevant Facts ........................................................................................... 55
    2.    Applicable Law ......................................................................................... 58
    3.    Discussion ................................................................................................ 61
        a)    The Defense Request for Documents in the SEC Action Moots this Motion ..... 61
        b)    The Criminal and Civil Investigations Were Parallel, Not Joint ....................... 63
        c)    Olan's Request is Distinguishable from *Gupta* and *Martoma* .......................... 65

*G.   The Court Should Deny Defendant Blaszczak's Chaves-Related Requests* ................ 68
    1.    Applicable Law ......................................................................................... 70
    2.    Discussion ................................................................................................ 72

III.   Conclusion ...................................................................................................... 74

# TABLE OF AUTHORITIES

**Federal Cases**

*Arriaga* v. *Mukasey,* 521 F.3d 219 (2d Cir. 2008)................................................................... 32

*Bank of Nova Scotia* v. *United States*, 487 U.S. 250 (1988) ......................................70, 72, 73

*Barber* v. *Thomas,* 560 U.S. 474 (2010) .................................................................................. 33

*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963)........................................................... 56

*City of Chicago v. Morales,* 527 U.S. 41 (1999) ...................................................................... 32

*Dirks* v. *S.E.C.*, 463 U.S. 646 (1983) ...................................................................................... 17

*Ferreira* v. *United States*, 350 F. Supp. 2d 550 (S.D.N.Y. 2004) ........................................... 59

*Fountain* v. *United States*, 357 F.3d 250 (2d Cir. 2004)........................................................... 18

*Haas* v. *Henkel*, 216 U.S. 462 (1910) ...............................................................40, 41, 43, 44

*Hamling* v. *United States*, 418 U.S. 87 (1974) ........................................................................ 13

*Hammerschmidt* v. *United States*, 265 U.S. 182 (1924) .............................................41, 42, 43

*Hemphill* v. *United States*, 392 F.2d 45 (8th Cir. 1968) ........................................................... 52

*Holder* v. *Humanitarian Law Project*, 561 U.S. 1 (2010) ...................................................... 33

*In re United States of America,* 441 F. 3d 44 (1st Cir. 2006)................................................... 72

*Kolender* v. *Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) ................ 32

*Kyles* v. *Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995)................................................... 58, 62

*Maynard* v. *Cartwright,* 486 U.S. 356 (1988) ........................................................................ 33

*Russell* v. *United States*, 369 U.S. 749 (1962) ....................................................................... 13

*Salman* v. *United States*, 580 U.S. __ ................................................................................... 17

*Scales* v. *United States,* 367 U.S. 203 (1961)......................................................................... 33

*SEC* v. *Blaszczak, et al.*, No. 17 Civ. 3919 (AJN) ................................................................ 57

*SEC* v. *Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir. 1980)......................................... 64

*SEC* v. *Stanard*, No. 06 CIV 7736 (GEL) .........................................................59, 63, 64, 66

*Smith* v. *Goguen,* 415 U.S. 566 (1974) .................................................................................. 32

*United States v. Ajlouny*, 629 F.2d 830 (2d Cir. 1980) ........................................................... 26

*United States* v. *Alfonso*, 143 F.3d 772 (2d Cir. 1998) ........................................................ 17

*United States* v. *Amer*, 110 F.3d 873 (2d Cir. 1997) ............................................................ 33

*United States* v. *Avellino*, 136 F.3d 249 (2d Cir. 1998) .................................................. 58, 63

*United States* v. *Banki,* 685 F.3d 99 (2d Cir. 2012) ............................................................ 33

*United States* v. *Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) ......................................... 47

*United States* v. *Bin Laden*, 91 F. Supp. 2d. 600 (S.D.N.Y. 2000) ...................................... 30

*United States* v. *Blakney*, 941 F.2d 114 (2d Cir. 1991) ....................................................... 26

*United States* v. *Bongiorno*, 05-cr-390 ............................................................................... 15

*United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016) ................................................. 58

*United States* v. *Bonventre*, No. 10 Cr. 228 (LTS) ............................................................... 58

*United States* v. *Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ............................................. 44, 46

*United States* v. *Brito*, 907 F.2d 39 (2d Cir. 1990) .............................................................. 73

*United States* v. *Brooks*, 966 F. 2d 1500 (D.C. Cir. 1992) .................................................... 65

*United States* v. *Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004) ............................................. 30

*United States* v. *Carter*, No. 04 CR. 594 (NRB) .................................................................. 70

*United States* v. *Coplan*, 703 F.3d 46 (2d Cir. 2012) ..................................................... 40, 43

*United States* v. *Coppola,* 671 F.3d 220 (2d Cir.2012) ........................................................ 32

*United States* v. *Corbin*, 729 F. Supp. 2d 607 (S.D.N.Y. 2010) ........................................... 19

*United States* v. *Courtney*, 257 F.2d 944 (2d Cir. 1958) ...................................................... 30

*United States* v. *Croft*, 750 F.2d 1354 (7th Cir. 1984) ......................................................... 39

*United States* v. *Cuti*, 2009 WL 3154310 (S.D.N.Y. 2009) .................................................. 45

*United States* v. *D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) ................................... 45, 47

*United States* v. *Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ..................................................... 53

*United States* v. *Edelman,* 726 F.3d 305 (2d Cir. 2013) ....................................................... 33

*United States* v. *Fattah*, 858 F.3d 801 (3rd Cir. 2017) ......................................................... 70

*United States* v. *Feola*, 651 F. Supp.1068 .......................................................................... 50

*United States* v. *Feyrer*, 333 F.3d 110 (2d Cir. 2003) .......................................................... 26

*United States* v. *Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006) .................................... 59, 64

*United States* v. *Fogel*, 17 Cr. 308 (DLC) ............................................................................... 3

*United States* v. *Friedman*, 854 F.2d 535 (2d. Cir. 1988) .................................................... 71

*United States v. Gaggi,* 811 F.2d 47 (2d Cir.1987) ............................................................... 62

*United States* v. *Garrett*, 648 F.3d 618 (8th Cir. 2011) ....................................................... 27

*United States* v. *Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) ........................................... 47

*United States* v. *Girard*, 601 F.2d 69, 71 (2d Cir. 1979) ............................................. passim

*United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) .......................... 64, 66

*United States* v. *Goldberg*, 756 F.2d 949 (2d Cir. 1985) ...................................................... 17

*United States* v. *Gonzalez,* 407 F.3d 118 (2d Cir. 2005) ....................................................... 33

*United States* v. *Gotti*, 42 F. Supp. 2d 252 (S.D.N.Y. 1999) ................................................. 30

*United States* v. *Guerrerio*, 670 F. Supp. 1215 (S.D.N.Y. 1987) .......................................... 59

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ..................................... passim

*United States* v. *Guttenberg*, No. 07 Cr. 141 (DAB) ............................................................. 16

*United States* v. *Hasting*, 461 U.S. 499 (1983) .................................................................... 72

*United States* v. *Heinemann*, 801 F.2d 86 (2d Cir.1986) ...................................................... 54

*United States* v. *Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) .................................... 45, 47, 53

*United States* v. *Hunt*, 05 Cr. 395 (DAB) ............................................................................. 38

*United States* v. *Jeter*, 775 F.2d 670 (6th Cir. 1985) ............................................................ 39

*United States* v. *Jones*, 677 F. Supp. 238, 241 (S.D.N.Y. 1988) ............................... 34, 35, 38

*United States* v. *Kazarian*, 2012 WL 1810214 (S.D.N.Y. 2012) ........................................... 46

*United States* v. *Kouzmine,* 921 F. Supp. 1131 (S.D.N.Y.1996) ........................................... 28

*United States* v. *Lanier,* 520 U.S. 259 (1997) ...................................................................... 32

*United States v. Leonelli,* 428 F. Supp. 880 (S.D.N.Y. 1977) ............................................... 46

*United States* v. *Levy*, 2013 WL 664712 (S.D.N.Y. 2013) .................................................... 46

*United States* v. *Lino*, 00 Cr. 632 (WHP) ............................................................................. 50

*United States* v. *Locascio*, 6 F.3d 924 (2d Cir. 1993) ........................................................... 58

*United States* v. *Mahabub*, 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ..................... 46, 47

*United States* v. *Mahaffy,* No. 5 Cr. 613 (E.D.N.Y. Aug. 2, 2006) ....................................... 20

*United States* v. *Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) .......................................... 46

*United States* v. *Martin*, 411 F. Supp. 2d 370 (S.D.N.Y. 2006) ..................................... 18, 19

*United States v. Martoma, 48 F. Supp. 3d 555 (S.D.N.Y. 2014)* .........................51, 61, 63, 64

*United States* v. *Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ................................. 60, 66

*United States* v. *Matzkin*, 14 F.3d 1014 (4th Cir. 1994) ...................................................... 39

*United States* v. *May*, 625 F.2d 186, 191 (8th Cir. 1980) .................................................... 39

*United States* v. *McAusland*, 979 F.2d 970 (4th Cir. 1992) ......................................35, 37, 38

*United States* v. *Mechanik,* 475 U.S. 66 (1986) .................................................................. 70

*United States* v. *Melvin*, No. 3:14-Cr-00022-TCB-RGV (N.D. Ga. May 27,2015) .............. 20

*United States* v. *Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ...................................... 46, 47

*United States* v. *Monserrate*, 2011 WL 3480957 (S.D.N.Y. 2011) ...................................... 45

*United States* v. *Morrison*, 686 F.3d 94 (2d Cir. 2012) ....................................................... 32

*United States* v. *Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) .......................................... 30

*United States* v. *Motz*, 652 F. Supp. 2d 284 (E.D.N.Y. 2009) ............................................. 20

*United States* v. *Mulder*, 273 F.3d 91 (2d Cir. 2001) ......................................................... 30

*United States v. Muyet*, 945 F. Supp. 586 (S.D.N.Y 1996) ................................................... 50

*United States* v. *Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) .................................. 46, 50

*United States* v. *Nadirashvili*, 655 F.3d 114 (2d Cir. 2011) .................................................. 33

*United States v. Newman,* 773 F.3d 438 (2d Cir. 2014) ...........................................15, 17, 51

*United States* v. *Nichols*, 820 F.2d 508 (1st Cir. 1987) ........................................................ 39

*United States* v. *Nordlicht et al.*, 16 Cr. 640 (E.D.N.Y. 2016) .............................................. 71

*United States* v. *Page*, 657 F.3d 126 (2d Cir. 2011) ....................................................... 27, 29

*United States* v. *Peltz*, 433 F.2d 48 (2d Cir. 1970) ...................................................41, 42, 43

*United States* v. *Pirro*, 96 F. Supp. 2d 279 (S.D.N.Y. 1999) ............................................... 19

*United States* v. *Quinn*, 445 F.2d 940 (2d Cir. 1971) .......................................................... 58

*United States* v. *Ragosta*, 970 F.2d 1085 (2d. Cir. 1992) ...................................................... 18

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ............................................. 51, 52

*United States* v. *Regan*, 706 F. Supp. 1102 (S.D.N.Y. 1989) ................................................ 72

*United States* v. *Reinhold*, 994 F.Supp. 194 (S.D.N.Y. 1998) ............................................... 49

*United States v. Rigas*, 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008) ..................................... 63

*United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) ...........................................59, 63, 64, 66

*United States* v. *Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ...........................28, 46, 49

*United States* v. *Rittweger*, 524 F.3d 171 (2d Cir. 2008) ..................................................... 27

*United States* v. *Rivera*, 546 F.3d 245 (2d Cir. 2008) ........................................................... 25

*United States* v. *Roberts,* 363 F.3d 118 (2d Cir.2004) .......................................................... 32

*United States* v. *Rosa*, 11 F.3d 315 (2d Cir. 1993) ............................................................... 27

*United States* v. *Ruiz*, 894 F.2d 501 (2d Cir. 1990) .............................................................. 26

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998) .................................................... 26, 27

*United States* v. *Samsonov*, 2009 WL 176721 (S.D.N.Y. 2009) ..................................... 45, 53

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990) ........................................................... 30

*United States* v. *Slawson*, No. 1:14 CR-00186-RWS-JFK, (N.D. Ga. Nov. 7, 2014) ........... 20

*United States v. Steinberg,* 21 F. Supp. 3d 309 (S.D.N.Y. 2014) .................................... 51, 52

*United States* v. *Stewart*, No. 15 Cr. 287 (LTS) .............................................................. 45, 51

*United States* v. *Strauss*, 999 F.2d 692 (2d Cir. 1993) ........................................................ 33

*United States* v. *Stringer*, 730 F.3d 120 (2d Cir. 2013) ....................................................... 13

*United States* v. *Tobias*, 836 F.2d 449 (1988) ..................................................................... 40

*United States* v. *Tochelmann*, No. 98 CR 1276 (JFK)) ........................................................ 13

*United States* v. *Torres*, 901 F.2d 205 (2d Cir. 1990) ...............................................44, 49, 52

*United States* v. *Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ............................................ 45

*United States* v. *Turoff*, 853 F.2d 1037 (2d Cir. 1988) ........................................................ 25

*United Sta*tes v. *Tuzman*, S8 15 Cr. 536 (PGG) ................................................................. 28

*United States* v. *Upton,* 856 F. Supp. 727 (E.D.N.Y. 1994) ................................................. 59

*United States* v. *Valvani*, No. 16 Cr. 412 (SHS) ................................................... 38

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir.) ....................................................... 12

*United States* v. *Walsh*, 194 F.3d 37 (2d Cir. 1999) ............................................. 44

*United States* v. *Walters*, No. 16 Cr. 338 (PKC) ................................. 60, 62, 68, 69

*United States* v. *Werner*, 620 F.2d 922 (2d Cir. 1980) ......................................... 25

*United States* v. *Whab*, 355 F.3d 155 (2d Cir. 2004) ........................................... 37

*United States* v. *William Walters, a/k/a "Billy,"* No. 16 Cr. 338 (PKC) .............. 52, 61, 70, 71

*United States* v. *Williams*, 540 U.S. 36 (1992) .................................................... 13

*United States* v. *Yannotti*, 541 F.3d 112 (2d Cir. 2008) .................................. 13, 21

*Zafiro* v. *United States*, 506 U.S. 534 (1993) ..................................................... 26

**Federal Statutes**

15 U.S.C. § 78ff ....................................................................................................... 2

15 U.S.C. § 78j(b) ........................................................................................ 2, 12, 15

15 U.S.C. § 78u-1(h) ............................................................................................. 36

18 U.S.C. § 1343 ............................................................................................ passim

18 U.S.C. § 1348 ................................................................................. 2, 12, 19, 20

18 U.S.C. § 371 .............................................................................................. passim

18 U.S.C. § 614 ...................................................................................................... 24

18 U.S.C. § 641 .............................................................................................. passim

18 U.S.C. §1349 ...................................................................................................... 2

**Federal Rules**

17 C.F.R. § 240.10b-5 ................................................................................... passim

5 C.F.R. § 2635 ............................................................................................... 36, 43

Fed. R. Crim. P 6(e)(7) .......................................................................................... 72

Fed. R. Crim. P. 14(a) ............................................................................................ 26

Fed. R. Crim. P. 52(a) ............................................................................................ 70

Fed. R. Crim. P. 7(c) .............................................................................................. 21

Fed. R. Crim. P. 8(a) ........................................................................................................... 25

Fed. R. Evid. 803(1) ........................................................................................................... 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
:
  UNITED STATES OF AMERICA      :
:
        - v. -            :     S1 17 Cr. 308 (LAK)
:
  DAVID BLASZCZAK,          :
  THEODORE HUBER,         :
  ROBERT OLAN and          :
  CHRISTOPHER WORRALL,     :
:
         Defendants.       :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

**GOVERNMENT'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE INDICTMENT,**
**TO SEVER, FOR *BRADY* MATERIAL, A BILL OF PARTICULARS, DISCOVERY**
**RELATING TO POTENTIAL GRAND JURY LEAKS and TO STRIKE CERTAIN**
**LANGUAGE FROM THE INDCTMENT**

       The Government respectfully submits this memorandum of law in opposition to the

pretrial motions of defendants David Blaszczak, Theodore Huber, Robert Olan, and

Christopher Worrall.  These papers address:  (i) Huber's motion to dismiss the counts in the

Indictment alleging violations of Sections 10(b), 1343, and 1348, for failure to allege a crime;

(ii) Huber's motion to dismiss the counts in the Indictment alleging violations of Sections

641 and 371 as void for vagueness and under the rule of lenity; (iii) Olan's motion to dismiss

count three of the Indictment as defective for purportedly failing to plead a knowledge

element of the crime; (iv) Olan's motion to sever counts seventeen and eighteen of the

Indictment; (v) Olan's motion to compel the Government to review the entire investigative

file of the Securities and Exchange Commission for hypothetical *Brady* materials; (vi)

Blaszczak's motion to dismiss counts seventeen and eighteen of the Indictment for failing to

state an offense; (vii) Blaszczak's motion to strike paragraph 39 of the Indictment as

prejudicial and inflammatory; (ix) Blaszczak's motion for discovery and other relief to

1

address the Government's purported violations of grand jury secrecy rules; and (x) Worrall's motion for a bill of particulars. These motions should be denied.

