UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK

- - - - - - - - - - - - - -
- -                                          x

SEALED

| | |
|---|---|
| UNITED STATES OF AMERICA : | **SUPERSEDING INDICTMENT** |
| ~~v.~~ | |
| - v. - : | SI 17Cr.~~308~~ 357 (~~DLC~~LAK) |

DAVID BLASZCZAK,_____:
THEODORE HUBER,_____:
ROBERT OLAN and_____:
CHRISTOPHER WORRALL,_____:

      Defendants.          :

- - - - - - - - - - - - - -          x

**COUNT ONE**
(Conspiracy to Convert Property of the United States, to Commit
Securities Fraud and to Defraud the United States)

    The Grand Jury charges:

<u>Relevant Entities and Individuals</u>

    1.   At all times relevant to this Indictment, Investment Advisor-A was a privately held group of associated fund advisors specializing in healthcare-related investments. As of 2017, Investment Advisor-A managed multiple hedge funds and other investment vehicles and had more than $7 billion in assets under management. Investment Advisor-A's primary place of business is New York, New York.

    2.   At all times relevant to this Indictment, the Centers for Medicare & Medicaid Services ("CMS"), a component of the United States

Department of Health and Human Services ("HHS"),

administered, among other things~~.~~, Medicare and Medicaid.~~The~~        The

Center for Medicare ("CM") is the component of CMS that is responsible
for setting Medicare reimbursement rates for healthcare providers.

3.    At all times relevant to this Indictment, DAVID BLASZCZAK,
the defendant, served as a consultant at a number of Washington, D.C.-
based firms that, in exchange for a fee, provided "political
intelligence," which included analysis of federal agency decision-
making with respect to, among other topics, how changes in Government-
provided insurance coverage and reimbursement rates would impact
publicly-traded healthcare- related companies. Prior to joining the
private sector, BLASZCZAK had worked as a Special Assistant and Health
Insurance Specialist at CMS. Between in or about January ~~2012~~ 2009 and
in or about November 2014, Investment Advisor-A paid ~~more than~~
approximately $~~263,000~~ 832,500 in consulting fees to the various firms
that employed BLASZCZAK.

4.    At all times relevant to this Indictment, CHRISTOPHER
WORRALL, the defendant, was a CMS employee. WORRALL began working at
CMS in or about 1999. Since ~~in or about January 2012~~ at least in or
about January 2009, WORRALL was a Health Insurance Specialist, whose
responsibilities included, among other things, providing technical
direction, oversight, and support on issues related to the development
and integration of cross-cutting payment policies in the national
payment systems and fee schedules. At various times during the

conspiracy, WORRALL worked in the Director's Office for CM as a Special Assistant and Senior Technical Advisor. By virtue of his position in the Director's Office, WORRALL had broad access to CMS's confidential deliberations about upcoming reimbursement decisions. WORRALL served as the project manager for an internal, non-public data— data-management system called "DataLink/DataLink2 Project." It contained CMS's most up-to-date claims data that CMS used to inform its decision-making. As discussed more fully below, DAVID BLASZCZAK, the defendant, commonly referred to this data- management system at CMS as the "real-time database."

5.    At all times relevant to this Indictment, THEODORE HUBER, the defendant, was a partner and analyst at Investment Advisor-A, where he was a member of the Medical Devices Team (the "Devices Team") . As an analyst, HUBER'S job was to analyze investment decisions and recommend potentially profitable trades for Investment Advisor-A.

6.    At all times relevant to this Indictment, ROBERT OLAN, the defendant, was a partner and analyst at Investment Advisor-A, where he was a member of the Devices Team. As an analyst, OLAN's job was to analyze investment decisions and recommend potentially profitable trades for Investment Advisor-A.

7.    At all times relevant to this Indictment, Jordan Fogel, a co-conspirator not named as a defendant herein, was a partner and analyst at Investment Advisor-A. From in or about 2006 through in or

about late 2012, Fogel worked with THEODORE HUBER and ROBERT OLAN, the defendants, on the Devices Team. Thereafter, until in or about 2016 when he departed Investment Advisor-A, Fogel worked as an ~~a co~~ analyst on Investment Advisor-A's Healthcare Services Team (the "Services Team").

8.    ~~At all times relevant to this Indictment, conspirator~~ At all times relevant to this Indictment, a coconspirator not named as a defendant herein ("CC-1") served as Investment ~~Advisdr A's~~ Advisor-A's managing partner. CC-1 had primary ~~—~~ responsibility for approving all investment decisions and supervising all analysts, including THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel. CC-1 encouraged his analysts to submit unanimous trading recommendations for his ultimate decision. These recommendations were made in person, over the phone, and through email.

9.    At all times relevant to this Indictment, a coconspirator not named as a defendant herein ("CC-2") was a political intelligence consultant retained by Investment Advisor- A.

10.   At all times relevant to this Indictment, Lobbyist-1 was an employee of Drug Company-1, a multinational biotechnology company based in California. Among other things, Drug Company-1 developed and sold drugs, including kidney dialysis-related drugs that were affected by CMS's reimbursement decisions. Lobbyist-1 previously worked at CMS, where Lobbyist-1 met DAVID BLASZCZAK, the defendant.

11.   At all times relevant to this Indictment., Political Intelligence Consultant-1 was a political intelligence consultant retained by Drug Company-1.

12.   At all times relevant to this Indictment:

a.   Accuray, Inc. ("Accuray") was a corporation headquartered in Sunnyvale, California. Accuray's stock traded on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ") and was listed under the ticker symbol "ARAY."

b.   DaVita Healthcare Partners, Inc. ("DaVita") was a corporation headquartered in Denver, Colorado. DaVita's stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "DVA."

c.   Elekta AB ("Elekta") was a corporation headquartered in Stockholm, Sweden. Elekta's stock traded on the Stockholm Exchange under the ticker symbol "EKTAB."

d.   Fresenius Medical Care AG & Co. KGaA ("Fresenius") was a corporation headquartered in Bad Homburg, Germany. Fresenius's stock traded on the Frankfurt Stock Exchange under the ticker symbol "FME." Fresenius's stock traded on the NYSE through the issuance of American Depository Receipts ("ADRs") under the ticker symbol "FMS."

e.   NxStage Medical, Inc. ("NxStage") was a corporation headquartered in Lawrence, Massachusetts. NxStage's stock traded on the NASDAQ under the ticker symbol "NXTM."

f.   Varian Medical Systems ("Varian") was a corporation

headquartered in Palo Alto, California. Varian's stock traded on the NYSE under the ticker symbol "VAR."

<u>CMS Rulemaking Process</u>

13.  As noted above, CM is the component of CMS that administers the national payment systems that determine Medicare reimbursement rates. The national payment systems include the prospective payment systems ("PPSs"), which is a method of reimbursement in which Medicare payment is made based on a predetermined, fixed amount, and fee schedules, which are listings of fees used by Medicare to pay doctors or other medical providers or suppliers.

14.  ~~14~~ . CMS updates the PPSs and fee schedules every year through the issuance of proposed and final rules. These rules are published in the Federal Register after they have been approved by, among others, CMS and the Secretary of HHS. The release of CMS's proposed and final rules can impact the stock prices of companies that offer products and services covered by the PPSs and fee schedules. For this reason, CMS typically issues its proposed and final rules after markets close.

<u>Confidentiality Policies and Prohibitions on Insider Trading</u>

15.  At all times relevant to this Indictment, CMS's Employee Nondisclosure Policy prohibited employees from disclosing "nonpublic, confidential, privileged, or proprietary" information "except as authorized by law." The policy defined nonpublic information as "information that an employee gains by reason of Federal employment and

that he/she knows or reasonably should know is not available to the general public." It further made clear that "no information should be provided to the public unless already available to the public, such as through a public web page or another publication." The policy explained that information learned in the course of CMS employment could be "'market sensitive' information, meaning that its disclosure may have stock or bond market implications." It accordingly prohibited CMS employees, including CHRISTOPHER WORRALL, the defendant, from using the information to make investment decisions, to tip other people, or otherwise to "allow the improper use of nonpublic information to further your own private interest or the interests of another person." Furthermore, as an employee of the executive branch of the United States Government, by 2012, WORRALL was subject to Section 21A(h) of the Exchange Act (added by the STOCK Act), which provides in relevant part that "each executive branch employee ... owes a duty arising from a relationship of trust and confidence to the United States Government and the citizens of the

United States with respect to material, nonpublic information derived from such person's position." Title 15, United States Code, Section 78u-1(h) 78u-1(h).

16.  At all times relevant to this Indictment, CHRISTOPHER WORRALL, the defendant, was subject to the "Standards of Ethical Conduct for Employees of the Executive Branch," which is codified at

Title 5, Code of Federal Regulations, Section 2635.703. Those standards state: "An employee shall not engage in a financial transaction using nonpublic information, nor allow the improper use of nonpublic information to further his own private interest or that of another, whether through advice or recommendation, or by knowing unauthorized disclosure."