## I.  Background

On May 24, 2017, a detailed 56-page indictment (the "Indictment") was unsealed, charging David Blaszczak, a political intelligence consultant; Theodore Huber and Robert Olan, two partners and analysts at a healthcare-focused hedge fund based in New York ("Investment Adviser-A"); and Christopher Worrall, a government employee at the Centers for Medicare and Medicaid Services ("CMS"), in eighteen counts.

The Indictment charges two related and overlapping schemes to illegally use and trade on confidential, nonpublic government information.  The first sixteen counts of the Indictment relate to an effort by the defendants, from in or about 2012 through in or about 2014, to obtain material, nonpublic information from CMS and use it for, among other things, executing profitable securities trades at Investment Adviser-A.  For their participation in this scheme, all defendants are charged with (1) conspiracy to convert property of the United States, to commit securities fraud, and to defraud the United States, in violation of 18 U.S.C. § 371 (Count One); (2) conspiracy to commit wire fraud and securities fraud, in violation of 18 U.S.C. §1349 (Count Two); (3) conversion of property of the United States, in violation of 18 U.S.C. § 641 (Count Three); (4) securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff (Counts Four through Eight); (5) wire fraud, in violation of 18 U.S.C. § 1343 (Count Nine); and (6) securities fraud, in violation of 18 U.S.C. § 1348 (Count Ten).  Blaszczak and Worrall are also charged with (7) counts of conversion of property of the United States, in violation of 18 U.S.C. § 641 (Counts Eleven and Thirteen); (8) wire fraud, in violation of 18 U.S.C. § 1343 (Counts Twelve and Fifteen); (9) securities fraud, in violation of 15 U.S.C. § 78j(b) and 78ff (Count Fourteen); and (10) securities fraud, in violation of 18 U.S.C. § 1348 (Count Sixteen).

The final two counts of the Indictment charge Blaszczak with obtaining confidential and nonpublic CMS information about cuts in CMS's reimbursement rates for home health providers, and providing that information to Christopher Plaford, a portfolio manager at a second healthcare-focused hedge fund based in New York ("Investment Adviser-B") over roughly the same time – from at least in or about 2011 through at least in or about September 2013. Plaford used Blaszczak's information to execute profitable trades.[1] For his participation in this scheme, Blaszczak is charged with conspiring to defraud the United States and to convert the property of the United States, in violation of 18 U.S.C. § 371 (Count Seventeen); and conversion of property of the United States, in violation of 18 U.S.C. § 641 (Count Eighteen).

On May 24, 2017, the Government also unsealed a criminal information (the "Information"), charging Jordan Fogel, a former partner and analyst at Investment Adviser-A, for crimes related to his participation in the scheme to obtain confidential and non-public CMS information while he worked at Investment Adviser-A. The Government also unsealed Fogel's guilty plea, which was entered pursuant to a cooperation agreement. *See United States* v. *Fogel*, 17 Cr. 308 (DLC).

**A.** **CMS**

By way of background, CMS is the component of the United States Department of Health and Human Services ("HHS") that administers Medicare and Medicaid. (Ind. ¶2). CMS is also responsible for setting Medicare reimbursement rates for healthcare providers. (Ind. ¶¶ 2, 13). CMS rulemaking decisions, including decisions that affect how

---

[1] Plaford has previously pled guilty to this conduct and is cooperating with the Government. In particular and as is relevant here, Plaford pled guilty to one count of conspiring to defraud the United States and to convert the property of the United States, in violation of 18 U.S.C. § 371, and count of conversion of property of the United States, in violation of 18 U.S.C. § 641, based on the CMS information he received from Blaszczak.

much the federal government will pay to reimburse medical providers for services rendered, have a substantial, market-moving impact on the stock price of publicly-traded companies that depend on government healthcare spending.  (Ind. ¶ 14).  For this reason, CMS typically issues its proposed and final rules after markets close.  (Ind. ¶ 14).

As noted in the Indictment, CMS's Employee Nondisclosure Policy prohibited employees from disclosing "nonpublic, confidential, privileged, or proprietary" information "except as authorized by law." (Ind. ¶ 15).  This policy explained that information learned in the course of CMS employment could be "'market sensitive' information, meaning that its disclosure may have stock or bond market implications."  (Ind. ¶ 15).

### B.    Christopher Worrall

Worrall began working at CMS in or about 1999.  (Ind. ¶ 4).  Beginning in January 2012, Worrall worked in the Director's Office for the Center for Medicare ("CM"), which gave Worrall broad access to CMS's confidential deliberations about upcoming reimbursement decisions.  (Ind. ¶ 4).  Worrall also served as a project manager for a confidential, non-public CMS database that contained CMS's most up-to-date claims data that CMS used to inform its decision-making.  (Ind. ¶ 4).  As an employee of the executive branch of the United States Government, Worrall was prohibited from sharing CMS's confidential information with people outside CMS, and Worrall was subject to Section 21A(h) of the Securities Exchange Act (added by the STOCK Act), which provides, in relevant part, that "each executive branch employee . . . owes a duty arising from a relationship of trust and confidence to the United States Government and the citizens of the United States with respect to material, nonpublic information derived from such person's position."  (Ind. ¶ 15).

### C. David Blaszczak

Blaszczak served as a consultant at a number of Washington, D.C.-based firms that, in exchange for a fee, provided so-called "political intelligence," which included predictions about how changes in Government reimbursement rates would impact publicly-traded companies in the health care space.  (Ind. ¶ 3).  Before becoming a political intelligence consultant, Blaszczak himself worked at CMS, eventually serving as a special assistant to the CMS Administrator.  (Ind. ¶ 3).

Between in or about January 2012 and in or about November 2014, Investment Adviser-A paid more than $263,000 in consulting fees to various firms that employed Blaszczak.  (Ind. ¶ 3).

### D. Investment Adviser-A, Huber, Olan, and Fogel

Investment Adviser-A managed multiple hedge funds specializing in healthcare-related investments.  (Ind. ¶ 1).  As of 2017, Investment Adviser-A had more than $7 billion in assets under management.  (Ind. ¶ 1).  As partners and analysts at Investment Adviser-A, Huber, Olan, and Fogel were tasked with analyzing investment decisions and recommending potentially profitable trades for Investment Adviser-A.  (Ind. ¶ 6).  Investment Adviser-A had a compliance manual, which prohibited its employees from committing insider trading.   (Ind. ¶ 18).  The compliance manual made clear that no Investment Adviser-A employee could "trade, either personally or on behalf of others, including the Funds [managed by Investment Adviser-A], while in possession of material non-public information that is subject to a duty of confidence or communicate such material non-public information to others in violation of the law."  (Ind. ¶ 18).  The compliance manual specifically cautioned that because Investment Adviser-A "conducts extensive fundamental research on the entire healthcare sector in order to develop and implement investment theses[,]" "such research may sometimes result in

[Investment Adviser-A] receiving non-public information about the companies it researches."
(Ind. ¶ 18).

### E.    Investment Adviser-B and Christopher Plaford

Investment Adviser-B also managed various hedge funds specializing in healthcare-related investments.  (Ind. ¶ 97).  Similar to Investment Adviser-A, Investment Adviser-B had a compliance manual, which forbid insider trading, that is, "any employee from trading, either personally or on behalf of others, . . . on material non-public information or communicating material non-public information to others in violation of law."  (Ind. ¶ 98).  Christopher Plaford was a partner and portfolio manager at Investment Adviser-B, and directed Investment Adviser-B's investments in a particular fund focused on investing in debt instruments issued by healthcare companies.  (Ind. ¶¶  97, 99).

### F.    The Scheme to Convert and Use Confidential CMS Information Involving Investment Adviser-A

As alleged in the Indictment, from at least in or about 2012 through in or about 2014, Blaszczak, Worrall, Huber, Olan, Fogel, and others participated in a scheme to convert to their own use confidential and nonpublic information from CMS concerning, among other things, CMS's internal deliberations regarding coverage and reimbursement decisions.  (Ind. ¶ 19).  The indictment alleges that "[a]s HUBER and OLAN knew, these CMS insiders included BLASZCZAK's former colleagues with whom he had close personal relationships, and who were prohibited from disclosing such information to CMS outsiders."  (Ind. ¶ 19).  As part of the scheme, Huber, Olan, and Fogel encouraged Blaszczak to obtain confidential and material nonpublic information from CMS insiders.  (Ind. ¶ 19).  The Indictment recounts a particularly vivid example of Huber, Olan and Fogel encouraging Blaszczak to obtain confidential and non-public CMS information.  (Ind. ¶ 20).  Specifically, in or about March and April 2012, Huber, Olan and Fogel emailed with Blaszczak about getting confidential information from a CMS contractor (the "CMS Contractor") who was working on a CMS

coding initiative that could have affected reimbursement rates for over one hundred medical tests and, in turn, affected the financial prospects of multiple publicly-traded companies. (Ind. ¶ 20).  On or about March 26, 2012, Fogel emailed Blaszczak to ask whether Blaszczak was "likely to get a read from staffers" about the reimbursement rates before they were made public.  (Ind. ¶ 20).  On or about April 27, 2012, Blaszczak wrote an email to Huber, Olan and Fogel to inform them that he had made contact with the CMS Contractor.  Blaszczak said, "The mystery man . . . responds.  Here's my chance. . . ."  (Ind. ¶ 20).  Huber told Blaszczak, "Just tell him your doing god's work." (Ind. ¶ 20).  Fogel chimed in, "That is huge dude . . . don't blow it!  You just turned my frown upside down so let us know if he bites.  [The CMS Contractor] is the man with the keys to these companies' coffins. . . ."  (Ind. ¶ 20).  In a separate email chain, Huber, Olan and Fogel discussed the possibility of Blaszczak's getting inside information from the CMS Contractor.  (Ind. ¶ 20).  Fogel said, "So you guys know, getting a useful input from [the CMS Contractor] would be way bigger than bonanza bananas bazooka in my book."  (Ind. ¶ 20).  Olan responded, "Agd.  I think odds of DB getting shut down by [the CMS Contractor] are 103%."  (Ind. ¶ 20).  To which Fogel replied, "I don't know, he's pretty good w/ this stuff. . . . I'll take the under 103% all day long."  (Ind. ¶ 20).  The CMS Contractor ultimately rejected Blaszczak's attempt to obtain inside information.  (Ind. ¶ 20).  Nonetheless, according to Huber's notes from an in-person meeting at Investor Adviser-A, Blaszczak told Huber and Olan that he still thought he would "get a look" at the reimbursement rates before CMS made the information public.   (Ind. ¶ 20).

The Indictment charges that Blaszczak obtained material, nonpublic information from his close friend and former CMS colleague Worrall and other people.  (Ind. ¶ 21).  Beginning in at least 2012, Worrall began tipping Blaszczak about impending CMS decisions, for at least two reasons.  (Ind. ¶ 21).  First, Blaszczak and Worrall were friends since their time working together at CMS.  (Ind. ¶ 21).  Second, Blaszczak frequently offered to help Worrall

find lucrative private sector employment opportunities, in exchange for Worrall giving Blaszczak confidential government information.  (Ind. ¶ 21).

The Indictment further specifically charges that Blaszczak conveyed the information obtained from Worrall to Huber, Olan, and Fogel, who — knowing that Blaszczak had obtained the information improperly from a CMS insider — used the information to trade.  (Ind. ¶ 21).  In exchange for being provided with this inside information, Huber, Olan, and Fogel caused Investment Adviser-A to pay Blaszczak more than $263,000 in consulting fees.  (Ind. ¶¶ 3, 21).

### 1.     July 6, 2012 Proposed Radiation Oncology Rule

In addition to the incident with the CMS Contractor referenced above, the Indictment also references specific CMS announcements that were also part of this illegal scheme involving Investment Adviser-A.  (Ind. ¶¶ 24-66).  For example, in or around May 2012, Blaszczak improperly obtained confidential and material nonpublic information about CMS's planned radiation oncology reimbursement cuts from Worrall.  (Ind. ¶ 25).  Blaszczak then provided that information to Huber, Olan, and Fogel, who used the information to cause Investment Adviser-A to make profitable trades in public companies that would be adversely affected by the cuts.  (Ind. ¶¶ 26, 27).  Blaszczak continued to provide updates about CMS's internal radiation oncology deliberations throughout May and June 2012, and Investment Adviser-A continued to trade on the confidential information.  Blaszczak emphasized that his radiation oncology tip was non-public and that, because of his relationships with CMS insiders, rival political intelligence consultants were unlikely to have access to similar information.  (Ind. ¶¶ 27-28).  For example, in one email from Blaszczak to Huber, Olan, and Fogel about this tip, Blaszczak stated that the information "is not out there so would not expect [] notes on it."  (Ind. ¶ 28(a)).

In another example in the Indictment, Blaszczak emailed Fogel and contrasted his own significant access to CMS insiders with those of another political intelligence consultant ("Consultant-1").  (Ind. ¶ 28(c)).  Blaszczak said:  "Ive known [Consultant-1] for a long time – he's a good guy and was my associate for awhile but I can say with 100% confidence he doesn't know anyone at cms.  His guesses are just wild random guesses.  I wouldn't read into what he says."  (Ind. ¶ 28(c)).  Fogel replied:  "I agree w all u said." (Ind. ¶ 28(c)).  Fogel then forwarded Blaszczak's dismissal of Consultant-1 to Huber and Olan and said, "Such has been my contention about [Consultant-1]." (Ind. ¶ 28(c)).  When CMS ultimately announced the cuts in a proposed rule, Investment Adviser-A made approximately $1.85 million in trading profits.  (Ind. ¶ 38).

Certain CMS staff members learned that Blaszczak had correctly reported the cuts in the proposed rule before they were publicly announced.  (Ind. ¶ 39).  One CMS staff member remarked, "Where does he get his information from?  It is pretty unbelievable and will probably blow up at some point."  (Ind. ¶ 39).  A second CMS staff member responded, "Don't know but it is obviously someone with access to our impact papers.  I just can't see the motivation for sharing this information.  I would doubt someone is trading based on it as [it] would be both a crime and require lying on financial disclosure reports which does not seem worth the risk." (Ind. ¶ 39).

### 2.  July 1, 2013 Kidney Dialysis Preliminary Rule

On or about July 1, 2013, after markets closed, CMS announced in a preliminary rule that it planned to cut the reimbursement rate for various kidney dialysis treatments, services, and drugs (known as the "base rate") by 12%.  (Ind. ¶ 41).  Before this announcement, in around March 2013, Worrall gave Blaszczak two confidential, internal CMS documents related to CMS's kidney dialysis rule.  (Ind. ¶ 47).  One of the documents contained a

warning that the slides were "for internal government use only" and that "[u]nauthorized disclosure may result in prosecution to the full extent of the law." (Ind. ¶ 47).

On or about June 14, 2013, Blaszczak and Worrall attended a baseball game together. (Ind. ¶ 53). Four days later, on or about June 18, 2013, Blaszczak forwarded Fogel his kidney dialysis prediction and explained that he was "much higher than others on a cut." (Ind. ¶ 53). Fogel asked, "How high? 4-5%?" (Ind. ¶ 53). Blaszczak replied, "12% total but phased in over 3 years 50/25/25." (Ind. ¶ 53). That prediction mirrored CMS's internal proposal for the proposed kidney dialysis rule, which was confidential. (Ind. ¶ 53).

On or about June 25, 2013, Fogel checked in with Blaszczak on the proposed kidney dialysis rule. (Ind. ¶ 54). Blaszczak reported, "No change in my numbers. I am pretty confident." (Ind. ¶ 54). Minutes later, Investment Adviser-A entered orders to short the stock of a company that would be hurt by such a significant kidney dialysis reimbursement reduction. (Ind. ¶ 54). After the reimbursement rate of 12% was announced, Investment Adviser-A made more than $865,000 in trading profits. (Ind. ¶ 59).[2]

### G.    The Scheme to Convert and Use Confidential CMS Information Involving Investment Adviser-B (Counts Seventeen and Eighteen)

As alleged in the Indictment, from at least in or about 2011, through at least in or about September 2013, Blaszczak, Plaford, and others participated in a scheme to obtain and convert to their own use material non-public information from CMS concerning, among other things, internal deliberations and upcoming actions of CMS regarding the reimbursement for and coverage of certain products and services. (Ind. ¶ 100). The Indictment alleges that Plaford got this information from Blaszczak and used it to direct a series of securities trades, understanding that the information had come from CMS insiders. (Ind. ¶¶ 100, 101). As an

---

[2]    Counts Eleven and Twelve relate to Worrall providing Blaszczak confidential CMS data relevant to the public company NxStage, for the ultimate purpose of executing securities transactions in NxStage stock. (*See* Ind. ¶¶ 84-87).

example of this scheme and the basis for the substantive charge under 18 U.S.C. § 641, the

Indictment alleges that Blaszczak provided multiples hedge fund clients, including

Investment Adviser-A and Investment Adviser-B, with a prediction that CMS would rebase

its coverage of the home health industry, with cuts between 3.25% and 3.5%. (Ind. ¶ 101).