17. At all times relevant to this Indictment, CMS prohibited its employees from receiving gifts from prohibited sources. The policy defined "gift" to include "any present, gratuity, favor, entertainment, hospitality, loan, forbearance, or other item having monetary value." The policy defined "prohibited source" to include "any person, company, or organization" that was, among other things, "[c]onducting business with CMS" or that "[h]as any interests that might be affected by the performance or nonperformance of [a CMS employee's] official duties."

18. At all times relevant to this Indictment, and as set forth in Investment Advisor-A's compliance manual (the "Compliance Manual") beginning in 2012, Investment Advisor-A prohibited its employees from committing insider trading. The Compliance Manual made clear that no employee could "trade, either personally or on behalf of others, including the Funds [managed by Investment Advisor-A], while in possession of material non-public information that is subject to a duty of confidence or communicate such material non-public information to others in violation of the law." The Compliance Manual cautioned that

because Investment Advisor-A "conducts extensive fundamental research on the entire healthcare sector in order to develop and implement investment theses[,]" "such research may sometimes result in [Investment Advisor-A] receiving non-public information about the companies it researches." In the years before the Compliance Manual was drafted, Investment Advisor-A brought in outside counsel to train its employees on these topics.

~~extensive fundamental research on the entire healthcare sector in order to develop and implement investment theses [,]" "such research may sometimes result in [Investment Advisor A] receiving non-public information about the companies it researches."~~

<u>The Scheme to Defraud</u>

19.  From at least in or about ~~2012~~ 2009 through at least in or about 2014, DAVID BLASZCZAK, THEODORE HUBER, ■—ROBERT ~~OLAN~~ OLAW and CHRISTOPHER WORRALL, the defendants, Jordan Fogel and others known and unknown, participated in a scheme to obtain and convert to their own use confidential and material non-public information from CMS insiders concerning, among other things, CMS's internal deliberations regarding coverage and reimbursement decisions. As HUBER and OLAN knew, these CMS insiders included BLASZCZAK's former colleagues with whom he had close personal relationships, and who were prohibited from disclosing such information to CMS outsiders.

20.  As a part of the scheme, THEODORE HUBER and ROBERT OLAN, the

defendants, and Jordan Fogel encouraged DAVID BLASZCZAK, the defendant, to obtain confidential and material non-public information from CMS insiders. For instance, between in or about March and April 2012, HUBER, OLAN and Fogel emailed with BLASZCZAK about getting confidential information from a CMS contractor (the "CMS Contractor") who was working on a CMS coding initiative that could have affected reimbursement rates for over one hundred medical tests and, in turn, affected the financial prospects of multiple publicly-traded companies. On or about March 26, 2012, Fogel emailed BLASZCZAK to ask whether BLASZCZAK was "likely to get a read from staffers" about the reimbursement rates before they were made public. On or about April 27, 2012, BLASZCZAK wrote an email to HUBER, OLAN and Fogel to inform them that he had made contact with the CMS Contractor. BLASZCZAK said, "The mystery man . . . responds. Here's my chance. . . HUBER told BLASZCZAK, "Just tell him your doing god's work." Fogel chimed in, "That is huge dude . . . don't blow it! You just turned my frown upside down so let us know if he bites. [The CMS Contractor] is the man with the keys to these companies' coffins. . . ." In a separate email chain, HUBER, OLAN and Fogel discussed the possibility of BLASZCZAK's getting inside information from the CMS Contractor. Fogel said, "So you guys know, getting a useful input from [the CMS Contractor] would be way bigger than bonanza bananas bazooka in my book." OLAN responded, "Agd. I think odds of DB getting shut down by [the CMS Contractor] are 103%." To

which Fogel replied, "I don't know, he's pretty good w/ this stuff. . . . I'll take the under 103% all day long." The CMS Contractor ultimately rejected BLASZCZAK's attempt to obtain inside information. Nonetheless, according to HUBER'S notes from an in-person meeting at Investor Advisor-A, BLASZCZAK told HUBER and OLAN that he thought he would "get a look" at the reimbursement rates before CMS made the information public. example, on or about June 12, 2009, HUBER emailed OLAN, Fogel, and CC-1 that BLASZCZAK "wants to take us to play golf at Wingfoot. I think broadening our relationship with Dave might help maximize the value we get from his unique flow of info . . . " At around this same time, from in or about May 2009 through June 2009, HUBER, OLAN and Fogel received material non-public information from BLASZCZAK relating to a July 1, 2009, Physician Fee Schedule proposal by CMS that included cuts to radiation oncology services. Based, at least in part, on the information provided by BLASZCZAK, HUBER, OLAN, and Fogel caused Investment Advisor-A to make timely and profitable trades in the stock of Varian.

21.  Similarly, in advance of a Physician Fee Scheduling Rule expected to be released in the fall of 2010, Fogel emailed THEODORE HUBER and ROBERT OLAN, the defendants, CC-1 and others at Investment Advisor-A on or about September 29, 2010 that he had spoken to Blaszczak and "spoke a bit about RadOnc. [T]here is clear desire from both coverage & payment side to fight back against the overpayment &

overutilization of radiation tx [therapy]. [T]hey've asked AMA to include in their 5-yr RUC review for targeted cuts. There is a closed-door meeting next week and Blaczack has a guy there. [R]egulation would be announced in 2011, effective 2012. Definitely worth keeping up on."

22.  On or around September 6, 2011, ROBERT OLAN, the defendant, emailed THEODORE HUBER, the defendant, and Jordan Fogel in response[1] to an email from Fogel about a stock they were considering shorting, and about the nature of the information they had received from DAVID BLASZCZAK. Specifically, OLAN asked, "So what is public info(Blaszak in print on) and what do we think we have in our back pocket?"

23.  Additionally, between in or about March and April 2012, THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel emailed with DAVID BLASZCZAK, the defendant, about getting confidential information from a CMS contractor (the "CMS Contractor") who was working on a CMS coding initiative that could have affected reimbursement rates for over one hundred medical tests and, in turn, affected the financial prospects of multiple publicly-traded companies. On or about March 26, 2012, Fogel emailed BLASZCZAK to ask whether BLASZCZAK was "likely to get a read from staffers" about the reimbursement rates before they were made public. On or about April 27, 2012, BLASZCZAK wrote an email to HUBER, OLAN and Fogel to inform them that he had made contact with the CMS Contractor. BLASZCZAK said, "The mystery man . . .

responds. Here's my chance. . . ." HUBER told BLASZCZAK, "Just tell him your doing god's work." Fogel chimed in, "That is huge dude . . . don't blow it! You just turned my frown upside down so let us know if he bites. [The CMS Contractor] is the man with the keys to these companies' coffins. . . . " In a separate email chain, HUBER, OLAN and Fogel discussed the possibility of BLASZCZAK's getting inside information from the CMS Contractor. Fogel said, "So you guys know, getting a useful input from [the CMS Contractor] would be way bigger than bonanza bananas bazooka in my book." OLAN responded, "Agd. I think odds of DB getting shut down by [the CMS Contractor] are 103%." To which Fogel replied, "I don't know, he's pretty good w/ this stuff. . . . I'll take the under 103% all day long." The CMS Contractor ultimately rejected BLASZCZAK's attempt to obtain inside information. Nonetheless, according to HUBER's notes from an in-person meeting at Investor Advisor-A, BLASZCZAK told HUBER and OLAN that he thought he would "get a look" at the reimbursement rates before CMS made the information public.

24.    21. As a further part of the scheme, DAVID BLASZCZAK, the

~~defendant,~~ obtained confidential and material non-public ~~obtained confidential and material non-public information from his close friend and former CMS colleague CHRISTOPHER WORRALL, the defendant.BLASZCZAK conveyed~~ defendant,

information from his close friend and former CMS colleague CHRISTOPHER WORRALL, the defendant. BLASZCZAK conveyed

information obtained from WORRALL to THEODORE HUBER and ROBERT OLAN, the defendants, Jordan Fogel and others, ~~,~~ who, knowing that BLASZCZAK had obtained the information improperly from a CMS insider in breach of a duty, used the information, in whole or in part, to cause Investment Advisor-A to purchase and sell securities. HUBER, OLAN and others caused Investment Advisor-A to confer a pecuniary benefit upon BLASZCZAK in the form of consulting fees in exchange, in part, for the confidential and material nonpublic information that BLASZCZAK improperly obtained from WORRALL.

25. ~~22.~~CHRISTOPHER WORRALL, the defendant, knew that DAVID BLASZCZAK, the defendant, was a political intelligence consultant whose clients included hedge funds that traded based on BLASZCZAK's CMS predictions. Furthermore, WORRALL frequently discussed private-sector employment and other business opportunities with BLASZCZAK. For

instance:

a.   In or about September 2011, BLASZCZAK put WORRALL in contact with Political Intelligence Consultant-1 so that WORRALL could interview for a private sector job with Political Intelligence Consultant-1's political intelligence firm. WORRALL commented to a family member that working for Political Intelligence Consultant-1 could be a "big opportunity" because of Political Intelligence Consultant-1's "political links." WORRALL further noted that "[i]f I ever do want to really get into politics, like run for Congress, these are the types of people I'd need to be around."

b.   On or about August 9, ~~2014~~2 014, BLASZCZAK asked WORRALL to become a "part owner" of a new political intelligence firm that BLASZCZAK was starting. BLASZCZAK told WORRALL, "[m]e and the two guys that work for me are on pace for 1.7 million total revenues for 2014. I bet we come close to 2 million by end of year." BLASZCZAK promised that, if WORRALL joined, they~~—~~, would "kill it working together." WORRALL responded, "You're like a drunk whore to me. Hard to resist. Lol. Let's talk."