The Indictment notes that Blaszczak specifically conveyed this tip to Plaford in at least one

phone conversation, which Plaford used to trade profitably.[3] (Ind. ¶ 101).

### H. Discovery

On May 24, 2017, Blaszczak was arrested and presented in the District of South

Carolina; Huber and Olan were arrested and presented in this District; and Worrall was

arrested and presented in the District of Maryland. Blaszczak, Huber, Olan, and Worrall

were arraigned on May 31, 2017 before the Honorable Denise L. Cote, and had an initial

conference on June 12, 2016 before this Court, to whom the case was reassigned. The

Government has since produced Rule 16 discovery, which has been detailed and voluminous.

The Government has produced close to ten million documents, the overwhelming majority of

which are electronically searchable. To aid the defendants in reviewing the discovery, the

Government has also provided defense counsel an itemized discovery index. To the extent

that defense counsel raised any issues with the production, the Government has remedied

those issues as quickly as possible including, among other things, providing a technical

overlay to address issues related to searching certain documents and ensuring that

attachments were properly connected to their parent documents in the database. Additionally,

---

[3]     The Indictment incorrectly states that Plaford used this information to trade in DeVita securities. In fact, Plaford traded in two different securities – Amedisys and Gentiva. The Government has notified all defense counsel of this error in the Indictment and directed defense counsel to the discovery produced reflecting Plaford's trades in Amedisys and Gentiva. The Government has also agreed to provide a summary of these trades to defense counsel. The Government will remedy this typographical error in the Indictment substantially before trial.

at the defendants' request, the Government, and as a courtesy, provided the defendants with certain documents underlying the indictment (including for example, the "two confidential, internal documents related to CMS's kidney dialysis rule" underlying ¶47 of the Indictment, among others). Additionally, on or about October 20, 2017, the Government informed the defendants that, with respect to the request to review the SEC's files for *Brady* material, it would voluntarily agree to review any interview notes or testimony taken in connection with this investigation that is in the possession of the SEC.

## II.    Argument

### A.   None of the Counts in the Indictment Should be Dismissed.

The defendants' motions to dismiss certain counts in the Indictment for failure to allege crimes pursuant to either Title 15, United States Code, Section 78j(b), or Title 18, United States Code, Sections 371, 641, 1343, or 1348, should be dismissed as frivolous.[4] The Indictment here amply alleges all that must be alleged to satisfy Federal Rule of Criminal Procedure 7 and the underlying constitutional principles it was designed to protect.

#### 1.    Applicable Law

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *United States* v. *Vilar*, 729 F.3d 62,80 (2d Cir.)  (quoting Rule 7(c) (alterations omitted)).  To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the

---

[4]    Huber, joined by defendant Olan, moves to dismiss the counts in the Indictment alleging violations of Title 15, United States Code, Section 78j(b), or Title 18, United States Code, Sections 1343, or 1348.  Defendants Olan, Worrall and Blaszczak join Huber's motion to dismiss the counts in the Indictment alleging violations of Title 18, United States Code, Sections 641 and 371; all of the defendants join Olan's motion to dismiss Count Three of the Indictment; and defendant Olan joins Blaszczak's motion to dismiss Counts Seventeen and Eighteen of the Indictment.

alleged crime." *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted). Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, that heightened standard is limited to "very rare cases," such as those involving refusal to answer questions before Congress, in which "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States* v. *Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell* v. *United States*, 369 U.S. 749 (1962)).

Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)); *see also United States* v. *Yannotti*, 541 F.3d at 127.

Even in cases involving very bare-bones charges, courts will not dismiss the indictment absent a showing of prejudice. *Stringer*, 730 F.3d at 124. Where a defendant has been given sufficient notice of the charges against him by means of, for example, a criminal complaint or discovery, prejudice will not have been shown, and the indictment should stand. *See, e.g.*, *id.* at 124-25; *Yannotti*, 541 F.3d at 127.

Moreover, it is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *See United States* v. *Williams*, 540 U.S. 36, 54 (1992). A defendant's arguments about the sufficiency of the evidence should be raised at trial and not in a motion to dismiss. *United States* v. *Tochelmann*, No. 98 CR 1276 (JFK), 1999 WL 294992, at *2 (S.D.N.Y. May 11, 1999).

### 2. Discussion

First, Defendant Huber, joined by Olan, moves to dismiss Counts One, Two, and Four

through Ten of the Indictment for failure to allege a crime, purportedly because the Indictment does not allege that Huber "knew the source of Mr. Blaszczak's information relating to the radiation oncology rule...[n]or does it allege that [Huber] had any knowledge of Blaszczak's relationship with that source," arguing instead that "the Indictment alleges only that that Mr. Huber traded on CMS information that he knew was not widely shared." (Huber Mot. at 7). Huber is wrong—not only on what the law requires, but on what is actually alleged in the Indictment.

The Indictment in this case not only tracks the language of the applicable statutes and rules, but also specifically alleges that "Blaszczak conveyed information obtained from Worrall to Theodore Huber and Robert Olan, the defendants, Jordan Fogel and others, who, *knowing that Blaszczak had obtained the information improperly from a CMS insider in breach of a duty*, used the information, in whole or in part, to cause Investment Adviser-A to purchase and sell securities." (Ind. ¶ 21, emphasis added). In the very next paragraph, the indictment describes the close friendship that existed between Blaszczak and Worrall (which had also been noted in paragraph 21), and details certain examples of the private-sector employment and other business opportunities that Worrall and Blaszczak discussed during the pendency of the conspiracy. (Ind. ¶ 22). The Indictment also specifically alleges that Huber, Olan, and Fogel encouraged Blaszczak "to obtain confidential and material non-public information from CMS insiders" and that, "[a]s Huber and Olan knew, these CMS insiders included Blaszczak's former colleagues with whom he had close personal relationships, and who were prohibited from disclosing such information to CMS outsiders." (Ind. ¶ 20, 19).

> (1) The Indictment Properly Alleges Insider Trading in Violation of Section 10(b) (Counts One and Four through Eight)

Count One and Counts Four through Eight of the Indictment charge Huber and his co-defendants with various violations of Section 10(b) of the Exchange Act and Rule 10b-5.

Section 10(b) makes it a crime to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 in turn provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Although the Indictment alleges that Huber and his co-defendants' conduct violated all three prongs of Rule 10b-5, "[t]he three prongs are disjunctive, however, such that the government can obtain a conviction by proving any one of them." *United States* v. *Bongiorno*, 05-cr-390, 2006 WL 1140864, at *5 (S.D.N.Y. May 1, 2006).

Huber makes essentially one argument with respect to these counts. Relying on the Second Circuit's decision in *United States* v. *Newman*, 773 F.3d 438 (2d Cir. 2014), he (somewhat inexplicably) argues that these counts must be dismissed because "the Indictment does not allege that Mr. Huber knew that the CMS insider(s) who purportedly disclosed confidential information to Mr. Blaszczak did so for personal benefit." (Huber Mot. at 7).

Even assuming *arguendo* that the Government was required to do more than track the statutory language, and to instead explicitly recite the elements of the crime as they appear in the case law (which it is not, *see, e.g.*, *United States* v. *Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810, at *3 (S.D.N.Y. Nov. 14, 2007) (holding that indictment tracking language of Section 10(b) and Rule 10b-5 in insider trading case sufficed)),[5] the defendants' accusation that the indictment failed to do so here is incorrect.

First, with respect to the personal benefit requirement, a tipper in an insider trading case does not breach a fiduciary duty unless his disclosure of material non-public information was for personal benefit. *See Newman*, 773 F.3d at 447-48 ("*Dirks* counsels us that the exchange of confidential information for personal benefit is not separate from an insider's fiduciary breach; it *is* the fiduciary breach that triggers liability for securities fraud under Rule 10b–5. For purposes of insider trading liability, the insider's disclosure of confidential information, standing alone, is not a breach."). Likewise, in order for a tippee to be held liable—be it under a classical or misappropriation theory of liability—the tippee must have knowledge of that personal benefit. *Id.* at 450. Accordingly, the Indictment's allegation that (i) Worrall disclosed to Blaszczak material non-public information "in breach of a duty" and (ii) that Huber and Olan knew "that Blaszczak had obtained the information improperly from a CMS insider in breach of a duty," necessarily entails an allegation that Huber was aware that that the insider in this case acted for personal benefit—both facts the Government of course plans to prove at trial.

Those allegations are then fleshed out by the Indictment's particulars referencing Blaszczak and Worrall's close friendship, the business ventures they discussed, as well as

---

[5]     Indeed, the defendant lists in his motion the myriad of cases in this District (and others) "holding that knowledge of the benefit is a 'sub-element' that need not be pleaded in the Indictment." (Huber Mot. at 12).

Huber and Olan's knowledge that Blaszczak was receiving material, non-public information from CMS insiders—including his former colleagues, as Huber and Olan well knew—with whom he had a close, personal relationship. As the Supreme Court has instructed, the personal benefit element is satisfied "*when an insider makes a gift of confidential information to a trading relative or friend.*'" *Salman* v. *United States*, 580 U.S. __, Slip. Op. at 9 (emphasis in original) (quoting *Dirks* v. *S.E.C.*, 463 U.S. 646, 664 (1983)). The Court further held that, "[t]o the extent the Second Circuit [in *Newman*] held that the tipper must also receive something of a 'pecuniary or similarly valuable nature' in exchange for a gift to family or friends," that "requirement is inconsistent with *Dirks*." *Id*. at 10. Thus the allegations in the Indictment go beyond what is required to allege a crime was committed under Section 10(b), and dismissal is patently inappropriate here.

Finally, to the extent that Huber's attack on the sufficiency of the Indictment's allegations—with regard to each of the counts he seeks to dismiss—is really an attack on the sufficiency of the evidence related to knowledge of the benefit (*see* Huber Mot. at 7-20), it has no place in these motions. Sufficiency of the evidence is a matter for trial, not for pretrial litigation. *See, e.g.*, *United States* v. *Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

> (2) The Indictment Properly Alleges Wire Fraud in Violation of Section 1343 (Counts One and Nine)

Next, Huber suggests that the Government's "failure to allege knowledge of the benefit to Mr. Worrall or any other CMS insider dooms not only the Counts alleging violations of Section 10(b), but the Counts alleging a violation of, or conspiracy to violate, Section 1343 as well." (Huber Mot. at 14). In other words, Huber makes the same argument for dismissal of the Section 1343 counts that he made in connection with his motion to dismiss the counts alleging a violation of Section 10(b)—and it fails for the same reasons.

The wire fraud statute proscribes the use of wire communications in interstate or foreign commerce "in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.'" *Fountain* v. *United States*, 357 F.3d 250, 255 (2d Cir. 2004) (quoting 18 U.S.C. § 1343). The Court of Appeals has summarized the "essential elements" of wire fraud as: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the ... wires to further the scheme." *Id.* at 255 (internal quotation marks and brackets omitted). Huber avers that the Indictment does not allege a "fraudulent scheme" because, by purportedly failing to alleged Huber's knowledge of the benefit, the Indictment does not assert that Huber "'engage[d] in or attempt[ed] to engage in a pattern or course of conduct designed to deceive.'" (Huber Mot. at 16, quoting *United States* v. *Ragosta*, 970 F.2d 1085, 1089 (2d. Cir. 1992)). This argument is addressed in detail above. To recap, the "sufficiency of the [G]ovemment's evidence of ... fraudulent intent is not considered on a motion to dismiss," and the Indictment suffices if it "track[s] the language of the statute alleged to have been violated," and alleges a deceptive scheme from which the Court can infer fraudulent intent. *See*, *e.g.*, *United States* v. *Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (rejecting argument that indictment failed to allege "intended harm," and thus the fraudulent intent element of the offense, because "the sufficiency of the government's evidence of . . . fraudulent intent is not considered on a motion to dismiss the indictment").

Counts One and Nine of the Indictment clearly allege that Huber and his co-conspirators "willfully and knowingly" made or caused to be made wire transmissions for the purpose of executing the alleged scheme to defraud. (Ind. ¶¶ 74,91). With respect to Count Nine, specifically, Huber and his co-conspirators are alleged to have "schemed to defraud CMS of confidential information related to CMS's proposed radiation oncology rule by improperly obtaining that information through deceptive means and then converting that

information to their own use, using cellular telephones and e-mail communications, for the purpose of executing securities transactions in Varian and Elekta stock." (Ind. ¶91). These allegations—especially when coupled with the more broadly applicable allegations of intent to deceive (which are incorporated into Counts One and Nine by reference)—are sufficient to state fraudulent intent. And, in any event, such intent is readily inferable from the nature of the alleged scheme. *See, e.g., Martin*, 411 F. Supp. 2d at 373 (inferring fraudulent intent with regard to wire fraud count from nature of purported scheme). Further, to the extent that Huber's arguments are more properly construed as a challenge to the quality and quantity of Government's anticipated evidence at trial, that challenge is not proper in a motion to dismiss. *See United States* v. *Corbin*, 729 F. Supp. 2d 607, 611 (S.D.N.Y. 2010) ("fact questions raised by an Indictment are the province of the jury") (internal quotation marks omitted) (*citing United States* v. *Pirro*, 96 F. Supp. 2d 279, 283 (S.D.N.Y. 1999)).

(3) The Indictment Properly Alleges Securities Fraud in Violation of Section 1348 (Counts Two and Ten)

Huber recycles his argument about failure to allege knowledge of the benefit a third time in his motion to dismiss Counts Two and Ten of the Indictment, which allege violations of Section 1348. (Huber Mot. at 17-20). Unsurprisingly, it is just as meritless the third time.

18 U.S.C. § 1348 makes it a crime to, in pertinent part, "knowingly execute [ ], or attempt[ ] to execute, a scheme or artifice" to:

(1) "defraud any person in connection with" the securities of a publicly traded company; or

(2) "obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of" the securities of a publicly traded company.

As with Rule 10b-5, the Government "need only prove a violation of subsection (1) or subsection (2), but not both for there to be a violation of Section 1348." *United States* v.

19

*Mahaffy,* No. 5 Cr. 613, 2006 WL 2224518, at *11 (E.D.N.Y. Aug. 2, 2006). "In order to prove a violation of 18 U.S.C. 1348, the Government must show: (1) fraudulent intent; (2) a scheme or artifice to defraud; and (3) a nexus with a security." *United States* v. *Motz*, 652 F. Supp. 2d 284, 295 (E.D.N.Y. 2009). Huber prematurely seeks a ruling that the sub-elements of a 10b-5 insider trading charge are also requisite sub-elements of a Section 1348 charge. As Huber acknowledges, however, at least two district court judges have expressly rejected this contention. *See United States* v. *Slawson*, No. 1:14 CR-00186-RWS-JFK, 2014 WL 5804191 (N.D. Ga. Nov. 7, 2014), report and recommendation adopted 2014 WL 6990307 (N.D. Ga. Dec. 10, 2014); and *United States* v. *Melvin*, No. 3:14-Cr-00022-TCB-RGV, 2015 WL 7116737, at *2 (N.D. Ga. May 27,2015), report and recommendation adopted, 143 F. Supp. 3d 1354, (N.D. Ga. Nov. 10, 2015).

The parties and the Court, however, need not grapple with this issue in the context of a motion to dismiss the indictment, and can more appropriately address this issue in the context of crafting the jury instructions at trial. Regardless of the contours of the sub-elements of Section 1348 offense, the Indictment adequately pleads a violation of Section 1348. Indeed, even assuming arguendo that Huber is correct regarding the need to ultimately prove a benefit and knowledge of such benefit under Section 1348, the count is adequately alleged for the reasons set forth above with respect to the 10(b) and 1343 charges. The Indictment in this case clearly lays out the contours of the fraudulent scheme perpetrated by Huber and his co-conspirators, and the deception in which they engaged. Nothing more is required, and Huber's motion should be dismissed as meritless.