26.   ~~23.~~Throughout the course of the scheme, DAVID BLASZCZAK, the defendant, communicated with THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others, in person, over the telephone and via e-mail, among other means.

~~July 6, 2012~~ CMS's Proposed Radiation Oncology

~~Rule~~Rules

27. As described above, beginning at least as early as 2009, THEODORE HUBER and ROBERT OLAN, the defendants, Jordan Fogel, and others at Investment Advisor-A encouraged DAVID BLASZCZAK, the defendant, to use his friends and former colleagues at CMS, including CHRISTOPHER WORRALL, the defendant, to wrongfully obtain material non-public information about proposed cuts to reimbursement rates relating to radiation oncology, among other things, so that they could use the information to make timely and profitable trades in the stock market.

July 6, 2012 Proposed Radiation Oncology Rule

28. ~~24.On~~ For example, on or about July 6, 2012, after the markets closed, CMS announced in a proposed rule that it was planning to cut reimbursable treatment times for two cancer procedures: (a) intensity modulated radiation therapy ("IMRT") from 60 minutes to 30~~.~~ minutes, and (b) stereotactic body radiotherapy ("SBRT") from 90 minutes to 60 minutes. The American College of Radiology had gathered data showing lower procedure times for IMRT and SBRT. CMS's deliberations and eventual decision to adopt that data to inform its reimbursement policy were both material and non-public.

29. ~~25.~~On or about May 8, 2012, approximately two months before CMS publicly announced the proposed rule, DAVID BLASZCZAK, the defendant, learned about CMS's planned radiation oncology reimbursement cuts during a meeting with CHRISTOPHER WORRALL, the defendant.

30. 26. The next day, on or about May 9, 2012, DAVID BLASZCZAK, the defendant, tipped THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel about CMS's confidential plans to cut radiation oncology reimbursement rates.

31. 27. During in or about June 2012, DAVID BLASZCZAK, the defendant, continued to tip THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel with updates about CMS's internal radiation oncology deliberations. For instance:

a.    On or about June 6, 2012, BLASZCZAK and HUBER had a telephone call. During the call, BLASZCZAK reiterated his radiation oncology tip and informed HUBER that the preliminary rule was "targeted for June 27 [, 2012]" although BLASZCZAK thought "it will come a week or so later." HUBER reported to others at Investment Advisor-A, including OLAN and Jordan Fogel, that BLASZCZAK was "lying low on this until close to the release given how charged it is." BLASZCZAK's timing information was correct. CMS's internal briefing papers stated that June 27, 2012 was the target release date for the proposed rule. That timing information was material and confidential.

b.    The next day, on or about June 7, 2 012 2012, Jordan Fogel (on behalf of the Devices Team) recommended taking a short position in Varian, Accuray and Elekta based on information from BLASZCZAK. Fogel explained in an e-mail to others at Investment Advisor-A, including HUBER and OLAN CLAN: "CMS expects to release June

27 but DB thinks it slips by a week for the proposal. And who knows if he or others write something at some point . . . so if it were tomorrow, we'd be quite big for this scare, but since it's not we thought of increasing some now and more in the coming 1-2 wks." Twelve minutes later, CC-1 approved short trades in the three stocks.

      c.   On or about June 11, 2012, BLASZCZAK visited Investment Advisor-A's Manhattan office and met with HUBER and OLAN to discuss, among other things, CMS's planned radiation oncology cuts. During the meeting, BLASZCZAK reiterated his radiation oncology tip and made clear that it was based on his knowledge of internal CMS deliberations. According to HUBER'S meeting notes, which were posted on the "Matrix," Investment Advisor-A's internal repository of investment-related information, BLASZCZAK said "Staff has proposed this. there is concern about politics."

   32.  28. DAVID BLASZCZAK, the defendant, emphasized that his radiation oncology tip was non-public and that, because of his relationships — with CMS insiders, rival political intelligence consultants were unlikely to have access to similar information. For instance:

      a. a.  On or about June 11, 2012, Jordan Fogel received a research note from another political intelligence consultant ("Consultant-1") that predicted that CMS's proposed radiation oncology rule would contain a three to five percent cut in reimbursement rates.

Fogel forwarded the research note to BLASZCZAK, copying THEODORE HUBER and ROBERT OLAN, the defendants, and asked whether Consultant-1 was "just totally missing the time adjustment issue." BLASZCZAK responded to Fogel, HUBER and OLAN and emphasized the non-public nature of his information: "Yes but the time adjustment is not out there so would not expect[] notes on it."

     b.   On or about June 11, ~~2012~~2 012, BLASZCZAK discussed Consultant-1's radiation oncology prediction with another hedge fund client. BLASZCZAK explained: "—[Consultant-1] doesn't seem to know whats on the table. [Consultant-1] used to be my associate - so I know [Consultant-1] well. I'm just waiting to see if any politicals block a big cut. If politicals block it - year its a 3-5% cut. If not - then its a enormous cut."

     c.   On or about June 12, 2012, BLASZCZAK emailed Fogel ~~arid~~ and contrasted ~~Consultant-1'~~Consultant-1' s lack of access to CMS insiders. BLASZCZAK said: "Ive known [Consultant-1] for a long time - he's a good guy and was my associate for awhile but I can say with 100% confidence he doesn't know anyone at cms. His guesses are just wild random guesses. I wouldn't read into what he says." Fogel replied: "I agree w all u said." Fogel then forwarded BLASZCZAK's dismissal of Consultant-1 to HUBER and CLAN and said, "Such has been my contention about [Consultant-1]."

     33.   ~~29.~~Between on or about June 7, ~~2 012~~2012 and June 14, ~~2~~

~~012~~2012, Investment Advisor-A sold short approximately 195,000 shares of Varian, 624,551 shares of Accuray and 118,000 shares of Elekta based on the material non-public information received from DAVID BLASZCZAK, the defendant, about CMS's internal radiation oncology deliberations.

34. On or about June 14, 2012, CC-2 contacted Jordan Fogel by telephone and tipped him about CMS's planned radiation oncology cuts. According to Fogel's call notes, which Fogel circulated to THEODORE HUBER and ROBERT OLAN, the defendants, among others, CC- 2 explained that "CMS strongly considering reducing # of minutes assoc w IMRT . . . Assumption of 60 minutes . . . really more like ~~2 0 30~~ 20-30 minutes . . . 30-40% cut to the code." The subject of Fogel's email was "[CC-2] on RadOnc - would short more aggressively today." Fogel later explained in an email that CC-2 "hasn't spoken to anyone and [CC-2]'s now the 2nd one with the same message as DB which is a big negative and totally off the radar. So the risk of this getting out there before the [CMS announcement] is now higher (target for [CMS announcement] is last wk of June, more likely first wk July), thus justifying moving up our timelines for exposure by some amount." HUBER responded to Fogel and ~~OLAN~~ OLAN to say that he "[a]greed on shorting more." HUBER went on to note: "Personally I'd be very large in this trade by the end of the month if Dave's inputs don't change (300BPS or more between the three [tickers]). If [CC-2] is starting to get noisy about this (Dave has been very quiet) then VAR could trade we ~~[a]~~ [a]k for the next couple

of weeks so I'd short more now." HUBER later added that "[o]f course a lot depends on the inputs we're getting back as the month evolves. Dave should be giving us updated info on timing and content later in the month." HUBER explained that he wanted to monitor the stocks' performance "for the balance of the month" in order to see whether "Dave's whispering and [CC-2]'s yacking have an impact. In that case, we'd feel pain if the white house squashes cuts at the 11th hour."

35. 31. The next day, on or about June 15, 2012, Investment Advisor-A placed orders to short 90,000 shares of Varian, 1,040,000 shares of Accuray, and 75,000 shares of Elekta. On or about June 18, 2012, Investment Advisor-A placed orders to short 250,000 shares of Varian and 80,000 shares of Elekta. On or about June 19, 2012, Investment Advisor-A placed orders to short 103,253 shares of Elekta. And, on or about June 20, 2 012, Investment Advisor-A placed orders to short 62,000 shares of Elekta.

18, 2012, Investment Advisor-A placed orders to short 250,000 shares of Varian and 80,000 shares of Elekta. On or about June 19, 2012, Investment Advisor-A placed orders to short 103,253 shares of Elekta. And, on or about June 20, 2012, Investment Advisor-A placed orders to short 62,000 shares of Elekta.