<blockquote>(4)    The Indictment Properly Alleges Theft of Government Property in Violation of Section 641 (Count Three)</blockquote>

Next, defendant Olan contends that Count Three of the Indictment is defective because it does not properly allege that he knew the information he and the other defendants received was stolen from the government. (Olan Mot. at. 1-2). He is wrong. Count Three

clearly alleges that Olan and his co-defendants had the requisite intent, by tracking the statutory language in 18 U.S.C. § 641, and providing additional information (indeed, much more than is required) about the defendants' guilty knowledge that they received stolen or converted property in the form of confidential CMS information. Accordingly, Count Three should not be dismissed.

The 56-page Indictment in this case is replete with facts and references to the defendants' knowledge that the information they received from CMS was stolen or converted. First, Count Three itself contains this exact language about the defendants' knowledge. (Ind. ¶ 77). Specifically, Count Three alleges that, from at least in or about May 2012, through July 2012, all the defendants in this case:

> . . . knowingly embezzled, stole, purloined, and converted to their use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, CMS, the value of which exceeded the sum of $1,000, and received, concealed, and retained the same with intent to convert it to their use and gain, *knowing it to have been embezzled, stolen, purloined, and converted*, to wit, BLASZCZAK, HUBER and OLAN received from WORRALL and others confidential CMS information about CMS's proposed radiation oncology rule, which BLASZCZAK, HUBER and OLAN knew had been obtained from CMS, and which HUBER, OLAN and others used, in whole or part, to cause Investment Adviser-A to purchase and sell securities.

(Ind. ¶ 77) (emphasis added).

This tracks the statutory language in 18 U.S.C. § 641, and, in particular, clearly alleges in many places throughout the count that the defendants "knew" the property they received was stolen or converted from CMS. In suggesting that more is required, Olan ignores well-established law, set out above, that "'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged,'" *Vilar*, 729 F.3d at 80 (quoting Fed. R. Crim. P. 7(c) (alterations omitted)), and "need do little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Yannotti*, 541 F.3d at 127.

Further, even though it is not required, Count Three provides (by incorporation) more detail about how the defendants knew the information was stolen or converted when they received it. (*See* Ind. ¶ 76). For example, Count Three incorporates the email exchange involving Blaszczak, Fogel, Huber, and Olan, in which they are trying to coax a CMS contractor into giving them confidential government information. During this exchange, Olan responded, "Agd. I think odds of DB getting shut down by [the CMS Contractor] are 103%." (Ind. ¶ 20). The clear implication from Olan's statement referenced in the Indictment is that Olan believed Blaszczak would get "shut down" because the information Blaszczak was attempting to obtain was confidential, non-public CMS information. Other parts of the Indictment are just as explicit about the defendants' guilty knowledge. In one email from Blaszczak to Huber, Olan, and Fogel about the radiation oncology rule, Blaszczak stated that the information "is not out there so would not expect [] notes on it" – the implication being that if the information "is not out there," it is confidential and non-public. (Ind. ¶ 28(a)). Thus, the indictment is explicit throughout in alleging the defendants' knowledge that the confidential information was improperly obtained, leaving no ambiguity that the grand jury found the requisite intent.[6]

> (5) The Indictment Properly Alleges Violations of Sections 371 and 641 (Counts Seventeen and Eighteen)

Blaszczak also contends that Counts Seventeen and Eighteen in the Indictment fail to state offenses. (Blaszczak Mot. at 9). He is wrong. The Indictment provides specific details about the scheme Blaszczak participated in to violate Title 18, United States Code, Sections

---

[6] Olan's reliance on a number of cases involving the possession of stolen bank funds is therefore misplaced. (Olan Mot. at 4). In those cases, courts found that the Government failed to alleged knowledge of the stolen property. *See, e.g., United States* v. *Fistel*, 460 F.2d 157, 160 (2d Cir. 1972) (noting that indictment was "defective in omitting the essential element of 'intent to steal or purloin' required to state an offense . . ."). That is not the case here. As noted above, the Indictment expressly charges the defendants with knowing the property was stolen from CMS.

371 and 641, and the Indictment tracks the language of these statutes. Nothing more is required.

As previously noted, as to Count Seventeen and Eighteen, the Indictment alleges that, from at least in or about 2011 through at least in or about September 2013, Blaszczak, Plaford, and others participated in a scheme to obtain and convert to their own use material non-public information from CMS concerning, among other things, internal deliberations and upcoming actions of CMS regarding the reimbursement for and coverage of certain products and services. (Ind. ¶ 100). The Indictment on these counts incorporates by reference paragraphs 2 and 3 of the indictment (describing CMS and Blaszczak, respectively), and paragraphs 12 through 17, which describe, among other things, CMS's rulemaking process, confidentiality policies, and prohibitions against insider trading. (*See* Ind. ¶¶ 13-15).

The Indictment alleges that Plaford received this confidential CMS information from Blaszczak and used it to direct a series of securities trades. (Ind. ¶ 100). As an example of this scheme and the basis for the substantive charge under 18 U.S.C. § 641 (Count Eighteen), the Indictment alleges that Blaszczak provided multiple hedge fund clients, including Investment Adviser-A and Investment Adviser-B, with a prediction that CMS would rebase its coverage of the home health industry, with cuts between 3.25% and 3.5%. (Ind. ¶ 101). The Indictment notes that Blaszczak specifically conveyed this tip to Plaford in at least one phone conversation in or about June 2013, which Plaford used to trade profitably. (Ind. ¶¶ 101, 105(a)).

Contrary to Blaszczak's claims, Blaszczak is not charged in Counts Seventeen and Eighteen with merely "receiving and disseminating information from CMS employees." (Blaszczak Mot. at 11). Rather, in these counts, the Indictment alleges that the scheme involved the improper receipt and conversion of "material non-public information from CMS." (Ind. ¶ 100). Count Seventeen and Eighteen charge that Blaszczak knew this CMS

information was "embezzled, stolen, purloined and converted," satisfying the intent element of 18 U.S.C. § 614. (Ind. ¶¶ 103, 107).

As to Blaszczak's liability under 18 U.S.C. § 371, the Indictment charges that Blaszczak "willfully and knowingly" used deceit, craft, trickery and dishonest means to defraud the United States and CMS, an agency of the United States Government. (Ind. ¶ 104). The "to wit" clause further specifies that Blaszczak's conduct violated Section 371, "by obtaining confidential CMS information that was disclosed to BLASZCZAK by a CMS employee in violation of CMS's prohibition on disclosing non-public information, thereby impeding, impairing, defeating and obstructing the lawful function of the agency . . ." (Ind. ¶ 104).

Thus, the Indictment provides Blaszczak with detailed information about where, where, and how he committed the crimes charged in Count Seventeen and Eighteen. The indictment alleges the intent requirements for both statutes, making it clear that the Government alleges that Blaszczak knew his disclosure of CMS information to Plaford during the timeframe charged was unauthorized and criminal. Any claims by Blaszczak that he was authorized to make such disclosures, or did not obtain the information from CMS insiders are trial defenses and issues for the jury to decide. According, Blaszczak's motion to dismiss Counts Seventeen and Eighteen should be denied.[7]

_____

[7] In the alternative, Blaszczak contends, among other things, that he is entitled to a bill of particulars with respect to Counts Seventeen and Eighteen. (Blaszczak Mot. at 15-16). As noted above, the Indictment provides Blaszczak with more than enough specifics for him to defend himself at trial. In addition, the Government has produced an enormous amount of discovery in this case, which provides even greater specifics. In particular, the Government has directed Blaszczak to Christopher Plaford's trading records covering the relevant trades based on Blaszczak's tips to Plaford about the home health cuts. The Government has also agreed to provide a further summary of these trades to Blaszczak.

## B.  Counts Seventeen and Eighteen Should Not Be Severed

Olan contends that Counts Seventeen and Eighteen should be severed from the trial in this matter because these counts encompass a separate and distinct scheme.[8] (Olan Mot. at 23-26).  Severance is not proper here, given that Counts Seventeen and Eighteen are part of the same common effort by Blaszczak - during the same time period charged in the other counts of the Indictment - to obtain confidential, non-public information from CMS, and use that information to execute profitable trades.

### 1.  Applicable law

Rule 8(a) provides that two or more offenses may be joined in a single indictment,

> if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a).  Accordingly, Rule 8(a) permits joinder of offenses against a single defendant in three circumstances: "when they are (1) 'based on the same act or transaction,' or (2) based 'on two or more acts or transactions connected together or constituting parts of a common scheme or plan,' or (3) 'of the same or similar character.'"  *United States* v. *Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988) (quoting Fed. R. Crim. P. 8(a)).  "Each of these tests for when offenses may be tried together reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused."  *Id.*

Rule 8(a) does not require "too precise an identity between the character of the offenses."  *United States* v. *Werner*, 620 F.2d 922, 926 (2d Cir. 1980).  Indeed, for purposes of Rule 8(a), "'[s]imilar' charges include those that are 'somewhat alike,' or those 'having a general likeness' to each other."  *United States* v. *Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) (quoting *United States* v. *Werner*, 620 F.2d at 926)).  Multiple distinct counts "warrant

---

[8]      All of the defendants join in this motion.

joinder in a single trial" when they have "sufficient logical connection" to one another, *United States* v. *Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990), or where "the same evidence may be used to prove each count," *United States* v. *Blakney*, 941 F.2d 114, 116 (2d Cir. 1991). "For purposes of analysis under Rule 8(a)," however, "no one characteristic is always sufficient to establish 'similarity' of offenses, and each case depends largely on its own facts." *United States* v. *Blakney*, 941 F.2d at 116 (internal quotations and citations omitted). In making this determination, the Court may consider allegations in the indictment, the Government's pretrial representations of the evidence that will be presented at trial, as well as the proof at trial. *See United States* v. *Ajlouny*, 629 F.2d 830, 842 (2d Cir. 1980).

"There is a preference in the federal system for joint trials of defendants who are indicted together," because joint trials promote efficiency and the interests of justice, by, among other means, avoiding inconsistent verdicts. *Zafiro* v. *United States*, 506 U.S. 534, 537 (1993); *see United States* v. *Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003). This presumption "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States* v. *Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).

A defendant may be severed for trial separately from his co-defendants, but only where joinder causes prejudice or "justice requires" otherwise. Fed. R. Crim. P. 14(a). Severance should be granted under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro* v. *United States*, 506 U.S. at 539. Severance may be warranted, for example, where certain evidence is admissible against only some defendants, but "[e]vidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial." *United States* v.

*Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). In practice, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *Id.*

The denial of a severance motion is reviewed for abuse of discretion. *United States* v. *Page*, 657 F.3d 126, 129 (2d Cir. 2011). Indeed, "in seeking to overturn the denial of a Rule 14 motion, the defendant bears a heavy burden," *United States* v. *Rittweger*, 524 F.3d 171 (2d Cir. 2008), because a district court's discretion in that regard is "virtually unreviewable," *United States* v. *Salameh*, 152 F.3d at 115.

### 2. Discussion

The schemes involving Investment Adviser-A and Investment Adviser-B are part of a common effort to unlawfully obtain CMS information and use that information to profit. There are numerous overlapping features of the schemes. First, both schemes concern the same defendant, Blaszczak, and charge that he improperly obtained CMS information regarding reimbursement rates and passed that information to hedge fund managers. The nature of the information Blaszczak obtained (reimbursement rates) is the same, as is the object of Blaszczak obtaining this information - so that he can convey it to his clients in the financial sector to trade.

The schemes are also alleged to have taken place during an overlapping time-frame. The Indictment charges that the scheme involving Investment Adviser-A occurred from at least in or about 2012 through at least in or about 2014. (Ind. ¶ 9). The scheme involving Investment Adviser-B is alleged to have occurred from in or about 2011 through at least in or about September 2013. (Ind. ¶ 100). *See United States* v. *Garrett*, 648 F.3d 618, 625 (8th Cir. 2011) (noting, in holding that two gun possession counts were properly joined, that "the offenses, occurring approximately fifteen months apart, took place over a relatively short period of time").

The Government's proof on both of these schemes will also overlap significantly, involving evidence of CMS's policies and prohibition on disclosing non-public information. Witnesses from CMS will testify to information and procedures relevant to all counts in the Indictment. Blaszczak's statements and acts, some which are noted in the Indictment, will also be relevant to both of these schemes. While there is, of course, not perfect synchronicity, the counts in the Indictment are unified by a number of common facts and participants. *See Rittweger*, 524 F.3d at 177 (holding that "joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme") (internal citations omitted)).

In opposition to Second Circuit authority favoring joinder under circumstances similar to those in this case, Olan relies on one of the Court's previous decisions, which is inapplicable here. In *United States* v. *Kouzmine,* 921 F. Supp. 1131, 1133 (S.D.N.Y.1996), this Court held that the joinder of two distinct conspiracies was improper where the defendants had had a "falling out" among themselves such that there was "no colorable argument" that the two conspiracies "were part of a single overarching scheme." Here, in contrast, there is no clean break between the two schemes. The schemes occurred at the same time, had the same object, and both included Blaszczak. Unlike in *Kouzmine*, there is a charged common purpose throughout the Indictment to which every defendant was committed: stealing confidential, non-public CMS information for financial gain. *See United States* v. *Tuzman*, S8 15 Cr. 536 (PGG), 2017 WL 4785459, at *4-6 (S.D.N.Y. Oct. 19, 2017) (holding that financial fraud schemes that occurred at two different companies were "premised on a common scheme or plan" and properly joined under Rule 8(b)).

Finally, the defendants have not even attempted to demonstrate how joinder of Counts Seventeen and Eighteen prejudices them. Joinder of these counts certainly does not prejudice Blaszczak, as evidence of both schemes would be admissible at separate trials against him.

Any potential prejudice to the other defendants could be addressed through a limiting instruction. *See United States* v. *Page*, 657 F.3d 126, 130 (2d Cir. 2010) ("Rule 14 leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion. . . . Accordingly, less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice and permit joinder.") (internal citation and quotation omitted)).  Therefore, the motion to sever Counts Seventeen and Eighteen should be denied.


### C.     The Court Should Deny the Motion to Strike Paragraph 39 of the Indictment

Blaszczak moves to strike Paragraph 39 of the Indictment.[9]  Paragraph 39 of the Indictment relates to the July 6, 2012 proposed radiation oncology rule, the contents of which Blaszczak illegally obtained from Worrall and passed on to Huber, Olan, and Fogel, who traded on this information.  As stated in paragraph 39 of the Indictment, after CMS announced the proposed rule, certain CMS staff members learned that Blaszczak had correctly reported the cuts in the proposed rule before they were publicly announced.  (Ind. ¶ 39).  One CMS staff member remarked, "Where does he get his information from?  It is pretty unbelievable and will probably blow up at some point."  (Ind. ¶ 39).  A second CMS staff member responded, "Don't know but it is obviously someone with access to our impact papers.  I just can't see the motivation for sharing this information.  I would doubt someone is trading based on it as [it] would be both a crime and require lying on financial disclosure reports which does not seem worth the risk." (Ind. ¶ 39).  Because this paragraph is relevant to multiple charges in the Indictment to prove that the information Blaszczak obtained about the radiation oncology rule was actually confidential and considered as such by CMS, Blaszczak's motion should be denied.

---

[9]     All of the defendants join in this motion.

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, it has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States* v. *Bin Laden*, 91 F. Supp. 2d. 600, 621 (S.D.N.Y. 2000) (internal quotation marks, citation, and brackets omitted); *see also United States* v. *Gotti*, 42 F. Supp. 2d 252, 292 (S.D.N.Y. 1999) ("Because the standard for surplusage is exacting, only rarely is alleged surplusage stricken from an indictment."). Indeed, "[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States* v. *Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001) (internal quotation marks omitted) (citing *United States* v. *Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990). Moreover, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *United States* v. *Mostafa*, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013). "[I]f it should be appropriate to give a copy of the indictment to the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial." *United States* v. *Butler*, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004). Because a district court has "wide discretion" in determining whether to strike allegedly prejudicial surplusage, its decision is reviewed under a deferential abuse of discretion standard." *See United States* v. *Courtney*, 257 F.2d 944, 947 (2d Cir. 1958) ("[T]he trial court is allowed wide discretion in coping with such motions.").

There is no doubt that paragraph 39 of the Indictment is relevant. That CMS insiders believed that the information Blaszczak obtained was confidential is evidence that the information was in fact confidential and non-public – an issue that goes to the heart of the charges here. Blaszczak merely speculates that the CMS staff members have no personal knowledge of the facts surrounding CMS's announcement. (*See* Blaszczak Mot. at 39). In

fact, the statements quoted and the balance of the Indictment state just the opposite, when noting that these staff members "worked on the proposed radiation oncology rule." (Ind. ¶ 39). It is precisely because of their knowledge of the proposed radiation oncology rule that these CMS staffers were able to conclude that Blaszczak should not have had that information before it was publicly announced. The statements in paragraph 39 were also made days after the radiation oncology rule was made public, during the timeframe of the crimes charged in Counts One through Ten.