36. 32. In advance of the announcement of CMS's proposed radiation oncology rule, THEODORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel frequently spoke with DAVID BLASZCZAK, the

defendant, to obtain updates. For instance, on or about June 21, 2012, HUBER told OLAN and Fogel: "I want to talk to [BLASZCZAK] daily for the balance of the month."

37. ~~33.~~ The next day, on or about June 22, 2012, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, met at CMS. During that meeting, WORRALL and BLASZCZAK discussed, among other things, a confidential, internal CMS document. This document contained information that, in BLASZCZAK's view, was relevant to Investment Advisor-A's evaluation of NxStage stock. THEODORE HUBER, the defendant, and BLASZCZAK spoke by phone after the CMS meeting. After the call, HUBER reported to ROBERT OLAN, the defendant, and Jordan Fogel that he had spoken to BLASZCZAK about NxStage and then had "checked in on rad one too. No news there yet."

~~34.~~ '38. On or about June 29, 2012, THEODORE HUBER and DAVID BLASZCZAK, the defendants, spoke by telephone. HUBER circulated his call notes in an email to others at Investment Advisor-A, including ROBERT OLAN, the defendant, and Jordan Fogel. Those notes state:

> There was a meeting ~~6/27~~ 6/2 7 between OMB and senior staff at CMS to sort through outstanding issues in the HOPPs rule about to be published. Dave heard from an attendee that Rad One was not on the agenda. This makes Dave believe its on track. Dave asserts that if something had changed, he would have heard about it - no new news on rad one i [s] good news. I'd add to our position given the date (CMS targeted today for publication of the rule but Dave thinks its next week) , price moves and this input. I'd do another 50 bps.

Within minutes, Investment Advisor-A began shorting additional shares of Varian.

39. On or about July 2, 2012, Jordan Fogel reported his top trading ideas to CC-1. The radiation oncology trades were listed as his "Top Short." Under "Thesis," Fogel explained: "[Blaszczak] & [CC-2] inputs on pending reimbursement cuts to be proposed in phys fee and hospital outpatient rules. Not on radars of sell- side, buy-side, or industry coming in and should create some shock value. End result is likely to be softened vs. initial proposal but should be there big for the scare."

40. On or about July 2, 2012, DAVID BLASZCZAK, the defendant, circulated a note to certain clients, including Investment Advisor-A. In the note, BLASZCZAK reported the radiation oncology prediction that he had first shared with THEORDORE HUBER and ROBERT OLAN, the defendants, and Jordan Fogel on or about May 9, 2012. In response to seeing BLASZCZAK's tip being disseminated to his broader client base, OLAN wrote an email to HUBER, Fogel and others at Investment Advisor-A and said, "Thar she blows."

41. On or about July 6, 2012, after the markets closed, CMS released the preliminary radiation oncology rule. As DAVID BLASZCZAK, the defendant, had predicted, CMS proposed to cut the reimbursable treatment time for IMRT from 60 minutes to 30 minutes and the reimbursable treatment time for SBRT from 90 minutes to 60 minutes.

After the announcement, Fogel circulated the text of the CMS rule within Investment Advisor-A, including to THEODORE HUBER and ROBERT OLAN, the defendants, and noted that the IMRT and SBRT reductions were "exactly as we expected."

42. ~~38.~~On or about July 9, 2012, the next trading day after CMS publicly released its proposed radiation oncology rule, Investment Advisor-A began covering its short positions in Varian, Accuray and Elekta. By the close of the trading day, Varian's stock price had decreased by 3% (and closed at $57.94 per share)__. Varian's trading volume was more than 200% higher than the prior trading day. Elekta's stock price decreased by 1.97% (and closed at $45.07 per share). Elekta's trading volume was more than 180% higher than the prior trading day. Accuray's stock price only decreased by .71% (and closed at $6.30 per share). Accuray's trading volume was 20% higher than the prior trading day. Investment Advisor-A made more than $1,851,000 trading on inside information provided by DAVID BLASZCZAK, the defendant.

43. ~~39.~~On or about July 17, 2012, following CMS's release of the proposed radiation oncology rule, certain CMS staff members who worked on the proposed radiation oncology rule obtained a copy of the July 2, 2012 note written by DAVID BLASZCZAK, the defendant. One CMS staff member remarked, "Where does he get his information from? It is pretty unbelievable and will probably blow up at some point." A second CMS

staff member responded, "Don't know but it is obviously someone with access to our impact papers. I just can't see the motivation for sharing this information. I would doubt someone is trading based on it as [it] would be both a crime and require lying on financial disclosure reports which does not seem worth the risk."

44. ~~40.~~ On or about August 2, 2012, an employee at Investment Advisor-A, who was responsible for contracting with political intelligence consultants ~~("Employee-1~~ ("Employee-1"), emailed with the Devices Team to discuss whether Investment Advisor-A should pay a second quarter 2012 discretionary bonus to Political Intelligence Firm-1, the firm that employed DAVID BLASZCZAK, the defendant. In response to Employee-1's email, THEORODRE HUBER, the defendant, wrote, "I think Dave earned his bonus with his work on Rad~~—.~~ One Q2. We did pretty well on that and it was really 100% Dave [.]" ROBERT OLAN, the defendant, responded, "I agree." Investment Advisor-A subsequently paid Political Intelligence Firm-1 $47,500, which included a $29,000 discretionary bonus. That was the highest quarterly bonus Investment Advisor-A paid Political Intelligence Firm-1 in 2012~~—~~.

### QMS's Proposed Kidney Dialysis Rules

45. Additionally, beginning at least as early as June 2009, THEODORE HUBER and ROBERT OLAN, the defendants, Jordan Fogel, and others at Investment Advisor-A encouraged DAVID BLASZCZAK, the defendant, to use his friends and former colleagues at CMS, including

CHRISTOPHER WORRALL, the defendant, to wrongfully obtain material non-public information about proposals to revise QMS's reimbursement rates and practices, relating to services for End Stage Renal Disease, or "ESRD," including the "bundling" of services, so that they could use that information to make timely and profitable trades in the stock market. For instance, on or around June 26, 2009, HUBER emailed OLAN to ask him "have u used [B]laszczak on CMS/dialysis bundling?" and stating "seems like he could be a resource in this."

### July 1, 2013 Proposed Kidney Dialysis Rule

46. ~~41.~~On or about July 1, 2013, after markets closed, CMS announced in a preliminary rule that it planned to cut the reimbursement rate for various kidney dialysis treatments, services and drugs (known as the "base rate") by 12%.

47. ~~42.~~Prior to the announcement, the market had been anticipating that CMS would cut the base rate, largely due to a December 2012 study by the Government Accountability Office ("GAO") that found that the utilization of kidney dialysis drugs had sharply declined between 2007 and 2011. The study indicated that, because the base rate was established on 2007 utilization numbers, CMS may have been overpaying for kidney dialysis care. Following the GAO report, in or about January 2013, Congress passed the American Taxpayer Relief Act of 2012 ("ATRA")—, which empowered CMS to reduce the kidney dialysis base rate by comparing ~~2007~~ 2 007 utilization data with 2012

utilization data. Then, in or about May 2013, the HHS Office of Inspector General ("HHS OIG") released a report that examined 2011 claims data and identified a decrease in kidney dialysis drug utilization.

48. 43.Following ATRA's passage, CHRISTOPHER WORRALL, the defendant, was asked to work on the kidney dialysis rule at CMS and, specifically, to explore "what initiatives are in place with our monitoring that could assist in decision making in the near future." In other words, because Congress had mandated CMS to base future policy on up-to-date drug utilization data, the confidential database that WORRALL managed was going to be central to the kidney dialysis rule.

49. 44.In or about late January 2013, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, met for lunch at CMS. Following that meeting, BLASZCZAK contacted Lobbyist-1, who closely followed CMS's kidney dialysis plans because of their potential impact on two of Drug Company-1's dialysis-related drugs. BLASZCAK told Lobbyist-1, "fyi - my friend Chris got promoted at CMS. He is now the [Technical Advisor] to [four senior CMS officials]. So basically covers A, B, C, and D of CMS. That is the best job ever at CMS - since he has his hands in all areas!" Lobbyist-1 responded, "Great on your well placed source!" "A, B, C, and D of CMS" referred to Medicare Parts A, B, C and D.

50. 45.On or about February 28, 2013, DAVID BLASZCZAK, the

defendant, contacted Jordan Fogel with a list of his current focus areas, which included kidney dialysis. Fogel responded by telling BLASZCZAK that he had left, the Devices Team and had joined the Services Team. Fogel told BLASZCZAK that he wanted to "catch up soon and figure out how we can re-ignite the Blaszczak-Fogel money printing machine."

51. 46.On or about March 5, 2013, DAVID BLASZCZAK, the defendant, visited CMS. Days later, on or about March 8, 2 0132013, BLASZCZAK emailed CHRISTOPHER WORRALL, the defendant, to introduce him to Senate Staff Member-1, a staff member on the Senate Finance

Committee, the committee with jurisdiction over CMS. After he made the introduction, BLASZCZAK told WORRALL, "after a certain amount of years in the government your knowledge and experience is going to be extremely valuable. You might as well meet as many people as possible along the way. That's what i was thinking and what i'd do[.]" WORRALL responded, "I do appreciate you making offers to put me in touch with people like this."