In addition, it is also mere speculation by Blaszczak that these statements constitute hearsay. The statements could be admissible as present sense impressions, for example, depending on the testimony admitted at trial. *See* Fed. R. Evid. 803(1). It would therefore be premature to rule these statements inadmissible and Blaszczak's evidentiary musings at this stage should not support a motion to strike.

Finally, the statements in paragraph 39 are no more prejudicial than the other paragraphs in the Indictment related to the illegal activity surrounding the proposed radiation oncology rule. The Indictment charges that Blaszczak committed numerous crimes by providing Huber, Olan and Fogel with confidential, non-public information from CMS about the proposed radiation oncology rule. Like the other paragraphs, paragraph 39 also supports these allegations.

### D. The Counts Alleging Violations of Sections 641 and 371 are Constitutional

Huber contends that all the counts in the Indictment charging violations of Section 641 and Section 371 with an object of defrauding the United States must be dismissed for vagueness or, in the alternative, that these counts violate the rule of lenity. (Huber Mot. at 20). But courts have long-held otherwise, in cases just like this one based on defendants illegally obtaining and using confidential, non-public Government information. This court should similarly reject Huber's arguments here.

## 1. Applicable Law

### a) Vagueness Doctrine

The void-for-vagueness doctrine, rooted in the Due Process Clause of the Fifth Amendment, "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States* v. *Morrison,* 686 F.3d 94, 103 (2d Cir. 2012) (quoting *Kolender* v. *Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). The first prong requires a court to determine "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States* v. *Roberts,* 363 F.3d 118, 123 (2d Cir.2004) (quoting *United States* v. *Lanier,* 520 U.S. 259, 267 (1997)). "[A]lthough clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* (quoting *Lanier,* 520 U.S. at 266). Under the second, "more important," prong, *Kolender,* 461 U.S. at 358, the inquiry is "whether the statutory language is of such a standardless sweep that it allows policemen, prosecutors, and juries to pursue their personal predilections." *Arriaga* v. *Mukasey,* 521 F.3d 219, 228 (2d Cir. 2008) (quoting *Smith* v. *Goguen,* 415 U.S. 566, 575 (1974) (internal quotation marks and alterations omitted)). "A statute that reaches 'a substantial amount of innocent conduct' confers an impermissible degree of discretion on law enforcement authorities to determine who is subject to the law." *Id.* (quoting *City of Chicago* v. *Morales,* 527 U.S. 41, 60-61 (1999)).

"Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *United States* v. *Coppola,* 671 F.3d 220, 235 (2d Cir.2012) (quoting *Maynard* v.

*Cartwright,* 486 U.S. 356, 361 (1988)). In such cases, regardless of whatever ambiguities may exist at the outer edges of the statute, a defendant cannot successfully raise its purported vagueness if his own conduct, as alleged, is clearly prohibited. *United States* v. *Nadirashvili,* 655 F.3d 114, 122 (2d Cir. 2011). "[E]ven if there might be theoretical doubts regarding" whether a statute's contours could be clearly understood in every context, a "defendant's vagueness challenge fail[s] [if] his 'case presented no such problem.'" *Holder* v. *Humanitarian Law Project,* 561 U.S. 1 (2010) (quoting *Scales* v. *United States,* 367 U.S. 203, 223 (1961) (alteration omitted)). That means that "one whose conduct is clearly proscribed" by a law may not challenge the law on the ground of vagueness. *United States* v. *Strauss*, 999 F.2d 692 (2d Cir. 1993); *accord, e.g., United States* v. *Amer*, 110 F.3d 873, 878-79 (2d Cir. 1997).

### b) Rule of Lenity

Under the rule of lenity, ambiguous criminal laws are to be interpreted in favor of the defendants subjected to them. *United States* v. *Banki,* 685 F.3d 99, 109 (2d Cir. 2012). The rule is applicable in very limited circumstances and only where "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute." *Barber* v. *Thomas,* 560 U.S. 474, 488 (2010) (internal quotation marks omitted); *see also United States* v. *Edelman,* 726 F.3d 305, 309-10 (2d Cir. 2013). Emphasizing its narrow application, the Second Circuit has cautioned that "the rule of lenity is not a catch-all maxim that resolves all disputes in the defendant's favor--a sort of juristical 'tie goes to the runner.'" *United States* v. *Gonzalez,* 407 F.3d 118, 124 (2d Cir. 2005). In the absence of unresolved, grievous ambiguity, the rule of lenity has no application.

## 2. Discussion

### a) The Indictment Properly Charges 641

Huber points to no cases holding Section 641 (a statute that has been around since 1948) to be unconstitutionally vague or to violate the rule of lenity. That is because courts have upheld the constitutionality of this statute in the face of similar challenges. *See, e.g.*, *United States* v. *Jones*, 677 F. Supp. 238, 241 (S.D.N.Y. 1988) (denying vagueness challenge to Section 641 because "the defendant had adequate notice that non-public information is a thing of value belonging to the United States"); *see also United States* v. *Girard*, 601 F.2d 69, 71 (2d Cir. 1979) ("The District Judge also rejected appellants' constitutional challenge to section 641 based upon alleged vagueness and overbreadth, and again we agree with his ruling.").

In *Girard*, a DEA agent and a former DEA agent were convicted of the unauthorized sale of government property (specifically, the names of confidential government informants), in violation of Section 641, and conspiring to do the same, in violation of Section 371's "offense" clause. The Second Circuit rejected a vagueness challenge to Section 641, noting that the agents, given that they had worked at the DEA, must have been aware that they could not sell confidential law enforcement information. *Girard*, 601 F.2d 71. The court also noted that the DEA's own regulations prohibited such disclosures. *Id.* The Second Circuit concluded that: "In view of [Section 641's] plainly legitimate sweep in regulating conduct, it is not so substantially overbroad that any overbreadth that may exist cannot be cured on a case by case basis." *Id.* at 72.

Similarly, in *Jones*, the court found that Section 641 was not unconstitutionally vague when applied to a defendant who overheard confidential information at the United States Attorney's Office for the Southern District of New York and passed that information along to an employee at Barclays. The court found that even if the defendant obtained the information

without wrongdoing (because he was lawfully present at the office), the defendant could violate 641 by transferring that information without authority. *Jones*, 677 F. Supp at 240. Thus, the court held that "under the existing law, Jones had adequate notice that Section 641 proscribed certain dispositions of government property regardless of whether that property was legally obtained." *Id*. at 240-41.

The Fourth Circuit's decision in *United States* v. *McAusland*, 979 F.2d 970, 971 (4th Cir. 1992), is also particularly instructive here. In that case, the Government charged two defendants at a data company with, among other things, one count of conspiracy to defraud the United States and to commit substantive offenses under 18 U.S.C. § 371, and one count of conversion or unauthorized conveyance of government property under 18 U.S.C. § 641. Notably, the two data company employees had hired a consultant middleman (similar to the role Blaszczak played in this case) to obtain confidential, non-public information from the Department of Defense about bidding information for government contracts. *Id.* at 971-74. The defendant contended that section 641 was vague as applied to their conduct. *Id.* at 975. In response, the Government "cited several categories of evidence to show that disclosure was without authority and that Defendants knew as much." *Id.* This evidence included "public regulations" that "prohibited disclosure of information in the proposals"; "unpublished DoD regulations": and the "[d]efendants' behavior and conduct" that "indicated they knew the disclosure was without authority." *Id.* In light of this evidence, the court held that 641 was not unconstitutionally vague as applied to the defendant's behavior. *Id.* at 976.[10]

---

[10]     Although the information in *McAusland* belonged to the Department of Defense, it was not classified information or sensitive defense information. The information concerned bidding on defense contracts that downstream defendants used to benefit their private business, just like the case here.

Just as in *Girard*, *Jones*, and *McAusland*, it was obvious to the defendants here that they were prohibited from obtaining and using confidential, non-public CMS information. The STOCK ACT and the Code of Federal Regulations – both publically available laws - make it clear the government employees often learn non-public information and are under a duty not to disclose this information. *See* Title 15, United States Code, Section 78u-1(h) ("[E]ach executive branch employee . . . owes a duty arising from a relationship of trust and confidence to the United States Government and the citizens of the United States with respect to material, nonpublic information derived from such person's position."); Title 5, Code of Federal Regulations, Section 2635.703 ("An employee shall not engage in a financial transaction using nonpublic information, nor allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure."). It logically follows from these regulations that since this information cannot be disclosed by government employees, it also cannot be lawfully possessed and used by individuals outside of government if, as alleged here, the disclosure is unauthorized.

In claiming lack of notice, Huber also wholly ignores that his company's own insider trading policy expressly prohibits the conduct he is charged with here. Specifically, as noted in the Indictment, Investment Adviser-A's compliance manual prohibited insider trading. (Ind. ¶ 18). As is particularly relevant here, the compliance policy also cautioned that because Investment Adviser-A "conducts extensive fundamental research on the entire health care sector . . . such research may sometime result in [Investment Adviser-A] receiving non-public information about the companies it researches." (Ind. ¶ 18) (emphasis added)(internal quotations omitted)). Huber was clearly on notice of his own company's policies—indeed, he signed a certification each year confirming that he was in compliance with those policies.

*See Girard*, 601 F.2d at 71 (noting that DEA agents had notice that their conduct was prohibited under 641 because of the DEA's rules and regulations).

In addition, the numerous and vivid emails cited in the Indictment demonstrate that Huber and the other defendants clearly knew they were not permitted to have the information Blaszczak obtained for them from CMS. *See McAusland*, 979 F.2d at 975 ("Defendants behavior and conduct also indicated that they knew the disclosure was without authority"). For example, Olan thought that Blaszczak might get "shut down" by the CMS contractor because they knew the CMS contractor was not permitted to disclose non-public government information. (Ind. ¶ 20). In another example, in one email from Blaszczak to Huber, Olan, and Fogel about radiation oncology, Blaszczak stated that the information "is not out there so would not expect [] notes on it." (Ind. ¶ 28(a)).

Huber complains that he had no notice that the STOCK ACT or Federal Regulations prohibited him from obtaining confidential, non-public government information. (*See* Br. 26). However, there is no requirement that Huber have notice of the STOCK Act or the CFR, or any published regulation proscribing their conduct. *McAusland*, 979 F.2d 975 ("While we agree that the existence of a published regulation proscribing disclosure certainly prevents [Section 641] from being vague as applied, we do not believe it is the exclusive method of preventing vagueness"); *see also United States* v. *Whab*, 355 F.3d 155, 162 (2d Cir. 2004) (noting the "traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required" (internal quotation marks omitted)). All that is required is that the defendant have notice that their conduct was unlawful. The above emails clearly show that they did.

The defendants contend that CMS often released information publicly, and that it was not a secretive organization. As the Indictment alleges, however, CMS safeguarded against the disclosure of the information at issue in this case precisely to prevent people from trading

on it.  Indeed, contrary to Huber's contention (Huber Mot. at 27), the Indictment is replete with references to this information being confidential.  (*See, e.g.*, Ind. ¶ 4 ("By virtue of his position in the Director's Office, WORRAL had broad access to CMS's confidential deliberations about upcoming reimbursement decisions.")); Ind. ¶ 20 (noting that as part of the scheme the defendants encouraged Blaszczak "to obtain confidential and material information from CMS insiders")).  The defendants appreciated this – that is why they believed Blaszczak would not be able to obtain the information, as reflected in the incident with the CMS contractor.  And even assuming, *arguendo*, that an argument could be made that CMS publicly disclosed information that Government alleges was confidential, that is not a reason to dismiss the Indictment as vague.  That is a trial defense that the defendants are free to present to the jury.  *Jones*, 677 F.Supp. at 238, fn.3 ("The ultimate determination of the question of whether the government abandoned its property interest in the information, however, should be left to the trial jury.").

It is also simply untrue that no defendant outside of the government has ever been found liable under Section 641 under these circumstances.  (Huber Mot. at 25).  Christopher Plaford, a hedge fund manager (and non-government employee) who received confidential and material non-public information from Blaszczak pled guilty to a Section 641 violation. In *United States* v. *Valvani*, No. 16 Cr. 412 (SHS) (S.D.N.Y. June 15, 2016), a case cited by the defendant, political consultant and cooperating witness Gordon Johnston also pled guilty to obtaining confidential information from the Food and Drug Administration, in violation of 18 U.S.C. § 641.  And there are, of course, numerous Section 641 prosecutions of non-government employees in other contexts.  *See United States* v. *McAusland*, 979 F.2d 970, 971 (4th Cir. 1992); *United States* v. *Jones*, 677 F. Supp. 238 (S.D.N.Y. 1988).

Because the law is not ambiguous in this context and clearly applies to the defendants' conduct, the rule of lenity is not applicable.  *See United States* v. *Hunt*, 05 Cr.

395 (DAB), 2006 WL 2613754, at *9 (S.D.N.Y. Sept. 6, 2006) ("Because the statute in question is not ambiguous, the Court finds the rule of lenity is inapplicable").  Nor does the rule of lenity help the defendants in avoiding binding Second Circuit precedent that government information is a "thing of value" under Section 641.  In *Girard*, both defendants argued that Section 641 only covers tangible property (like documents) but not the sale of intangible property (like information) contained within documents.  The Second Circuit disagreed and held:

> The word "thing" notwithstanding, the phrase is generally construed to cover intangibles as well as tangibles. . . . Although the content of a writing is intangible, it is nonetheless a thing of value.  The existence of a property in the contents of unpublished writings was judicially recognized long before the advent of copyright laws. . . . Although we are not concerned here with the laws of copyright, we are satisfied, nonetheless, that the Government has a property interest in certain of its private records which it may protect by statute as a thing of value.  It has done this by the enactment of section 641.

*Girard*, 601 F.2d at 71; *see also id*. (noting that sexual intercourse, promises to reinstate an employee, an agreement not to run in a primary election, and testimony of a witness have all been held to be "things of value" under other statutes).

In so holding, *Girard* aligned the Second Circuit with the majority view that Section 641 prohibits the theft, conversion or unauthorized use of intangible property.  *See, e.g.*,*United States* v. *Matzkin*, 14 F.3d 1014 (4th Cir. 1994) (affirming conviction under Section 641 for conversion of contractor pricing information); *United States* v. *Nichols*, 820 F.2d 508, 512-13 (1st Cir. 1987) (affirming convictions under Section 641, based on the "unauthorized" use and conversion of confidential law enforcement information); *United States* v. *Jeter*, 775 F.2d 670, 679-81 (6th Cir. 1985) (affirming conviction under Section 641 for unauthorized disclosure of secret grand jury information); *United States* v. *Croft*, 750 F.2d 1354 (7th Cir. 1984) (affirming conviction under Section 641 for knowingly converting the services of a EPA employee); *United States* v. *May*, 625 F.2d 186, 191 (8th Cir. 1980)

(affirming conviction under Section 641 for knowing conversion of salaries of U.S. servicemen whose services were misused by a military general).[11]

The counts in the Indictment charging Section 641 are therefore proper.

### b) The Indictment Properly Charges 371

Huber's arguments for dismissing the charges under Section 371 fare no better. Courts have consistently upheld the application of Section 371 to schemes to obtain confidential government information.

As the Second Circuit recently noted, the "conspiracy to defraud the United States" statute traces back to two seminal Supreme Court cases from nearly a century ago addressing Section 371's predecessor statute. *United States* v. *Coplan*, 703 F.3d 46, 60 (2d Cir. 2012). In the first case, *Haas* v. *Henkel*, 216 U.S. 462, 476-80 (1910), the defendants obtained information in advance of publication from an employee of the Bureau of Statistics within the Department of Agriculture. The defendants used the reports to make a profit buying and selling cotton futures. The indictment charged that the defendants had "defraud[ed] the United States by defeating, obstructing and impairing it in the exercise of its governmental function in the regular and official duty of publicly promulgating fair, impartial and accurate reports concerning the cotton crop." *Id.* at 478. The Court rejected the defendant's claim – repeated by Huber now - that the conspiracy statute was limited to offenses involving the deprivation of property, holding that: "it is not essential that such a conspiracy shall contemplate a financial loss or that one shall result. The statute is broad enough in its terms

---

[11]     The Ninth Circuit stands alone in declaring that Section 641 does not reach "intangible goods . . . like classified information." *United States* v. *Tobias*, 836 F.2d 449, 451 (1988) (holding that Section 641 was inapplicable to grand jury transcripts).

to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Id*. at 479-80.

Fourteen years later, in *Hammerschmidt* v. *United States*, 265 U.S. 182 (1924), the Supreme Court reaffirmed its holding in *Haas* that the defraud conspiracy is not limited to the deprivation of money or property, but extends to conspiracies to impair, obstruct, or defeat the lawful functions of a government agency. Specifically, the Court declared that: "To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions *by deceit, craft or trickery, or at least by means that are dishonest*." *Id.* (emphasis added).