52. 47.In or about March 2013, CHRISTOPHER WORRALL, the defendant, gave DAVID BLASZCZAK, the defendant, two confidential, internal documents related to CMS's kidney dialysis rule. The first document was a February 6, 2013 PowerPoint slide deck used to brief the CM Director (WORRALL's boss) about the kidney dialysis rule (the "February 6 slide deck") . The February 6 slide deck contained

internal analysis and policy recommendations. It also contained a warning that the slides were "for internal government use only" and that "[u]nauthorized disclosure may result in prosecution to the full extent of the law." WORRALL had received a copy of the February 6 slide deck via email on or about February 8, 2013. The second document was a February 22, 2013 PowerPoint slide deck (the "February 22 slide deck") that WORRALL had prepared for the CM Director to use at a presentation to a membership organization for kidney dialysis providers. Although the February 22 slide deck had been prepared for a public presentation, it included (for internal CMS reference only) non-public data from the confidential database that WORRALL managed. When circulating the February 22 slide deck within CMS, WORRALL noted that he was including the non-public data "more as an FYI for discussion than anything else. I don't think it should be publicly disclosed." WORRALL nonetheless disclosed the data to BLASZCZAK.

53. 48.On or about March 13, 2013, DAVID BLASZCZAK, the defendant, scanned a hard copy of the February 22 slide deck. He renamed the document "ESRDrealtimedata" — referring to CMS's confidential database managed by CHRISTOPHER WORRALL, the defendant — and then emailed the document to Lobbyist-1. BLASZCZAK wrote, " [S]ee attached for the latest data regarding ESRD [end- stage renal disease] utilization ... I think the data is up to Jan 1, 2013 [.]" BLASZCZAK cautioned, "It's very important to keep this info CONFIDENTIAL and

don't send to others outside [of Drug Company-1]."

54. 49.On or about March 14, 2013, DAVID BLASZCZAK, . the defendant, scanned the February 6 slide deck. The slides were printed two-to-a-page and bore a "February 8, 2013" print date in the upper right corner of each page. BLASZCZAK took steps to sanitize the document. First, he redacted the confidentiality warning at the bottom of each page. Then, he redacted the "February 8, 2013" date from each page, except one, which still bore a print date. BLASZCZAK then emailed the document to

Lobbyist-1 and instructed, "please don't send to anyone outside [Drug Company-1]\!" Emailing with Political Intelligence Consultant-1 afterward, BLASZCZAK reported, "I basically gave [Drug Company-1] the CMS plans for the proposed rule. It was in the slides I sent them and outlines what cms intends to do. They should be good there - although the rebase number is yet to be decided. I also gave [Drug Company-1] all the latest ESRD real time data cms has gathered thru their database."

55. Lobbyist-1 was enthusiastic about the internal kidney dialysis documents DAVID BLASZCZAK, the defendant, had provided. On or about March 14, 2013, Lobbyist-1 Lobbyist-1 informed BLASZCZAK that his "stock remains high here!" and, referring to the confidential documents he had obtained from CHRISTOPHER WORRALL, the defendant, Lobbyist-1 remarked "Great Intel intel, Fantastic!" Lobbyist-1 then told BLASZCZAK

-- who had recently switched consulting firms - - a n anecdote about the person who had replaced BLASZCZAK. Lobbyist-1 said that the "new Dave has been told [by BLASZCZAK's old firm] to be very careful with running with detail that is not public knowledge. So for instance when he talks with CMS staff he has to say 'don't tell me anything you don't want made public [.]'" Lobbyist-1 reported that one of Lobbyist-1's colleagues at Drug Company-1 told the "new Dave" that he was "going to suck at your job then." Lobbyist-1 informed BLASZCZAK that he/she believed "CMS is also skittish of giving ~~Intel~~ intel to people because info got out that was not public and there is a big problem."

56. ~~51.~~On or about May 4, 2013, THEODORE HUBER, the defendant, emailed DAVID BLASZCZAK, the defendant, and copied, among others, ROBERT OLAN, the defendant. In the email, HUBER asked BLASZCZAK whether he had "any views here on what might be coming" in the proposed kidney dialysis rule. HUBER added that "others are calling for up to a 5% cut due to the rebasin [g] BLASZCZAK informed HUBER and OLAN, on or about May 6, 2013, that "CMS is definitely pushing for a cut on the higher end in dialysis. They sent a strong warning to people the other week to be prepared for a significant cut."

57. ~~52.~~On or about June 12, 2013, Political Intelligence Consultant-1 emailed DAVID BLASZCZAK, the defendant, and asked, "Chris Worral [sic] - when is your lunch - [Drug Company-1] has a qstn re secret database[.~~]~~ ] "

58. 53. On or about June 14, 2013, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, attended a baseball game together. Four days later, on or about June 18, 2013, BLASZCZAK forwarded Jordan Fogel his kidney dialysis prediction and explained that he was "much higher than others on a cut." Fogel asked, "How high? 4-5%?" Blaszczak replied, "12% total but phased in over 3 years 50/25/25 That 50/25/25." That prediction mirrored CMS's internal proposal for the proposed kidney dialysis rule, which was confidential.

59. 54. On or about June 25, 2013, Jordan Fogel checked in with DAVID BLASZCZAK, the defendant, on the proposed kidney dialysis rule. BLASZCZAK reported, "No change in my numbers. I am pretty confident." Shortly thereafter, Fogel submitted the Services Team's unanimous recommendation to short Fresenius stock and ADRs based on BLASZCZAK's inside information. Minutes later, Investment Advisor-A entered orders to sell short 303,000 shares of Fresenius's ADR (of which 33,665 shares were executed) and 138,000 shares of Fresenius's stock.

60. 55. On or about June 29, 2013, DAVID BLASZCZAK, the defendant, confirmed that his 12% prediction was based on his access to the data in the confidential database managed by CHRISTOPHER WORRALL, the defendant. Emailing with a client at another hedge fund, BLASZCZAK explained:

> [W] e are off consensus. Most expect a 3-4% cut
> (overall) and we are at 12% but phased in over 3
> years. The reason for our high prediction amount

are because the numbers for EPO [epoetin] and other ESRD drugs have continued to decline in recent months. The OIG and GAO report only looks at utilization numbers up to a certain point. Also, those report only look at EPO while we factor in other ESRD drugs (eg use of IV iron has significantly dropped as well).

Following this exchange, BLASZCZAK boasted to a colleague: "I am a ~~beaSt~~ beast that cannot be stopped."

61. ~~56.~~On or about July 1, 2013, after the markets closed, CMS announced the 12% cut (as DAVID BLASZCZAK, the defendant, had predicted)~~—~~. The proposed rule did not include a three-year phase- in, which the Secretary of HHS had removed prior to the rule's release. Two hours before the announcement, a member of Investment Advisor-A's Services Team emailed Jordan Fogel to say "I really hope your boy is [r]ight on dialysis tonight." After the announcement, Fogel responded, "Boy was he ever right. . . BLASZCZAK later contacted Fogel and boasted:                              "Warren Buffet can eat it. Nailed the 12% cut on dialysis but no phase in. They gotta give them a phase in for the final. [DaVita] and FMS got spanked."

62. ~~57.~~DAVID BLASZCZAK, the defendant, published a research note to his clients on or about July 1,~~2013~~ 2 013 announcing that he had correctly predicted CMS's 12% kidney dialysis cut. BLASZCZAK explained that his prediction was based on data kept in the confidential database managed by CHRISTOPHER WORRALL, the defendant, which contained up-to-date drug utilization information. BLASZCZAK stated, "CMS essentially took the top line GAO number but also

accounted for more recent utilization numbers based on their real-time database. CMS also factored into their numbers other ESRD drugs such as IV iron and vitamin D, which increased the cut further than the GAO numbers."

63. 58. On or about July 1, 2013, after the public announcement and after the markets closed, Investment Advisor-A started covering its short position in Fresenius. As Jordan Fogel and others at Investment Advisor-A discussed their trading strategy, CC-1 urged caution: "Notes already out suggesting it will be pared back [in the final rule]. Lets not get too greedy."

64. 59. On or about July 2, 2 013 2013, the first trading day after the public announcement, Fresenius's ADR closed at $32.11 per share, a 9.5% decrease from the prior trading day. The trading volume was up more than 12 000 0% over the prior trading day. Fresenius's stock reacted similarly. It closed at $64.71 per share, a 8.94% decrease from the prior trading day. The trading volume was up more than 680 6 8 0% over the prior trading day. Investment Advisor-A covered the remainder of its short position by on or about August 2, 2013 and made more than $865,000 trading on inside information provided by DAVID BLASZCZAK, the defendant.