Since then, Courts have continued to apply Section 371 to schemes to trade upon confidential government information. In *United States* v. *Peltz*, 433 F.2d 48 (2d Cir. 1970), the Second Circuit affirmed the Section 371 conspiracy to defraud conviction of a lawyer who conspired with an SEC employee to obtain confidential information about matters pending before the Commission and use that information to profitably trade. On appeal, the defendant argued that the Section 371 conviction must fail because (1) the SEC suffered no pecuniary harm and (2) the conspiracy did not intend to prevent the SEC from taking the actions that were the subject of the leaks. The Second Circuit, speaking through Judge Friendly, quickly rejected these arguments, citing *Haas* and *Hammerschmidt* as "seemingly insurmountable obstacles." *Id.* at 51. As Judge Friendly explained:

> An agreement whereby a federal employee will act to promote private benefit in breach of his duty thus comes within the statute if the proper functioning of the Government is significantly affected thereby.
>
> It scarcely needs argument that the high repute and effective functioning of the SEC – conspicuous for its zeal in preventing the misuse of inside information – would be significantly compromised by arrangements whereby an individual could

> obtain information about its impending action from one of its employees and profit from having such knowledge before this became available to the public generally. Public confidence essential to the effective functioning of government would be seriously impaired by any arrangement that would enable a few individuals to profit from advance knowledge of governmental actions. The very making of a plan whereby a government employee will divulge material information which he knows he should not is "dishonest" within … *Hammerschmidt*, regardless of whether such plan is secured by consideration.

*Id.* at 52.

Critically, in so holding, the Second Circuit emphasized that its holding in *Peltz* was not limited to the SEC. Judge Friendly explained:

> [W]e do not mean at all to limit our holding to that agency. Similar considerations would apply in many other instances that readily come to mind. Arrangements to obtain advance information with respect to rate decisions of the ICC, FPC, FCC, and CAB, of merger decisions of the ICC, of the issuance of television licenses by the FCC or airline certificates by the CAB, or the approval or disapproval of foods or drugs by the FDA, are only a few examples. An arrangement with the secretary or law clerk of a federal judge to secure advance information with respect to a decision having implications for the stock market would be another.

*Id.* at 52 n.4 (emphasis added).

Judge Friendly's examples of the multiple ways 371 can be violated in the context of confidential government information are directly applicable to this case. Here, Huber and Olan conspired with Blaszczak, a paid consultant relying on his CMS contacts, and Worrall, a CMS employee, to obtain confidential information about reimbursement rates. On numerous occasions, Huber, Olan, and Fogel used that confidential information to trade in advance of CMS disclosures and reap millions of dollars in profits. As Judge Friendly recognized, such a scheme compromises the effective functioning of a government agency. This scheme also involved deceit and dishonesty. As Huber, Olan, and Blaszczak well knew (Ind. ¶ 21), CMS insiders, including Worrall, were not permitted to disclose confidential, non-public information. *See Peltz*, 433 F.2d at 52 n.4 ("The very making of a plan whereby a government employee will divulge material information which he knows he should not is

'dishonest' within *Hammerschmidt.* . . ."). In addition, by disclosing this information, Worrall violated government ethics rules, codified by regulation. *See* Title 5, Code of Federal Regulations, Section 2635.703. It is a clear violation of Section 371.

Given the long history of 371 and its application to cases like this, it is not surprising that the Second Circuit has previously rejected a challenge to the validity Section 371. *See Coplan*, 703 F.3d at 62. In *Coplan*, the defendants were charged with conspiracy to defraud the United States under Section 371 by interfering with the lawful functions of the IRS in ascertaining and collecting taxes, in what has become known as a "Klein" conspiracy. The Second Circuit confirmed that "it is now well established that § 371 is not confined to fraud as that term has been defined in the common law, but reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Id*. at 61 (internal citation and quotations omitted). The Second Circuit noted the "infirmities in the history and deployment of the statute," but acknowledged that the statute's meaning "derives from and falls within the scope of the law of the Circuit (itself grounded on long-lived Supreme Court decisions)" and ultimately rejected any challenged to the statute's sweep. *Id.* at 62.

Despite this long-standing precedent, Huber claims he had insufficient notice his conduct was prohibited under Section 371 and complains that he had no reason to suspect any tips were improperly obtained. Huber Br. 31. He likens his situation to a patient who asks a doctor to inquire with CMS whether a treatment the patient is considering will be covered by CMS in the future. The Indictment charges otherwise. As previously noted, and just like the defendants in *Haas* and *Peltz* who also obtained confidential government information and traded on it, Huber had every reason to believe his conduct was unlawful. His company's compliance manual prohibited this conduct, and Huber's emails evince a clear understanding of the unlawfulness of his conduct. It makes no difference that Huber did not directly pay a

CMS employee to illegally obtain the confidential information for him. Huber and his firm paid Blaszczak to get the information, knowing Blaszczak was not supposed to have the information but could illicitly obtain it. That is illegal under firmly established precedent. Huber's remedy is trial.

Nor does the rule of lenity require limiting the application of Section 371 to schemes to obtain government money and property. As noted above, the case law has long held otherwise, and defendants provide no argument for retreating from over a century of established case law. *See Haas* v. *Henkel*, 216 U.S. 462, 476-80 (1910). In any event, as noted above, it has also long been the law in the Second Circuit that confidential government information is deemed "property." *Girard*, 601 F.2d 69.

Accordingly, the counts alleging violations of Section 371 should not be dismissed.

## E.  The Court Should Deny the Defendants' Demands for a Bill of Particulars

### 1.  Applicable Law

The purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotations omitted).

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendant to date. *See United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *Torres*, 901 F.2d at 234

(affirming denial of request for bill of particulars where defendants had "been provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits") (internal citation omitted); *United States* v. *Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. 2016) (denying request for a bill of particulars in an insider trading case where the information already proffered was sufficient to enable the defendant to prepare for trial); *United States* v. *Monserrate*, 2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States* v. *D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (denying bill of particulars request where supplementary facts were supplied to defense by way of letter); *United States* v. *Cuti*, 2009 WL 3154310, at *3-4 (S.D.N.Y. 2009) (in accounting fraud case, denying request for particulars identifying all fraudulent transactions, payments, and statements made in furtherance of charged scheme where Government had furnished more than a million pages of discovery and, by letter, identified a series of fraudulent transactions and payments); *United States* v. *Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been provided); *United States* v. *Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself.").

Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not

substitute for a bill of particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575; *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *United States* v. *Kazarian*, 2012 WL 1810214, at *25 (S.D.N.Y. 2012); *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery).  In no event should volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial.  *See United States* v. *Levy*, 2013 WL 664712, at *13 (S.D.N.Y. 2013).

Bills of particulars would undoubtedly be helpful to the defense in any case.  But because "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States* v. *Leonelli,* 428 F. Supp. at 880 (S.D.N.Y. 1977) "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful."  *United States* v. *Mitlof*, 165 F. Supp. 2d at 569 (S.D.N.Y. 2001); *United States* v. *Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the defendant."); *United States* v. *Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case") (citation and quotation marks omitted).  A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the

Government's evidence or legal theories." *Mitlof*, 165 F. Supp. 2d at 569; *see also D'Amico*, 734 F. Supp. 2d at 335 ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting *United States* v. *Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

There are good reasons why bills of particulars are warranted only where the allegations in the Indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense. Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Id.*; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"). Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

### 2. Discussion

Applying these principles, the defendants are not entitled to, and should not be

granted, a bill of particulars.[12]  The defendants' request impermissibly seeks to compel the Government to preview its case-in-chief and to cabin the Government's proof months before trial.  Accordingly, the request should be denied.

The 56-page Indictment in this case, standing alone, is sufficiently detailed to defeat a claim for a bill of particulars.  The Indictment provides detailed information about (1) the history of Blaszczak's relationship with Christopher Worrall, including their meaningfully close personal relationship; (2) the nature of the relationship between Blaszczak and the analysts at Investment Adviser-A, including defendants Huber, Olan, and co-conspirator Jordan Fogel; (3) the names of the publicly-traded companies in which the defendants placed trades based on inside information received from Blaszczak; (4) the nature of the material, non-public information that Blaszczak passed to Huber, Olan, and Fogel ahead of their illegal trading; (5) the public announcements and/or market-moving events that caused Investment Adviser-A to profit or avoid losses in the stocks purchased based on the inside information provided by Blaszczak; (6) the approximate time, date, and method of certain communications during which the Government has alleged that material, non-public information was passed from Worrall to Blaszczak; (7) the approximate time, date, and method of certain communications through which Blaszczak passed on material, non-public information to Huber, Olan, Fogel in advance of the trading decisions at Investment Adviser-A;  and (8) examples of the wires (including phone calls, emails, and certain examples of stock purchases) that the defendants are alleged to have used to facilitate the fraudulent insider trading scheme.

Thus, the Indictment provides the defendants with a detailed chronology of the Government's allegations concerning the market-moving events about which Blaszczak

---

[12]      All of the defendants join in this motion.

provided material, non-public information to the defendants at Investment Adviser-A, as well as the event around which Blaszczak is alleged to have provided information to Christopher Plaford at Investment Adviser-B. The defendants essentially have in hand a road map, set forth over 56-pages of the Indictment and supplemental, targeted disclosures, of what the principal witnesses against them will say at trial about the nature of the inside information Blaszczak passed to the defendants ahead of each market-moving event.

The defense has also been provided with substantial additional detail in the productions the Government has made. The vast majority of the discovery materials was produced four months ago, is electronically searchable, and was accompanied by detailed, itemized indices detailing the nature of the documents and identifying the bates range applicable to each category of document. These productions include, among other things, the defendant email accounts, brokerage records reflecting the illegal trading, sign-in sheets from CMS, documents relating to the proposed rules/announcements that the defendants traded ahead of, and draft presentations and communications among CMS employees reflecting those internal discussion. Moreover, when the defendants expressed that they were having difficulty finding some of the documents referenced in the Indictment, the Government voluntarily identified those documents for the defendants. According to the defendants, this is still not enough.

The defendants argue that the Government is required to identify any known co-conspirators in advance of trial. (Olan Mot. at 15). This is not the law. Courts routinely deny requests for a list of all unindicted co-conspirators. *See, e.g.*, *Rittweger*, 259 F. Supp. 2d at 292 (collecting cases); *Torres*, 901 F.2d at 233–34 (upholding district court's denial of a bill of particulars where the defendant had requested, in part, "the identity of other persons 'known and unknown' as alleged in . . . the indictment"); *United States* v. *Reinhold*, 994 F. Supp. 194, 200-01 (S.D.N.Y. 1998) (denying defendants' motion for a bill of particulars that

sought "identification of alleged co-conspirators who have not been named in the Indictment"); *United States v. Muyet*, 945 F. Supp. 586, 599 (S.D.N.Y 1996) (holding that where the Indictment and pretrial discovery had provided sufficient information to the defense, "[t]he defendants are not entitled to a bill of particulars setting forth the 'whens,' 'wheres,' and 'with whoms' regarding the . . . conspiracy."). The cases Olan cites as support for his contention that "requests for names of unindicted coconspirators have been routinely granted in this district" (Olan Mot. at 16), involve facts completely at odds with those presently before the Court. For example, in *United States* v. *Lino*, No. 00 Cr. 632 (WHP), 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001), a case charging a 26-count RICO conspiracy, the Court reasoned that the Government should identify unidentified, known co-conspirators because the alleged conspiracy "involve[ed] a large number of defendants [23], is wide-ranging in terms of the nature of the predicate acts and the amount of commerce affected, and is comprised of a number of schemes, some of which are temporally removed from the main scheme, and in such contexts, 'a defendant is more likely to be surprised by the identity of other co-conspirators, whom he may never have met.'" *Id.* at *13. (quoting *Nachamie,* 91 F. Supp. 2d at 572-73). Likewise, *United States* v. *Feola*, 651 F. Supp.1068, 1080-83, involved a nineteen-defendant drug conspiracy—where many of the defendants had recent, previous narcotics-related convictions—alleging the distribution of more than one type of narcotic and multiple sources of supply. The Government's proof in *Feola* also involved the physical search and seizure of evidence from over 15 locations, and 5 government informants, three of whom had not yet been identified at the time of Indictment. *Id.* Here, the Government has charged an insider trading conspiracy where Olan, Huber and their co-conspirators traded on tips provided by one person—defendant David Blaszczak—who received those tips from Worrall, an insider at CMS. To suggest that this case is comparable — and the facts here necessitate the same level of guidance as in *Lino* and *Feola* to understand the charges levied

against the defendants in this case — is misleading at best.

Nor are the facts on par with many of the other insider trading cases in this district to which Olan and Worrall cite, where the Government was either ordered to or voluntarily provided additional particulars.  (*See e.g.*, Olan Mot. at 15-18; Esseks Decl. at Ex. O-S; Worrall Mot. at 5) (citing *United States* v. *Rajaratnam*, 719 F.3d 139 (2d Cir. 2013); *United States* v. *Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012); *United States* v. *Newman,* 773 F.3d 438 (2d Cir. 2014); *United States* v. *Steinberg,* 21 F. Supp. 3d 309 (S.D.N.Y. 2014); *United States* v. *Martoma,* 48 F. Supp. 3d 555 (S.D.N.Y. 2014)).  These examples are enlightening, but not for the reasons the defendants suggest.  These cases make plain that the detail purposefully included in the Indictment here (especially when combined with the detailed, supplemental disclosures and voluminous, organized discovery) far exceeds that which the Government had originally provided in those cases, and is unquestionably sufficient under the law.

Take for example Olan's demand for greater particularity regarding the "content and source of the 'inside information'" he and others at Investment Adviser-A received from Blaszczak (Olan Mot. at 17-11), and Worrall's request for granular-level particularity regarding the disclosures described in eight paragraphs of the Indictment (Worrall Mot. at App. A). These are precisely the sort of evidentiary demands that courts have said are not grounds for a bill of particulars. In *United States* v. *Sean Stewart*, a recent insider trading case in this District, a son was charged with providing his father tips in advance of five different mergers and acquisitions.  Stewart moved for a bill of particulars in advance of trial, claiming—as the defendants here do—that he required additional specificity as to the material, non-public information at issue. *United States* v. *Stewart*, No. 15 Cr. 287 (S.D.N.Y. Jan. 19, 2016) (Dkt. No. 64, at 21).   In support of his contention, Stewart referred the Court—as the defendants here do—to the additional disclosures provided in *Rajaratnam*,

which involved multiple insider trading conspiracies. *Id.* at 19. Judge Swain rejected this

comparison, reasoning that "specificity as to the substance of tipping communications may

sometimes be necessary in complex insider trading cases involving multiple alleged

conspirators and communications, large numbers of companies and transactions and extended

time periods … [but] no such challenge of complexity is presented here." *Id.* The Honorable

P. Kevin Castel similarly rejected defendant William "Billy" Walters' request for granular

particularity regarding the specifics of the material, non-public information passed in another

recent insider trading trial in this District involving six years of repeated tips. *United States* v.

*William Walters*, *a/k/a "Billy,"* No. 16 Cr. 338 (PKC) (Dkt No. 51 at 27). This case is much

more like *Stewart* and *Walters* than *Rajaratnam* (multiple charged conspiracies), *Steinberg*

(tips on 13 publicly-traded companies involving 13 separate sources of information) or

*Newman* (lengthier tipping chains involving multiple sources and intermediaries). Moreover,

as detailed above and in response to the defendants' earlier requests, the Government has

already provided the defendants with the a subset of documents underlying the charges in the

documents, including, for example, the documents referenced in paragraphs 27(a), 33 and 47

of the Indictment.