65. 60. On or about July 2, 2013, Jordan Fogel wrote to others at Investment Advisor-A about the kidney dialysis announcement. Fogel Fogel stated, "Credit to d blazcack [sic] on this one. Wish we

didnt wuss out but will still make a couple million on it. He also
nailed the home health cuts though we were on wrong side of that trade
... He deserves to get paid some for this dialysis call . . . lets not
get crazy but still. Way more valuable than the other dc clowns put
together I think." Employee-1 responded to Fogel: "we are in the
process of contracting with them - will definitely take that into
account." The next day, on or about July 3, 2013, Employee-1 wrote to
BLASZCZAK: "Can we agree to pay you the amount you suggested ($100K)
with included a preferential access to pricing and reimbursement /
contracting studies? I am not sure on your side how you could set this
up but if you have some ideas, I would be interested to look at it."

November 22, 2013 Final Kidney Dialysis Rule

66.   61. On or about November 22, 2013, after the market closed,
CMS issued its final kidney dialysis rule. CMS announced that it would
maintain the 12% cut it announced in the July 1, 2013 proposed rule but
that the cut would be phased-in over a three- to-four-year period.
Prior to the announcement, DAVID BLASZCZAK, the defendant, tipped
Jordan Fogel and 1 others at Investment Advisor-A that CMS was likely
to maintain the cuts but implement a three-to-four-year phase-in.

67.   62. On or about July 11, 2013, days after DAVID BLASZCZAK,
the defendant, successfully predicted CMS's preliminary kidney dialysis
rule based on information from CHRISTOPHER WORRALL, the defendant,
Jordan Fogel emailed BLASZCZAK to tell him that "getting these final

rules right could be a huge advantage." BLASZCZAK told Fogel about industry efforts to roll back the cuts but explained, again referencing the confidential database that WORRALL managed, that "CMS has the data to back it up so it is difficult to argue against." On or about July 31, 2013, Fogel again told BLASZCZAK that Investment Advisor-A wanted to "nail ESRD_[.]" BLASZCZAK told Fogel that he was "all over . . . ESRD." He also told Fogel, "I'm trying to focus the most attention on stuff that can move the needle the most."

68. 63. Between in or about July 2013 and in or about November 2013, DAVID BLASZCZAK, the defendant, updated Jordan Fogel and others at Investment Advisor-A about the status of internal CMS deliberations on the final kidney dialysis rule. During this time, BLASZCZAK was in communication with CHRISTOPHER WORRALL, the defendant. For instance:

a. On or about July 23, 2013, BLASZCZAK emailed WORRALL to schedule lunch at CMS. As they discussed their schedules, BLASZCZAK remarked to WORRALL, "I bet you are busy. You are in an awesome and important position." WORRALL responded, "Yeah. Definitely now working with just about every senior person in the agency."

b. On or about November 15, 2013, BLASZCZAK and WORRALL had lunch at CMS. Shortly thereafter, BLASZCZAK exchanged emails with Jordan Fogel. BLASZCZAK told Fogel that CMS would enact a phase in that could be as long as four years. Fogel expressed surprise at BLASZCZAK's prediction: "Oh wow u think 4 yrs vs 2-3? Haven't heard the 4."

BLASZCZAK went on to reveal his knowledge of CMS's internal deliberations. He told Fogel that,

within CMS, ~~within CMS,~~ "[t]he[] debate has been 3 or 4" and that it was

"[h]ighly unlikely" that CMS would enact a two-year phase in. BLASZCZAK further explained that "by law they are supposed to adjust the rate per lower use of drugs. In fact - it is highly likely the utilization rate has changed even further in CMS favor after the proposed rule." Fogel forwarded BLASZCZAK's information to others within Investment Advisor-A and stated that if BLASZCZAK's information were correct and CMS implemented a 12% cut phased in over four years, then the DaVita "stock never looks back."

69. ~~64.~~On or about November 22, 2013, Jordan Fogel recommended that Investment Advisor-A establish a long position in DaVita stock and short Fresenius's ADRs to hedge the risk around the final rule. Investment Advisor-A executed~~.~~ the trades shortly thereafter. The same day, after the markets closed, CMS announced the final rule that it would maintain the 12% cut and~~,~~ adopt a three- to four-year phase in, precisely as DAVID BLASZCZAK, the defendant, predicted.

70. ~~65.~~Following the announcement, Fogel emailed his colleagues on the Services Team and praised DAVID BLASZCZAK, the defendant, for his prediction. Fogel wrote, "I told you guys blazcack [sic] is the man. [H]e has crushed it on these rules both times around. Blazcack [sic] dead on again. He is the only one who has a clue." Fogel also congratulated BLASZCZAK directly, telling him: "Great call on all

fronts DB."

71.   66. On or about November 25, 2013, the first trading day after the CMS announcement, DaVita stock closed more than 8.86% above the prior day's closing price. Investment Advisor-A made approximately $1,014,799 on the trades.

<u>Statutory Allegation</u>

72.   67. From at least in or about 2012 2009 through at least in or about 2 014, in the Southern District of New York and elsewhere, DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, conversion of United States property, in violation of Title 18, United States Code, Section 641; securities fraud, in violation of Title 15, United States Code, Sections 78j_(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b- 5; and to defraud the United States and an agency thereof, to wit, CMS, in violation of Title 18, United States Code, Section 371 and Title 5, Code of Federal Regulations, Section 2635.703(a).

73.   68. It was a part and an object of the conspiracy that DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others known and unknown, knowingly would and did embezzle, steal, purloin, and convert to their use and the use of others records, vouchers, money, and things of value of the United

States and a department and agency thereof, to wit, CMS, the value of which exceeded the sum of $1,000, and would and did receive, conceal, and retain the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined and converted, in violation of Title 18, United States Code, Section 641.

74.   69.It was further a part and an object of the conspiracy that DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

75.   70.It was further a part and an object of the conspiracy

that DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER

WORRALL, the defendants, and others known and unknown, willfully and

knowingly, using deceit, craft, trickery and dishonest means, would and

did defraud the United States and an agency thereof, to wit, CMS, by

obtaining confidential information about CMS's internal deliberations

in advance of the agency's rulemaking decisions, thereby impeding,

impairing, defeating and obstructing the lawful function of the agency,

in violation of Title 18, United States Code, Section 371, and Title 5,

Code of Federal Regulations, Section 2635.703(a).

## Overt Acts

76. 71. In furtherance of the conspiracy and to effect its

illegal objects, DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and

CHRISTOPHER WORRALL, the defendants, and their co-conspirators,

committed the following overt acts, among others, in the Southern

District of New York and elsewhere:

     a. On or about July 14, 2009, BLASZCZAK and WORRALL met
at CMS.

     b. a. On or about May 8, 2012, BLASZCZAK and WORRALL
met at CMS.

     c. b. On or about May 9, 2012, BLASCZAK and Jordan
Fogel spoke by telephone.

     d. c. On or about June 7, 2012, HUBER, OLAN and Fogel
caused Investment Advisor-A to sell short Varian securities.

e.   ~~d.~~On or about June 11, 2012, BLASZCZAK visited HUBER and OLAN at Investment Advisor-A's Manhattan office.

f.   ~~e.~~On          or about June 15,      2012, HUBER, OLAN and Fogel
caused  Investment Advisor-A to sell  short Varian securities.

g.   ~~f.~~Onor about June 15,  2012,  OLAN caused Investment Advisor-A to sell short Elekta securities.

h.   ~~g.~~On or about June 29, 2012, BLASZCZAK and HUBER spoke by telephone.

i.   ~~h.~~On or about June 29, 2012, HUBER caused Investment Advisor-A to sell short Varian securities.

j.   ~~i.~~On or about June 25, 2013, BLASZCZAK and Fogel communicated by email.

k.   ~~j.~~On or about June 25, 2013, Fogel caused Investment Advisor-A to sell short Fresenius securities.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Conspiracy to Commit Wire and Securities Fraud)

The Grand Jury further charges:

77.  ~~72.~~The allegations contained in paragraphs 1 through ~~66~~ 71 and ~~71~~ 76 of this Indictment are repeated and realleged as though fully set forth herein.

78.  ~~73.~~From at least in or about ~~2012~~ 2009 through at least in or about ~~2014~~2 014, in the Southern District of New York and elsewhere,

DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit (a) wire fraud, in violation of Title 18, United States Code, Section 1343; and (b) securities fraud, in violation of Title 18, United States Code, Section 1348.

79. 74. It was a part and an object of the conspiracy that DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

80. It was further a part and an object of the conspiracy that DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, and others known and unknown, knowingly and intentionally would and did execute a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange

Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, ~~3 8~~and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, in violation of Title 18, United States Code, Section 1348.

(Title 18, United States Code, Section 1349.)

### COUNT THREE

(Conversion of Property of the United States)

The Grand Jury further charges:

81. ~~76.~~The allegations contained in paragraphs 1 through ~~66~~ 71 and ~~71~~ 76 of this Indictment are repeated and realleged as though fully set forth herein.