And while it is true that the conspiracy here charges that Blaszczak passed

information to the Investment Adviser-A analysts that he had received from Worrall and

others at CMS, the Indictment provides particularization as to specific instances of illegal

trading with which the defendants have been charged, including the dates on which those

trades were made and the specific nature of the inside information passed. No more detail is

required. *See, e.g.*, *Torres*, 901 F.2d at 234 ("'Acquisition of evidentiary detail is not the

function of the bill of particulars.'") (quoting *Hemphill* v. *United States*, 392 F.2d 45, 49 (8th

Cir. 1968)). Indeed, to require the Government to disclose more detailed information about

the evidence it intends to present at trial simply because a defendant wants it (and not because

of any actual need) would be improper, as it would not only force the Government to preview its entire case (which it is not required to do), and would allow defendants to tailor their testimony and defenses to explain away the Government's evidence. *Henry*, 861 F. Supp. at 1197. The law recognizes that no such disclosure is required, and indeed, cases in this District caution against it. *Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

To this end, Olan also claims to seek protection "from unfair surprises at trial" and asks the court to require the Government to provide notice if it intends to offer evidence at trial of any allegedly illegal trades besides those set forth in the Indictment. This is not the law.[13] (Olan Mot. at 21). Nonetheless, the Indictment in this case details the specific trades underlying the charges in this case (*see, e.g.*, Indictment ¶¶ 29, 31, 34, 54, 79, 91), and the Government will endeavor to identify for the defendants any additional trading it intends to

_____

[13] In support of this demand, defendant Olan again directs the Court to a case whose facts and holding are inapposite. Olan correctly points out that, in *United States* v. *Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), the Second Circuit reversed a conviction for "failure to grant a bill of particulars where [the] indictment alleged extortion of one company but at trial the defendant was confronted with evidence of extortions aimed at entirely different companies." (Olan Mot. at 21). What Walters Olan to note is that *Davidoff* was a RICO case, and that its holding expressed specific concerns about the risks attendant to the Government charging criminal offenses under statutes as broad as RICO. *Id.* Specifically, the court instructed that, "[w]ith the wide latitude accorded the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope." *Id.* To suggest that this holding is instructive on the facts of the insider trading conspiracy charged here is simply wrong.

introduce in its case-in-chief in advance of trial.[14]

Finally, defendant Olan demands—without citing to any supporting case law—that the Government indicate whether it contends that Olan had knowledge of any improper conduct relating to the kidney dialysis trades. Olan correctly notes that he is charged in a conspiracy count that encompasses this illegal trading, but is not charged in the related substantive counts. At trial, the Government intends to offer evidence of illegal trading, based on material, non-public information provided by Blaszczak, ahead of the announcements of CMS's proposed and final kidney dialysis rules. This evidence is, of course, properly admissible against Olan in connection with the conspiracy with which he is charged in Count One.*see, e.g., United States* v. *Heinemann*, 801 F.2d 86, 92 (2d Cir.1986) (observing that "there is, of course, no requirement that each co-conspirator participate in every phase of an evolving conspiracy, as long as each was aware that the conspiracy did not begin and end with his own activities.").

The defendants here cannot demonstrate a genuine necessity for further particulars, and their efforts to capitalize on insider trading cases in which less detail was provided

---

[14]     These voluntary pre-trial disclosures, however, should not limit the evidence the Government may rely on at trial. While courts have on occasion required the Government to list all trades in furtherance of a crime, *see, e.g., United States* v. *Walters*, No. 16 Cr. 338 (PKC), it is axiomatic that, at least in cases where some specific examples are offered, the Government is not required to furnish an inventory of every act or individual it plans to prove furthered the fraud. This remains true even in cases of significantly greater duration and complexity. *See, e.g., United States* v. *Bonventre*, 2013 WL 2303726, at *5-7 (S.D.N.Y. 2013) (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," "all unnamed clients and allegedly fake trades referred to in" a particular count, and all allegedly false documents and records); *Cuti*, 2009 WL 3154310, at *3-4 (in accounting fraud case alleged to have spanned years, denying request for bill of particulars identifying every fraudulent transaction). *See also United States* v. *Guttenberg*, 2007 WL 4115810, at *4-5 (S.D.N.Y. 2007) (in insider trading case, denying request for bill of particulars itemizing trades alleged to have been based on material nonpublic information).

should fail given the highly particularized Indictment returned in this case and the other materials already provided to the defense. The defendants' requests for additional particulars here should be denied in their entirety.

### F. The Court Should Not Order the Government to Search the Investigative Files of the SEC for *Brady* Material

Defendant Olan and his co-defendants next ask the Court to order the Government to review the SEC's entire investigative file for hypothetical exculpatory and impeachment material solely in possession of the SEC because the Government and the SEC allegedly conducted a joint investigation.[15] (Olan Mot. at 5, 7-10). In support of his argument, Olan urges the Court to improperly extend the law of this Circuit, which would result in perverse and undesirable incentives and undermine the efficient enforcement of the criminal and civil laws. Additionally, the Government has already agreed to review any interview notes or testimony taken in connection with this investigation that is in the possession of the SEC for *Brady* material. Accordingly, his request should be denied.

#### 1. Relevant Facts

As the Court knows, the United States Attorney's Office is an arm of the United States Department of Justice, which is an executive agency responsible for enforcing the criminal laws in this country. The SEC is an independent regulatory agency charged with enforcing civil securities laws. In this case, the SEC commenced an investigation into insider trading related to the defendant and others in or about July 2013 (the "SEC Investigation"). The Government opened a parallel, criminal investigation into that conduct in or around November 2014 (the "Criminal Investigation"), around which time the Government submitted an access request letter to the SEC. Once granted, this access request allowed the SEC to provide to the Government documents and materials that the SEC obtained as part of

---

[15]        Defendants Huber and Blaszczak join in this motion.

its investigation (and which were otherwise not subject to any privilege or limitation). Pursuant to that access request letter, the Government obtained millions of documents from the SEC. All of the SEC materials in the possession, custody and control of the Government have been produced to the defendants pursuant to the Government's disclosure obligations under Rule 16 of the Federal Rules of Criminal Procedure. To the best of the Government's knowledge, there remain documents in the possession, custody and control of the SEC that the Government does not have. Likewise, the Government obtained evidence pursuant to court orders and grand jury subpoenas which it did not share with the SEC.

In addition, in order to maximize efficiency and reduce the financial and other burdens on third-party witnesses, the Government and the SEC conducted a number of witness interviews together. Before each interview, the respective, independent agencies informed the witness that the criminal and civil investigations were separate investigations designed to enforce separate laws, and that the interviews were conducted at the same time primarily for the convenience of the parties. For the most part (but with some exceptions), representatives from both the Government and the SEC asked questions, but in all cases, either an FBI agent or an agent from HHS-OIG took the only notes and drafted reports memorializing the interviews. On some occasions, attorneys for the SEC went to the U.S. Attorney's Office or to the FBI to review and create notes and/or memoranda from some, but not all, of those reports.

On May 24, 2017, the Indictment was unsealed. The Government also unsealed a guilty plea by Fogel to a criminal information charging comparable offenses. The same day, the SEC filed a civil complaint against Huber, Blaszczak and Worrall, alleging violations of the securities laws related to the same scheme to commit insider trading in advance of certain CMS announcements (the "SEC Action"). Although the insider trading charges were based on the same underlying conduct, and the Government and the SEC discussed broad theories

of liability based on the underlying facts, the Government and the SEC each evaluated its own evidence and made independent charging decisions based on each agency's own mandate to enforce its respective laws. The Government did not direct the SEC to take any action or make any particular decision, nor did the SEC direct the Government to do the same. Indeed, the Government brought charges against Olan, where the SEC did not.

By motion dated August 10, 2016, the Government intervened in the SEC enforcement action and sought a stay of (a) all depositions, interrogatories, and requests for admission; (b) production of transcripts of testimony and notes of or memoranda describing interviews with, written statements made or adopted in the course of an interview by, or correspondence concerning interviews of any person whom the Government certifies may be called as a witness in the criminal action; and (c) disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i) in the SEC action until the conclusion of the parallel criminal case. The Government did not seek to otherwise stay document discovery. *See* Government Memorandum of Law in Support of Motion to Intervene and For a Stay, *SEC* v. *Blaszczak, et al.*, No. 17 Civ. 3919 (AJN) (Aug. 22, 2017) (Dkt. No. 32). On September 8, 2017, the defendants opposed the Government's motion, challenging the stay request only as it relates to category (b) above. *See* Memorandum of Law in Opposition to the Government's Application for a Partial Stay of Discovery, *Blaszczak*, No. 17 Civ. 3919 (AJN) (Sept. 8 2017) (Dkt. No. 37) ("Stay Opp.").

While Judge Nathan has not yet decided this limited issue, discovery in the parallel civil action is proceeding apace. The defendants have served the SEC, as well as third-parties, with broad document requests that seek, among other things, the entire investigative file related to the SEC Action — the same materials the defendants now ask the Government to first obtain and then review for *Brady*. Moreover, it is the Government's understanding that the SEC produced the vast majority of these materials to the defendants in early

November. To the extent that the SEC has withheld certain documents pending the resolution of the Government's motion for a partial stay, the Government informed the defendants in late October that it would voluntarily review for *Brady* any interview notes or testimony taken in connection with this investigation that is in the possession of the SEC.

## 2. Applicable Law

"An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995)). "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Id*. at 255 (internal citations omitted); *see also United States* v. *Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting imputation of knowledge of FBI reports by agents who were not involved in the investigation or trial); *United States* v. *Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting imputation of knowledge of a Florida prosecutor to an AUSA in New York). Thus, where information was independently obtained through sources outside of the prosecution team, *Brady* "is not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense." *Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), *aff'd in part*, *United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016).

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession, custody or control of another agency for *Brady* evidence only

where the Government conducts a "joint investigation" with another state or federal agency. *United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC* v. *Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding that facts similar to those here "make clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody or control); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, *J.*) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE); *Ferreira* v. *United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same 'prosecutorial team'"); *United States* v. *Upton,* 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (holding that USAO and FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal investigation); *United States* v. *Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the USAO and USAO had no control over the material).

Olan relies on two decisions in this District that have attempted to determine whether parallel investigations became joint through an analysis of the ways in which the agencies gathered relevant facts. In *United States* v. *Gupta,* 848 F. Supp. 2d 491 (S.D.N.Y. 2012), the Government and the SEC interviewed 44 witnesses together, attorneys for both agencies asked questions, and the SEC attorney prepared memoranda that summarized the relevant information shortly after the interviews occurred while also consulting with the Government

in doing so. *Id.* at 494. While recognizing the inconsistency of the case law in this area, and without citing to any authority, Judge Rakoff determined that, in the context of *Brady* disclosures, the proper inquiry to determine whether parallel investigations are also joint investigations "is one of fact-gathering, not charging determinations or otherwise." *Id.* Judge Rakoff thus determined that "joint fact-gathering" triggers *Brady* obligations for the Government related to the interviews conducted together by the Government and the SEC, even if there is no "joint prosecution." *Id.* at 494-95. Judge Rakoff clarified that "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation," but rather held that the Government need only review for *Brady* documents related to the witness interviews conducted by both agencies. *Id.* at 495. Judge Castel held that the Government need only review the same materials – the materials the Government has also committed to reviewing here – in *United States* v. *Walters*, No. 16 Cr. 338 (PKC) (Dkt. 51, Tr. 11-14).

In *United States* v. *Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), the court addressed a narrow and specific request by the defendant: that the Government review for *Brady* notes and memoranda of communications between the SEC and counsel for the cooperating witnesses that were in the sole custody of the SEC that related to threats of criminal prosecution or promises related to non-prosecution agreements. *Id.* at 459. Purportedly relying on *Gupta* to evaluate whether the parallel criminal and civil investigations were "engaged in joint fact-gathering," Judge Gardephe held that the Government and the SEC conducted a joint investigation because (a) they conferred with each other about the respective investigations, (b) they "jointly conducted" 20 interviews of 12 witnesses, (c) the SEC provided the Government with documents it obtained during its investigation, and (d) they coordinated efforts in connection with SEC depositions of witnesses. *Id.* at 461. Unlike in *Gupta*, however, where Judge Rakoff held that the

Government's *Brady* obligation extended only to memoranda in the custody of the SEC related to interviews that were part of the joint fact-gathering, Judge Gardephe held that the fact that "the agencies [were] engaged in joint fact-gathering" required the Government to review a narrow subset of memoranda related to conversations in which the Government was not involved at all. *Id.* at 462. Accordingly, while *Martoma* purported to follow *Gupta*, which itself refashioned the joint investigation analysis, *Martoma* extended *Gupta*'s analysis to materials that were not generated through joint fact-gathering.

### 3. Discussion

Rather than acknowledging that the Government has already agreed to conduct the review that *Gupta* requires (and is consistent with the review ordered by Judge Castel in *United States* v. *Walters)*, Olan instead urges the Court to require the Government to scour the SEC's entire "investigative files" for *Brady*. At bottom, Olan seeks through criminal discovery an explanation as to why the SEC chose not to charge him in an entirely separate civil proceeding. (Def. Mot. at 10-11.) Olan provides no support for this overbroad proposition, and it should be rejected.

#### a) The Defense Request for Documents in the SEC Action Moots this Motion

As a threshold matter, discovery is well underway in the SEC action. The defendants have requested and begun receiving documents that include (but are not limited to) the SEC's investigative file for the SEC Action. Put simply: the defendants will receive in the SEC Action the same material that they ask the Government to review for *Brady*. This moots the defense request, as *Brady* does not require the Government to turn over exculpatory evidence "if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Gaggi,* 811 F.2d 47, 59 (2d Cir.

1987), *cert. denied,* 482 U.S. 929 (1987).[16]   Therefore, once the SEC finishes producing documents and materials responsive to the defendants' request for documents—and to be clear, the defendants have had the majority of the documents they requested from the SEC since November 6, 2017 — then the defendants, including Olan, will be in possession of the materials Olan asks the Government to review.  This fact renders Olan's request superfluous and demonstrates that Olan presses this claim simply for tactical advantage.[17]

Moreover, this posture is analogous to that in the *Walters* case (although discovery in the SEC action here is farther along), in which Judge Castel found—because discovery in the civil case was proceeding—"the obligation of the Government in this case to be limited to notes and memoranda of witness interviews of witnesses jointly interviewed by the SEC.  So if, for example, an SEC staff person attended the interview and made notes, even if they did not type those notes up into a report, that they are the type of material that the government needs to review for *Brady* disclosures." *United States* v. *Walters*, No. 16 Cr. 338 (PKC) (Dkt. 51, Tr. 13, 14).

Here, the Government has *already agreed* to review this category of materials.  Accordingly, Olan's motion should be denied.

_____

[16]   In an effort to extend the Government's *Brady* obligations beyond the prosecution team, Olan cites *Kyles* for the proposition that the Government's *Brady* obligations extend to others acting on the Government's behalf, "which can include those outside the prosecutor's office."  (Olan Mot. at 7 (citing *Kyles*, 514 U.S. at 437).)  *Kyles*, however, does not address an agency independent from the prosecution team, such as the SEC.  Rather, in *Kyles*, the Supreme Court found that the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, *including the police*." *Kyles*, 514 U.S. at 437 (emphasis added).  The police, of course, were the investigating agents for the prosecutor — the equivalent of the FBI in this case — and there is no dispute that the Government's *Brady* obligations extend here to the FBI and HHS-OIG.  Thus, *Kyles* is inapposite.

[17]   To the extent that the SEC claims privilege over any documents in their possession, including work-product privilege in connection with their own memoranda, the Government expects that Judge Nathan will be able to resolve any litigation related to those issues.

62

### b) The Criminal and Civil Investigations Were Parallel, Not Joint

The defendants' overly broad and burdensome request demonstrates why the proper inquiry into whether parallel civil and criminal investigations are "joint investigations" should focus on decision-making, not fact-finding as suggested in *Gupta* and *Martoma*. *See Stanard*, 2007 WL 1834709, at *3 (noting that the SEC is an independent agency from the Government in holding that, although the parallel investigations "may have overlapped," they were not conducted jointly); *see also United States* v. *Rigas*, 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (finding similarly parallel civil and criminal investigations were not "joint"). Any long-term parallel investigation will inevitably result in some overlap in fact gathering. To do otherwise would require witnesses to travel, sit and be asked questions about the same subject matter by two (or more) agencies serially, and would require subpoena recipients to respond and produce documents to two (or more) agencies on multiple occasions. Asking the Government to review the entire SEC investigative file — including searching databases located around the country, reviewing terabytes of documents, and parsing through attorney work product — simply because the Government and the SEC sought to maximize the efficiencies of investigation would "inappropriately require [the court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Avellino*, 136 F.3d at 255. Reviewing the entire investigative file of another independent agency would be inordinately time consuming and burdensome for attorneys for the Government, which does not have custody of the files, is not familiar with the files, and knows of no effective way to search the files. Indeed, the Government routinely does not ask the SEC for its entire investigative file for this precise reason, as it cannot afford to take on obligations it cannot realistically be expected to meet.