82. ~~77.~~From at least in or May 2012 through at least in or about July 2012, in the Southern District of New York and elsewhere, DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, knowingly embezzled, stole, purloined, and converted to their use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, CMS, the value of which exceeded the sum of $1,000, and received, concealed, and retained the same with intent to convert it to their use

and gain, knowing it to have been embezzled, stolen, purloined, and

converted, to wit,

BLASZCZAK, HUBER and OLAN received from WORRALL and others confidential
CMS information about CMS's proposed radiation oncology rule, which
BLASZCZAK, HUBER and OLAN knew had been obtained from CMS, and which
HUBER, OLAN and others used, in whole or in part, to cause Investment
Advisor-A to purchase and sell securities.

(Title 18, United States Code, Sections 641 and 2.)

## COUNTS FOUR Through EIGHT

(Securities Fraud)

The Grand Jury further charges:

83. ~~78.~~The allegations contained in paragraphs 1 through ~~66~~ 71

and ~~71~~ 76 of this Indictment are repeated and realleged as though fully

set forth herein.

84. From at least in or May 2012 through at least in or about

July ~~2012~~2 012, in the Southern District of New York and elsewhere,

DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL,

the defendants, willfully and knowingly, directly and indirectly, by

use of the means and instrumentalities of interstate commerce, and of

the mails, and the facilities of national securities exchanges, used

and employed, in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation of

Title 17, Code of Federal Regulations, Section 240.10b-5, by (a)

employing devices, schemes, and artifices to defraud; (b) making and

causing to be made untrue statements of material fact and omitting to

state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading;
and (c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon other persons, to
wit, in advance of the July 1, 2012 public announcement by CMS about
proposed radiation oncology cuts, BLASZCZAK obtained material non-
public information from WORRALL regarding the status of CMS's internal
deliberations and plans for the proposed rule and, based in .whole or
in part on that information, tipped HUBER and OLAN, among others, who,
based in whole or in part on that information, caused Investment
Advisor-A to execute the securities
transactions listed below:

| Count | Order Dates | Transactions |
|-------|-------------|--------------|
| 4 | June 7, 2012 | Short sale of 105,/000 shares of Varian |
| 5 | June 14, 2012 | Short sale of 90,000 shares of Varian |
| 6 | June 15, 2012 | Short sale of 90,000 shares of Varian |
| 7 | June 18, 2012 | Short sale of 250,000 shares of Varian |
| 8 | June 25 and 29, 2012 | Short sales of 265,000 shares of Varian |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17,
Code of Federal Regulations, Section 240.10b-5; and Title 18,
ᴸUnited States Code, Section 2.)

**COUNT NINE**

(Wire Fraud)

The Grand Jury further charges:

85. 80.The allegations contained in paragraphs 1 through 66 71
and 71 76 of this Indictment are repeated and realleged as though fully
set forth herein.

86.   From at least in or about May 2012 through at least in or about July 2 012, in the Southern District of New York and elsewhere, DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, willfully and knowingly,

~~81.~~ ~~From at least in or about May 2012 through at least in or about July 2 012, in the Southern District of New York and elsewhere, DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, willfully and knowingly,~~ having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BLASZCZAK, HUBER, OLAN, WORRALL and others schemed to defraud CMS of confidential information related to CMS's proposed radiation oncology rule by improperly obtaining that information through deceptive means and then converting that information to their own use, using cellular telephones and e-mail communications, for the purpose of executing securities transactions in Varian ~~and~~, Elekta~~-~~, and Accuray stock.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TEN

(Securities Fraud)

The Grand Jury further charges:

87. 82. The allegations contained in paragraphs 1 through 66 71 and 71 76 of this Indictment are repeated and realleged as though fully set forth herein.

88. 83. From at least in or about May 2012 through at least in or about July 2 012, in the Southern District of New York and elsewhere, DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants, knowingly and intentionally executed a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money, and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, BLASZCZAK, HUBER, OLAN, WORRALL and others schemed to defraud CMS of confidential information related to CMS's proposed radiation oncology rule by improperly obtaining that information through deceptive means and then converting that information to their own use, using cellular telephones and e-mail communications, for the purpose of executing securities transactions in Varian and , Elekta , and Accuray stock.

(Title 18, United States Code, Sections 1348 and 2.)

### COUNT ELEVEN

(Conversion of Property of the United States)

The Grand Jury further charges:

89. ~~84.~~The allegations contained in paragraphs 1 through ~~66~~ 71 and ~~71~~ 76 of this Indictment are repeated and realleged as though fully set forth herein.

90. ~~85.~~In or about June 2012, in the Southern District of New York and elsewhere, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, knowingly embezzled, stole, purloined, and converted to their use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, CMS, the value of which exceeded the sum of $1,000, and received, concealed, and retained the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined, and converted, to wit, BLASZCZAK received from WORRALL a confidential CMS report with CMS's internal data analysis relevant to NxStage, among other companies.

(Title 18, United States Code, Sections 641 and 2.)

### COUNT TWELVE

(Wire Fraud)

The Grand Jury further charges:

91. ~~86.~~The allegations contained in paragraphs 1 through ~~66~~ 71 and ~~71~~ 76 of this Indictment are repeated and realleged as~~.~~ though

fully set forth herein.

92. 87.In or about June 2012, in the Southern District of ' New York and elsewhere, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property **by** means of -...--means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BLASZCZAK, WORRALL and others schemed to defraud CMS of confidential information related to CMS's internal data analysis relevant to NxStage, among other companies, by improperly obtaining that information through deceptive means and then converting that information to their own use, using cellular telephones and e-mail communications, for the purpose of executing securities transactions in NxStage stock.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THIRTEEN

(Conversion of Property of the United States)

The Grand Jury further charges:

93. 88.The, allegations contained in paragraphs 1 through 66 71 and 71 76 of this Indictment are repeated and realleged as though fully set forth herein.

94. 89.From in or about January 2013 through at least in or

about July    2013, in   the Southern    District of New York    and elsewhere,    DAVID BLASZCZAK and    CHRISTOPHER WORRALL,    the defendants, knowingly embezzled, stole, purloined, and converted to their use and the use of others records, vouchers, money, and things of value of         the United States  and a department and agency thereof, to   wit, CMS, the value of   which exceeded the sum    of $1,000, and received, concealed, and retained the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined, and converted, to wit, BLASZCZAK received from WORRALL confidential CMS reports with CMS's internal data analysis and other confidential information in advance of the proposed kidney dialysis rule.

(Title 18, United States Code, Sections 641 and 2.)

## ~~COUNT~~ COTINT FOURTEEN

(Securities Fraud)

The Grand Jury further charges:

95. ~~90.~~The allegations contained in paragraphs 1 through ~~66~~ 71 and ~~71~~ 76 of this Indictment are repeated and realleged as though fully set forth herein.

96. ~~91.~~From at least in or about January 2013 through at least in or about July ~~2 013~~2013, in the Southern District of New York and elsewhere, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, in advance of the July 6, ~~2013~~ 2 013 public announcement by CMS of its proposed kidney dialysis cuts, BLASZCZAK obtained material nonpublic information from WORRALL regarding ~~CMS's~~ QMS's internal data and plans

for the proposed rule and tipped Jordan Fogel, among others, who, based in whole or in part on that information, caused Investment Advisor-A to sell short 33,665 shares of Fresenius ADR on or about June 25, 2013.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT FIFTEEN

(Wire Fraud)

The Grand Jury further charges:

97. ~~92.~~The allegations contained in paragraphs 1 through ~~66~~ 71 and ~~71~~ 76 of this Indictment are repeated and realleged as though fully set forth herein.

98. ~~93.~~From at least in or about January 2013 through in or about July 2013, in the Southern District of New York and elsewhere, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, ~~to wit~~towit, BLASZCZAK, WORRALL and others schemed to defraud

CMS of confidential information related to CMS's proposed kidney-dialysis rule by improperly obtaining that information through deceptive means and then converting that information to their own use, using cellular telephones and e-mail communications, for the purpose of executing securities transactions in Fresenius stock and ADRs.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SIXTEEN

(Securities Fraud)

The Grand Jury further charges:

99. 94. The allegations contained in paragraphs 1 through 66 71 and 71 76 of this Indictment are repeated and realleged as though fully set forth herein.

95 100. From at least in or about January 2013 through in or about July 2013, in the Southern District of New York and elsewhere, DAVID BLASZCZAK and CHRISTOPHER WORRALL, the defendants, knowingly and intentionally executed a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase, and sale of securities of an issuer with a class of securities registered

under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, BLASZCZAK, WORRALL and others schemed to defraud CMS of confidential information related to CMS's proposed kidney dialysis rule by improperly obtaining that information through deceptive means and then converting that information to their own use, using cellular telephones and e-mail communications, for the purpose of executing securities transactions in Fresenius stock and ADRs.

(Title 18, United States Code, Sections 1348 and 2.)

### COUNT SEVENTEEN
(Conspiracy to Defraud the United States and to
Convert Property of the United States)

The Grand Jury further charges:

101. 96. The allegations contained in paragraphs 2 and 3, and 12 1 through 17 71 and 76 of this Indictment are repeated and realleged as though fully set forth herein.