Indeed, parallel investigations between the SEC and the Government have been endorsed in support of the "[e]ffective enforcement of the securities laws." *SEC* v. *Dresser*

*Industries*, *Inc.*, 628 F.2d 1368, 1377 (D.C. Cir. 1980) (en banc) ("If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions."). To that end, the typical overlap between investigations that existed here to promote efficiency and reduce costs has been affirmed by several judges in this District as indicative of parallel, not joint, investigations. *See, e.g.*, *United States* v. *Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90) (denying identical motion to this based, in part, on representations by the Government that similar cooperation as here occurred between the Government and the SEC); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *2. In *Stanard*, for example, then-District Judge Lynch addressed a defendant's discovery request to the SEC to obtain and produce notes and memoranda that were in the possession, custody and control of the U.S. Attorney's Office but which the SEC had reviewed. *Stanard*, 2007 WL 1834709, *2. Acknowledging that the SEC could be considered to have "effective control" over the documents if it conducted a joint investigation with the Government, Judge Lynch instead determined that the facts of the case "ma[d]e clear that the investigations, while they may have overlapped, were not conducted jointly," and rejected the defendant's argument. *Id.*; *see also Finnerty*, 411 F. Supp. 2d at 433 (finding NYSE investigation into own policies that were relevant to criminal charges was not joint investigation). This analysis is squarely at odds with, for example, the *Martoma* decision's consideration of whether the SEC and the Government ever conferred about their respective investigations at all. *See Martoma*, 990 F. Supp. 2d at 461.

Instead of focusing the "joint investigation" inquiry on joint fact-gathering, which simply is a result of efforts to promote efficiency and which would lead to perverse results if

abandoned, the Government asks the Court to consider whether the parallel investigations made joint decisions about which charges to bring or which defendants to charge, or if the SEC otherwise acted as a member of the prosecution team by, for example, obtaining evidence solely for use in the criminal case. Where, as here, the two agencies did not strategize about what charges they intended to bring, or even agree on which defendants each would charge – and, indeed, charged different sets of defendants – but instead independently evaluated their separate evidence to make independent investigatory and charging decisions consistent with their separate mandates, there is no joint investigation. For these reasons, the defendant's request should be denied.

### c) Olan's Request is Distinguishable from *Gupta* and *Martoma*

Even if the Court were inclined to focus on joint fact-gathering, Olan and his co-defendant's requested relief is unsupported by any authority and excessively broad. Unlike here, where the defendants seek to compel the Government to review the entire SEC investigative file for *Brady*, Gupta simply requested that the Government review for *Brady* the SEC's notes and memoranda of interviews that the two agencies conducted together. Indeed, in holding that the Government's *Brady* obligations extended to the SEC's notes and memoranda of jointly conducted interviews, *Gupta* relied on the fact that the Government could easily access the requested materials. *See Gupta*, 848 F. Supp. 2d at 495 (citing *United States* v. *Brooks*, 966 F. 2d 1500, 1503 (D.C. Cir. 1992) (holding that prosecutor must search files "particularly when files can be searched 'without any difficulty'")). That is not true with respect to the SEC's entire investigative file, which is cumbersome, located in multiple places, and difficult, if not impossible, to search. Moreover, *Gupta* makes clear that not "all of the documents the SEC prepared and accumulated in its investigation of Gupta are part of the joint investigation." *Id.* Rather, *Gupta* held that the Government's obligation to review for *Brady* extends only to "documents arising from those joint efforts" to "investigate the

facts of a case together.  *Id.*  Accordingly, the defendants' overbroad request runs afoul of *Gupta*.[18]

In *Martoma*, the defendant requested that the Government review even less material than in *Gupta*.  *See Martoma*, 990 F. Supp. 2d at 459 (defendant requested that the Government review notes of communications between the SEC and attorneys for two cooperating witnesses in the sole possession of the SEC).  With this narrow request in mind, Judge Gardephe conducted an analysis of the Government's and the SEC's investigations, ultimately finding that there was a "joint investigation" because (1) the two agencies conferred about their investigations and (2) jointly conducted interviews; (3) the SEC provided the Government with documents it obtained as part of its investigation; and (4) the two agencies "coordinated their efforts in conducting depositions of SAC Capital and its employees."[19]  *Id.* at 461.  As a result, Judge Gardephe held that the Government was obligated to "produce to Defendant communications from the SEC to the doctors' counsel, or to [the cooperating witnesses] directly, that (1) threaten criminal prosecution of either [witness] if he does not implicate Martoma; or (2) promise a non-prosecution agreement to either doctor if he implicates Martoma."  *Id.* at 462.

The Government respectfully submits that *Martoma* was not intended to extend *Gupta* to all materials in the SEC's custody or control, or to contradict *Goffer*, *Rigas*, or *Stanard*, and must be limited to its unusual facts.  If *Martoma* were extended to support the defendants' request here, the exception would swallow the rule, and any jointly-conducted

---

[18]    As noted above, the Government respectfully suggests that the proper lens through which to assess whether two investigations are joint or parallel is in connection with the presence or absence of joint charging decisions.  In the event that the Court disagrees and believes that the relevant inquiry is one turning on joint fact gathering, the Government respectfully submits that a review of the notes SEC attorneys made of the FBI FD-302 reports for *Brady* would satisfy the concerns articulated in *Gupta*.

.

interviews or document-sharing between the SEC and the Government would require the Government to search the entire SEC investigative file. That result would diverge wildly from the rationale of *Gupta*, and cannot be what *Martoma* intended. In fact, Martoma's narrow request related to communications between the SEC — a *civil* regulator — and Government witnesses in connection with the possibility of *criminal* prosecution, which was an outcome that was exclusively in the control of the Government, not the SEC. *Martoma* is therefore properly read to simply provide a safeguard in an unusual situation to ensure that no promises or representations about a putative *criminal* prosecution are relayed to witnesses by the SEC, a *civil* regulator. Thus, to the extent that Olan and his co-defendants rely on *Martoma* to support their request for the Government to search the entire investigative file of the SEC, such reliance is misplaced.

In conclusion, the United States Attorney's Office and the SEC are separate agencies with separate mandates. One is located within the Department of Justice, the other is an independent administrative agency. One is a law enforcement agency, the other a regulator. They have separate offices, budgets, personnel, and files, not to mention procedures for organizing and maintaining evidence and other materials. Government attorneys seek indictments from the grand jury. SEC attorneys seek approval to file charges from the members of their Commission. Although, as here, they occasionally investigate the same conduct, they make their own, independent determinations about whether the evidence gathered satisfies their respective criminal and civil standards and burdens of proof. They make independent decisions about whom to charge and with what offenses—as is evidenced here by the SEC's decision not to charge Olan. While they occasionally gather evidence together to promote efficiencies and ease the burden on witnesses and subjects of their investigations, they are not the same party. To require the Government to search the SEC's entire voluminous files for material that is not, and never was, in its possession nor was ever

reviewed based simply on their efforts to conduct parallel investigations would seriously undermine the separate but complementary criminal and regulatory structure set up by Congress. Accordingly, where, as here, the only meaningful collaboration between the Government and SEC investigations was to conduct interviews together to promote efficiency and reduce costs, and for the SEC to provide documents to the Government that the Government could have otherwise obtained through grand jury subpoena, the Government respectfully submits that the Court should determine that the investigations were parallel, not joint, and deny Olan's motion.

### G. The Court Should Deny Defendant Blaszczak's Chaves-Related Requests

Finally, defendant Blaszczak asks the Court to order discovery in connection with a potential violation of grand jury secrecy by David Chaves ("Chaves"), formerly a supervisory special agent with the FBI.[20] (Blaszczak Mot. at 1-9). Blaszczak correctly notes that Chaves admitted to leaking confidential information to reporters in connection with the investigation in *United States* v. *Walters*, No. 16 Cr. 338 (PKC), and is now the subject of an ongoing criminal investigation which is being conduction by the Public Integrity Section of the Department of Justice ("PIN").

The Court should deny this motion for two independent reasons. First, the Government has contacted PIN, the New York Field Office of the FBI and DOJ's Office of Inspector General ("DOJ-OIG") in an effort to determine whether Chaves was a source for the two identified articles that relate to the investigation of this matter, and has already agreed to provide the results of that inquiry to the defense. Accordingly, the motion for discovery is largely moot. Second, and more broadly, even assuming *arguendo* that Chaves was a source for the relevant articles and that information he passed was protected by Rule 6 of the Federal

---

[20] All of the defendants join in this motion.

68

Rules of Criminal Procedure,[21] Blaszczak has not even attempted to articulate, let alone actually demonstrate, any prejudice stemming from the publication of those articles. As well established by the Supreme Court, and as recently articulated by Judge Castel in *Walters in the context of a Chaves-specific motion*, the defendant must show prejudice in order to obtain any of the ultimate relief he suggests in his motion. Because he cannot, the Court should deny his application for discovery.

In terms of mootness, the defendant's application should be denied because the Government has already inquired of PIN, the FBI, and DOJ-OIG for any information suggesting that Chaves was the source of the two identified articles that related to those investigations. From speaking with these components, the Office has learned that PIN has obtained from the FBI all Chaves-related telephone and email data held by the FBI, and has also obtained records relating to certain non-FBI Chaves email accounts. At our request, PIN is reviewing this body of records (and any other information garnered in the course of its investigation) to determine if any evidence exists indicating that Chaves was a source for the two articles. Specifically, we have sought any information that suggests Chaves communicated with reporters in advance of two of the pre-indictment articles identified in Blaszczak's motion, both of which appeared in the Wall Street Journal—the first on October 29, 2014, and the second almost two years later, on August 19, 2016. The Government will relay the results of that inquiry to the defendant.

Even if the review indicates that Chaves improperly leaked information about the investigation, however, and even if that information was protected by grand jury secrecy rules, Blaszczak has not attempted to show, and cannot show, that he was prejudiced by those

---

[21]     Chaves' admission to providing information did not include an admission to passing grand jury materials.

leaks. Thus, the appropriate remedy is the investigation of the rogue-leaking agent—which is already underway—and not any sort of relief in this case. *See, e.g., United States* v. *Fattah*, 858 F.3d 801, 814 (3rd Cir. 2017) (finding that, where an agent admitted to leaking grand jury material during his testimony at trial, the "remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police." (*internal quotations and citations omitted*)); *Walters*, No. 16 338, slip op. at 19 (S.D.N.Y. Mar. 1, 2017) (hereafter "*Walters* Opinion") ("The proper remedy here is to investigate and, if appropriate, prosecute the offender, rather than dismiss the indictment based on the grand jury investigation that was the subject of the leaks.").

### 1. Applicable Law

It is well-established that to the extent that a defendant seeks a remedy for an alleged violation of Rule 6(e), he must first be able to show that the error was not harmless and that he has been prejudiced as a result of the alleged misconduct. *See generally* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). The Supreme Court has made clear that "a federal court may not invoke supervisory power to circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)." *Bank of Nova Scotia* v. *United States*, 487 U.S. 250, 254 (1988) (rejecting defendant's request to dismiss the indictment in the face of Rule 6(e) violations, including the public identification of the targets and the subject matter of the grand jury investigation, because the misconduct did not result in prejudice to the defendant). In so doing, the Court reasoned that "it would be inappropriate to devise a rule permitting federal courts to deal more sternly with non-constitutional harmless errors than with constitutional errors that are likewise harmless." *Id.* at 255; *United States* v. *Mechanik,* 475 U.S. 66, 71-72 (1986); *accord United States* v. *Carter*, No. 04 CR. 594 (NRB), 2005 WL 180914, at *4 (S.D.N.Y. Jan. 25, 2005).

The court's reasoning in *Walters* is consistent with this well-established precedent. *Walters* Opinion at 18-19. In *Walters*, the Honorable P. Kevin Castel rejected the defendant's motion to dismiss the indictment because the defendant failed to show prejudice resulting from the grand jury leaks, finding that the appropriate remedy was the ongoing investigation of Chaves. *Id.* at 13 (finding no prejudice and specifically rejecting Walters' arguments that the leaks influenced a co-conspirator to cooperate with the Government, holding that "[the co-conspirator's] conduct [was] not causally related to the government misconduct. Nor is it cognizable legal prejudice.").[22]

Similarly, in the *United States* v. *Friedman*, 854 F.2d 535 (2d. Cir. 1988), the Second Circuit considered extensive publicity surrounding a grand jury investigation that the court characterized as "'outrageous.'" 854 F.2d at 582. In that case, the Second Circuit assumed *arguendo* "that the government persistently leaked information about grand jury proceedings to the press in an unethical and unlawful campaign both to induce the cooperation of potential witnesses and to supplant state prosecutorial efforts in a bureaucratic turf fight." *Id.* at 582. The Second Circuit nevertheless declined to dismiss the indictment because the appellants could not "show resultant prejudice from the publicity surrounding the grand jury proceedings." *Id.* at 584.[23]

---

[22]     Chief Judge Irizarry in the Eastern District of New York also rejected a motion to dismiss an indictment/motion for discovery and an evidentiary hearing alleging a purported Chaves-related leak in a white-collar case pending in that district, though no opinion has been issued yet setting forth the Court's basis for denying the motion. *See United States* v. *Nordlicht et al.*, 16 Cr. 640 (E.D.N.Y. 2016) (October 16, 2017 docket entry stating that defense motion was "denied in its entirety" and indicating that a written opinion would follow).

[23]     The district court in *Friedman* fashioned a remedy short of dismissal to deal with any pre-trial publicity caused by the grand jury leaks—it transferred venue. Here, where the most recent article in question was published almost two years before the scheduled start of trial, any concern about publicity can be addressed through the additional *voir dire* of potential jurors.

Further, while a court may use its supervisory powers to fashion remedies for prosecutorial misconduct that violates legally-compelled standards and results in prejudice to the defendant, those remedies should be tethered to the alleged misconduct — and not simply result in "a windfall for the unprejudiced defendant." *See In re United States of America,* 441 F. 3d 44, 60 (1st Cir. 2006) (quoting *Bank of Nova Scotia*, 487 U.S. at 253); *see also United States* v. *Hasting*, 461 U.S. 499, 506 (1983) (instructing that deterrence is not an appropriate basis on which to reverse a conviction where "means more narrowly tailored to deter objectionable prosecutorial conduct are available" and recognizing that, where the error is harmless, concerns about the "integrity of the [judicial] process" will carry less weight). Indeed, when a knowing violation of Rule 6 is found, the remedy provided by the Rule is contempt as to the wrongdoer, not "windfall" to any target of the investigation. *See* Fed. R. Crim. P 6(e)(7) ("A knowing violation of Rule 6 . . . may be punished as a contempt of court"); *see also United States* v. *Regan*, 706 F. Supp. 1102, 1120 (S.D.N.Y. 1989) (holding that where an agent violated grand jury secrecy rules in securing a search warrant but did not violate a defendant's substantive rights, appropriate sanction was contempt, not suppression of fruits of warrant).

### 2. Discussion

In his motion, Blaszczak does not—and cannot—claim that he has suffered any actual prejudice, and thus, even if it is determined that Chaves illegally leaked in this case, no additional remedy is appropriate in this case. *See Friedman*, 854 F.2d at 582-84. Should Blaszczack seek in his reply brief to articulate some form of prejudice (for the first time), then the Government respectfully requests leave to file a sur-reply to respond to any such claims. If the defendant claims that he was somehow improperly prejudiced by the articles he cites, that is a prejudice he should be able to articulate now. Such an approach is far more

efficient than addressing discovery disputes that ultimately are untethered to any appropriate relief in this case.[24]

In addition to seeking discovery related to Chaves' potential leaking in this matter, the defendant seeks discovery relating to Chaves' leaking in "other white collar investigations." The defendant's request should also be denied for the same reason: any such discovery on Chaves leaking in other cases would not provide the basis for any appropriate relief in this case. Citing *dicta* in the Supreme Court's decision in *Bank of Nova Scotia* that was subsequently quoted by the Second Circuit in *United States* v. *Brito*, 907 F.2d 39 (2d Cir. 1990), the defendant attempts to argue that the Court may impose remedies in this case, absent a showing of prejudice , based on Chaves leaking across multiple investigations. *See* Def. Br. at 8. Judge Castel rejected an identical argument in *Walters*, noting that the defendant built an argument on mere *dicta* that had never been relied upon to dismiss a case, and holding that even if *Bank of Nova Scotia* provided an avenue for relief based on such systemic conduct, a defendant still had to demonstrate prejudice to be entitled to relief. Walters Order at 17-18, quoting *Bank of Nova Scotia* 487 U.S. at 245 ("[A] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.").

While Chaves' admitted conduct in the *Walters* matter was unquestionably serious, and the possibility of leaks is always troubling, the proper remedy for these actions is to investigate and, if appropriate, prosecute Chaves for this conduct, not to award any sort of relief to the defendants in this action, whose criminal conduct, as alleged in the Indictment, is itself serious.

---

[24]    For example, the defendant also requests the grand jury minutes in this case, without any articulation regarding how such minutes could conceivably relate to any showing of prejudice resulting from any leaks by Chaves.

### III. <u>Conclusion</u>

For the foregoing reasons, the Government respectfully submits that the Court should

deny the defendants' motions in their entirety.

Dated: New York, New York          Respectfully submitted,
       November 17, 2017

                                    JOON H. KIM
                                    Acting United States Attorney

               By:      /S/_____
                                    Ian McGinley
                                    Brooke E. Cucinella
                                    Joshua A. Naftalis
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2257/2477/2310