### Relevant Entities and Individuals

102. 97. At all times relevant to this Indictment, Investment Advisor-B was a privately held group of associated fund advisors specializing in healthcare-related investments. Until September 2013, Investment Advisor-B managed various hedge funds. One such fund focused on long-short equity investments in the healthcare sector ("Fund-1"). Another fund, which operated from in or about 2009 until on or about September 30, 2013, invested primarily in debt instruments

issued by healthcare companies ("Fund-2"). Investment Advisor-B's primary place of business was New York, New York.

103. 98.At all times relevant to this Indictment, and as set forth in Investment Advisor-B's compliance manuals, Investment Advisor-B forbid insider trading, that is, "any employee from trading, either personally or on behalf of others, ... on material non-public information or communicating material non-public information to others in violation of the law."

104. 99.At all times relevant to this Indictment, Christopher Plaford served as a partner in Investment Advisor-B and as Fund- 2's portfolio manager from its inception in or about May 2009 through its liquidation in 2013. As portfolio manager, Plaford directed the majority of Fund-2's investments.

105. At all times relevant to the Indictment:

a. Gentiva Health Services, Inc. ("Gentiva") was a corporation headquartered in Atlanta, Georgia. Gentiva's stock traded on the NASDAQ under the ticker "GTVA."

b. Amedisys, Inc. ("Amedisys") was a corporation headquartered in Baton Rouge, Louisiana. Amedisys's stock traded on the NASDAQ under the ticker symbol "AMED."

The Scheme to Defraud

106. 100.From at least in or about 2011 through at least in or about September 2013, DAVID BLASZCZAK, the defendant, Christopher

Plaford, and others known and unknown, participated in a scheme to obtain and convert to their own use material non-public information from CMS concerning, among other things, internal deliberations and upcoming actions of CMS regarding the reimbursement for and coverage of certain products and services. Plaford obtained this valuable information from BLASZCZAK and used it to direct the execution of a series of securities trades.

107. ~~101.~~For instance, in or about June 2013, DAVID BLASZCZAK, the defendant, provided multiple hedge fund clients, including Investment Advisor-A and Investment Advisor-B with a prediction that CMS would rebase its coverage of the home health industry. Under the Affordable Care Act ("ACA"), Congress empowered CMS to cut ~~2014~~ 2 014 home health payments by as much as 3.5%. BLASZCZAK correctly predicted that the cuts would be between 3.25% and 3.5% and informed Christopher Plaford, in at least one telephone conversation, that his home health prediction was based on his conversations with CMS insiders. Plaford used BLASZCZAK's information to trade profitably in ~~DaVita~~ Gentiva and Amedisys securities.

Statutory Allegation

108. ~~102.~~From in or about 2011 through in or about 2013, DAVID BLASZCZAK, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the

United States, to wit, conversion of United States property, in violation of Title 18, United States Code, Section 641; and to defraud the United States and an agency thereof, to wit, CMS, in violation of Title 18, United States Code, Section 371 and Title 5, Code of Federal Regulations, Section 2635.703(a).

109. ~~103.~~ It was a part and an object of the conspiracy that DAVID BLASZCZAK, the defendant, and others known and unknown, knowingly would and did embezzle, steal, purloin, and convert to their use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, CMS, the value of which exceeded the sum of $1,000, and would and did receive, conceal, and retain the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined and converted, in violation of Title 18, United States Code, Section 641.

110. ~~104.~~ It was further a part and an object of the conspiracy that DAVID BLASZCZAK, the defendant, and others known and unknown, willfully and knowingly, using deceit, craft, trickery and dishonest means, would and did defraud the United States and an agency thereof, to wit, CMS, by obtaining confidential CMS information that was disclosed to BLASZCZAK by a CMS employee in violation of CMS's prohibition on disclosing non-public information, thereby impeding, impairing, defeating and obstructing the lawful function of the

agency, in violation of

Title 18, United States Code, Section 371 and Title 5, Code of

Federal Regulations, Section 2635.703(a).

Overt Act

111. ~~105.~~In furtherance of the conspiracy and to effect its

illegal objects, DAVID BLASZCZAK, the defendant, committed the

following overt act, among others, in the Southern District of New

York and elsewhere:

a.   ~~a.~~In or about June 2013, BLASZCZAK disclosed

confidential CMS information to Christopher Plaford about CMS's

impending home health regulatory action.

(Title 18, United States Code, Section 371.)

**COUNT EIGHTEEN**

(Conversion of Property of the United States)

The Grand Jury further charges:

112. ~~106.~~The allegations contained in paragraphs ~~2 and 3, 12~~1

through ~~17~~71, ~~97 through 101~~and ~~105~~76 of this Indictment are

repeated and realleged as if fully set forth herein.

113. ~~107.~~From at least in or about 2011 through at least in or

about 2 013, in the Southern District of New York and elsewhere, DAVID

BLASZCZAK, the defendant, knowingly embezzled, stole, purloined, and

converted to his use and the use of others records, vouchers, money,

and things of value of the United States and a department and agency

thereof, to wit, CMS, the value of which exceeded the sum of $1,000,

and received, concealed, and retained the same with intent to convert it to his use and gain, knowing it to have been embezzled, stolen, purloined, and converted, to wit, BLASZCZAK disclosed to Christopher Plaford confidential CMS information about impending CMS decisions, including the June 2013 home health regulatory action, knowing that the information had been obtained from CMS and that Plaford would use the information to purchase and sell securities.

(Title 18, United States Code, Sections 641 and 2.)

FORFEITURE ALLEGATION

114. 108. As a result of committing one or more of the offenses alleged in Counts One through Eighteen of this Indictment, DAVID BLASZCZAK, the defendant (as to acts alleged in Counts One through Eighteen of this Indictment), THEODORE HUBER and ROBERT OLAN, the defendants (as to acts alleged in Counts One through Ten of this Indictment), and CHRISTOPHER WORRALL, the defendant (as to acts alleged in Counts One through Sixteen of this Indictment), the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Sixteen of this Indictment.

Substitute Assets Provision

115. 109. If any of the above-described forfeitable property, as a result of any act or omission of DAVID BLASZCZAK, THEODORE HUBER, ROBERT OLAN and CHRISTOPHER WORRALL, the defendants,

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

court;

        c.    has been placed beyond the jurisdiction of the

court;

      d.    ~~d.~~ has been substantially diminished in value; or

      e.    has been commingled with other property which cannot

be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United

States Code, Section ~~' 853 (p~~ 853(p), and Title 28, United States Code

Section 2461, to seek forfeiture of any other property of

BLASZCZAK, HUBER, ~~CLAN~~ OLAN and WORRALL up to the value of the

forfeitable property described above.

      (Title 18, United States Code, Section 981(a) (1) (C)~~;~~
            Title 21, United States Code, Section 853 (p) ;
            Title 28, United States Code, Section 2461.)

_____  
FOREPERSON

_____  
ROBERT KHUZAMI  
Acting United States Attorney

Form No. USA-33S-274 (Ed. 9-25-58)

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

DAVID BLASZCZAK,
THEODORE HUBER,
ROBERT OLAN and
CHRISTOPHER WORRALL,

Defendants.

~~SEALED~~ SUPERSEDING INDICTMENT

SI 17 Cr. ~~308  (DLC~~357 (LAK)
(15 U.S.C. §§ 78j (b) ~~Se 78f f~~& 78ff;
17 C.F.R. § 240.10b-5;
18 U.S.C. §§ 371, 641, 1343, 1348, 1349 & 2;
5 C.F.R. § 2635.703(a).)

~~JOON H. KIM~~

ROBERT KHUZAMI
Acting United States Attorney
*H'Mchm  sh/h*

—————————————————————
Foreperson

Foreperson

| Comparison Details | |
|---|---|
| Title | **pdfDocs compareDocs Comparison Results** |
| Date & Time | 3/5/2018 3:22:29 PM |
| Comparison Time | 11.06 seconds |
| compareDocs version | v4.3.100.78 |

| Sources | |
|---|---|
| Original Document | 2017-05-23 Sealed Superseding Indictment.pdf |
| Modified Document | S1 17 Cr. 357 (LAK) Indictment - SIGNED (2).pdf |

| Comparison Statistics | |
|---|---|
| Insertions | 106 |
| Deletions | 46 |
| Changes | 216 |
| Moves | 28 |
| Font Changes | 0 |
| Paragraph Style Changes | 0 |
| Character Style Changes | 0 |
| TOTAL CHANGES | 396 |
| | |
| | |
| | |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | Standard |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Font Changes | |
| Paragraph Style Changes | |
| Character Style Changes | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Changed lines | Mark left border. |
| Comments color | By Author. |
| Balloons | False |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after Saving | General | Always |
| Report Type | Word | Formatting |
| Character Level | Word | False |
| Include Headers / Footers | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include List Numbers | Word | True |
| Include Tables | Word | True |
| Include Field Codes | Word | True |
| Include Moves | Word | True |
| Show Track Changes Toolbar | Word | True |
| Show Reviewing Pane | Word | True |
| Update Automatic Links at Open | Word | False |
| Summary Report | Word | End |
| Include Change Detail Report | Word | Separate |
| Document View | Word | Print |
| Remove Personal Information | Word | False |
| Flatten Field Codes | Word | True |