18-2811(L)
USA v. Blaszczak

1        UNITED STATES COURT OF APPEALS

2            FOR THE SECOND CIRCUIT

3                  - - - - - -

4               August Term, 2020

5   (Argued: June 9, 2021                    Decided: December 27, 2022)

6       Docket Nos. 18-2811, 18-2825, 18-2867, 18-2878

7   _____

8   UNITED STATES OF AMERICA,

9                              *Appellee*,

10                     - v. -

11  DAVID  BLASZCZAK,  THEODORE  HUBER,  ROBERT  OLAN,
12  CHRISTOPHER WORRALL,

13                          *Defendants-Appellants*.
14  _____

15  Before:  KEARSE, WALKER, and SULLIVAN, *Circuit Judges*.

16          Appeals, following vacatur and remand by the United States Supreme Court

17  for further consideration, in light of *Kelly v. United States*, 140 S. Ct. 1565 (2020), of this

18  Court's prior affirmance of judgments of the United States District Court for the Southern

19  District of New York convicting some or all of the defendants on substantive counts of

1    conversion of government property in violation of 18 U.S.C. § 641, wire fraud in violation

2    of 18 U.S.C. § 1343, and securities fraud in violation of 18 U.S.C. § 1348; and convicting

3    certain of the defendants on various counts of conspiring to engage in conduct violating one

4    or more of the above sections, all originating from misappropriation of confidential

5    information from the Centers for Medicare & Medicaid Services ("CMS"), *see United States*

6    *v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019), *vacated and remanded*, 141 S. Ct. 1040, 2021 WL 78042,

7    2021 WL 78043 (Jan. 11, 2020).  On this remand:  (A) defendants contend that their argument

8    that the CMS information at issue does not constitute "property" or a "thing of value" within

9    the meaning of the above statutes is supported by the Supreme Court's decision in *Kelly*;

10   (B) the government, concurring in that contention, confesses error as to the substantive

11   counts and as to a count charging only conspiracy to violate §§ 1343 and 1348 (Count Two);

12   and it agrees that either the defendants' convictions on those counts should be reversed, or

13   the cases should be remanded to the district court so that the government can dismiss those

14   counts pursuant to Fed. R. Crim. P. 48(a); and (C) the government seeks affirmance on the

15   remaining conspiracy counts (Counts One and Seventeen).

16          Given the Supreme Court's decision in *Kelly* and the prosecutorial discretion

17   to which the Executive Branch of the government is entitled, we grant the government's

18   request to remand the cases to the district court for dismissal of the substantive counts and

19   Count Two.  As to Counts One and Seventeen, the verdicts do not reveal whether the jury

2

1    found that the charged defendants conspired to commit offenses as to which the government

2    has confessed error or instead found that they conspired to engage in other charged criminal

3    conduct.  Accordingly, we vacate the convictions on these two counts and remand for such

4    further proceedings as may be appropriate.

5               Remanded for dismissal of the substantive counts and Count Two; vacated and

6    remanded for further proceedings on Counts One and Seventeen.

7               Judge Walker joins the majority opinion and concurs in a separate concurring

8    opinion, in which Judge Kearse joins.

9               Judge Sullivan dissents, in a separate opinion.


10              ERIC J. FEIGIN, Deputy Solicitor General, United States
11                   Department of Justice, Washington, D.C. (Elizabeth B.
12                   Prelogar, Acting Solicitor General, United States
13                   Department of Justice, Washington, D.C.; Audrey
14                   Strauss, United States Attorney for the Southern District
15                   of New York, Ian McGinley, Joshua A. Naftalis, Won S.
16                   Shin, Assistant United States Attorneys, New York, New
17                   York, on the brief), *for Appellee*.

18              DONALD B. VERRILLI, JR., Washington, D.C. (Elaine J.
19                   Goldenberg, Jonathan S. Meltzer, Dahlia Mignouna,
20                   Jacobus P. van der Ven, Munger, Tolles & Olson,
21                   Washington, D.C., David Esseks, Eugene Ingoglia,
22                   Alexander Bussey, Allen & Overy, New York, New York,
23                   on the brief *for Defendant-Appellant Robert Olan*; Daniel M.
24                   Sullivan, James M. McGuire, Holwell Shuster &
25                   Goldberg, New York, New York, Stephen Fishbein, John
26                   A. Nathanson, Shearman & Sterling, New York, New
27                   York, on the brief *for Defendant-Appellant Christopher*

| | |
|---|---|
| 1 | *Worrall*; Alexandra A.E. Shapiro, Daniel J. O'Neill, Eric S. |
| 2 | Olney, Shapiro Arato Bach, New York, New York, Barry |
| 3 | H. Berke, Dani R. James, Kramer Levin Naftalis & |
| 4 | Frankel, New York, New York, on the brief *for Defendant-* |
| 5 | *Appellant Theodore Huber*; Colleen P. Cassidy, Barry D. |
| 6 | Leiwant, Federal Defenders of New York, New York, |
| 7 | New York, on the brief *for Defendant-Appellant David* |
| 8 | *Blaszczak*), *for Defendants-Appellants*. |
| 9 | KATHERINE R. GOLDSTEIN, New York, New York (Akin |
| 10 | Gump Strauss Hauer & Feld, New York, New York, on |
| 11 | the brief), *Court-appointed Amicus Curiae, in support of* |
| 12 | *reinstatement of this Court's decision of affirmance*. |
| 13 | Peter Neiman, New York, New York (Nicholas Werle, Wilmer |
| 14 | Cutler Pickering Hale and Dorr, New York, New York, |
| 15 | Jessica Lutkenhaus, Wilmer Cutler Pickering Hale and |
| 16 | Dorr, Washington, D.C.; Lindsay A. Lewis, Committee of |
| 17 | the National Association of Criminal Defense Lawyers, |
| 18 | New York, New York, of counsel), *submitted a brief for* |
| 19 | *Amicus Curiae National Association of Criminal Defense* |
| 20 | *Lawyers in support of reversal*. |
| 21 | Roman Martinez, Washington, D.C. (Michael Clemente, Latham |
| 22 | & Watkins, Washington, D.C., Jason M. Ohta, Latham & |
| 23 | Watkins, San Diego, California; Stephen R. Cook, Brown |
| 24 | Rudnick, Irvine, California, Justin S. Weddle, Weddle |
| 25 | Law, New York, New York, of counsel), *submitted a brief* |
| 26 | *for Amicus Curiae Jeffrey Wada in support of Defendants-* |
| 27 | *Appellants and reversal*. |
| 28 | Michael H. McGinley, Philadelphia, Pennsylvania (Michael P. |
| 29 | Corcoran, Dechert, Philadelphia, Pennsylvania, of |
| 30 | counsel), *submitted a brief for Amicus Curiae The Alternative* |
| 31 | *Investment Management Association in support of reversal*. |

1    KEARSE, *Circuit Judge*:

2            This appeal returns to us on remand from the United States Supreme

3    Court for further consideration, in light of *Kelly v. United States*, 140 S. Ct. 1565 (2020),

4    of this Court's prior affirmance of judgments of the United States District Court for

5    the Southern District of New York convicting defendants David Blaszczak, Theodore

6    Huber, Robert Olan, and Christopher Worrall of conversion of government property

7    in violation of 18 U.S.C. § 641 and wire fraud in violation of 18 U.S.C. § 1343; and

8    convicting Blaszczak, Huber, and Olan of securities fraud in violation of 18 U.S.C.

9    § 1348 ("Title 18 securities fraud"), conspiracy to commit wire fraud and Title 18

10   securities fraud in violation of 18 U.S.C. § 1349, and conspiracies in violation of

11   18 U.S.C. § 371 to, *inter alia*, convert government property and defraud the United

12   States, all originating from misappropriation of confidential information from the

13   Centers for Medicare & Medicaid Services ("CMS"), *see United States v. Blaszczak*, 947

14   F.3d 19 (2d Cir. 2019) ("*Blaszczak I*"), *vacated and remanded*, 141 S. Ct. 1040, 2021 WL

15   78043 (Jan. 11, 2021).  On this remand:  (A) defendants contend that their argument

16   that the CMS information at issue does not constitute "property" or a "thing of value"

17   within the meaning of the above statutes is supported by the Supreme Court's decision

18   in *Kelly*; (B) the government, concurring in that contention, confesses error as to those

19   substantive counts and as to a conspiracy count premised only on crimes concerning

1    "property" (Count Two); and it agrees that either the defendants' convictions on those

2    counts should be reversed, or the cases should be remanded to the district court so

3    that the government can dismiss those counts pursuant to Fed. R. Crim. P. 48(a); and

4    (C) the government seeks affirmance on the remaining conspiracy counts on which one

5    or more defendants were convicted (Counts One and Seventeen).

6         For the reasons that follow, given the Supreme Court's decision in *Kelly*

7    and the prosecutorial discretion to which the Executive Branch of the government is

8    entitled, we grant the government's request to remand the cases to the district court

9    for dismissal of the substantive counts and the conspiracy charged in Count Two.  As

10   to Counts One and Seventeen, the verdicts do not reveal whether the jury found that

11   the charged defendants conspired to engage in alleged conduct other than that which

12   the government no longer contends was criminal.  Accordingly, we vacate the

13   convictions on these two counts and remand for such further proceedings as may be

14   appropriate.

15                                    I. BACKGROUND

16        The history of this prosecution, summarized briefly here, is set out in

17   *Blaszczak I*, 947 F.3d 19, familiarity with which is assumed.

1       CMS is an agency within the United States Department of Health and

2   Human Services.  CMS administers Medicare and Medicaid, including *inter alia*, issuing

3   rules setting reimbursement rates for healthcare providers.  The rules may impact the

4   stock prices of companies that offer products and services covered by the rates.

5       Worrall was an employee at CMS; Blaszczak, a consultant for hedge

6   funds, was a former CMS employee.  Huber and Olan were partners in a hedge fund

7   ("Deerfield").   At various times between 2009 and 2014, Worrall gave Blaszczak

8   nonpublic information about the timing and substance of proposed CMS rule changes

9   that would change reimbursement rates for certain types of medical care for various

10  health conditions.   Blaszczak gave that information to Huber, Olan, or another

11  Deerfield partner, following which Deerfield engaged in profitable short sales of shares

12  of companies that would be negatively affected by reimbursement rate reductions

13  when they became effective.   Between 2010 and 2013, Blaszczak also gave such

14  information to another hedge fund client, following which that fund profitably

15  maintained its short positions and purchased put-options in shares of such companies.

16  A.  *The Prosecution and the Convictions*

17      With respect to the above activities, defendants were indicted and tried

18  on substantive charges of Title 18 securities fraud in violation of § 1348, securities

1    fraud in violation of 15 U.S.C. § 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5 (collectively

2    "Title 15 securities fraud"), wire fraud in violation of 18 U.S.C. § 1343, and conversion

3    of United States property (*i.e.*, the CMS information) in violation of 18 U.S.C. § 641.

4    All four defendants were charged with conspiracy, in violation of 18 U.S.C. § 371, to

5    commit Title 15 securities fraud, to convert government property, and to defraud the

6    United States (Count One), and conspiracy in violation of 18 U.S.C. § 1349 to commit

7    wire fraud and Title 18 securities fraud (Count Two).  Blaszczak was charged in Count

8    Seventeen with conspiracy in violation of § 371 to convert government property and

9    to defraud the United States.

10          The jury acquitted all of the defendants on all substantive counts of Title

11   15 securities fraud.   On the other substantive charges, all four defendants were

12   convicted on at least one count of § 641 property conversion and at least one count

13   of § 1343 wire fraud:  Blaszczak was convicted on a total of three counts of § 641

14   property conversion, two counts of § 1343 wire fraud, and two counts of Title 18

15   securities fraud.  Huber and Olan were each convicted on one count of § 641 property

16   conversion, one count of § 1343 wire fraud, and one count of Title 18 securities fraud.

17   Worrall was convicted only on one count of § 641 property conversion and one count

18   of § 1343 wire fraud.  As to the conspiracy counts, Blaszczak, Huber, and Olan were

19   convicted on Counts One and Two; Blaszczak was convicted on Count Seventeen.

1    On appeal, defendants challenged their convictions on the principal

2    ground that §§ 1343 and 1348 apply to fraudulent schemes to obtain "money or

3    property" and that § 641 applies to conversion of "money[] or [a] thing of value" of

4    the government, and that CMS's confidential information as to its plans for announcing

5    changes in medical service reimbursement rates was not government "property" or a

6    "thing of value" within the meaning of those statutes.  The majority in *Blaszczak I*

7    disagreed, and the convictions were affirmed.

8    B.  *The Supreme Court's Decision in* Kelly

9    Following denial of defendants' petitions for rehearing in this Court and

10   a stay of their time to seek further review, defendants petitioned the Supreme Court

11   for certiorari.  In the meantime, the Supreme Court had decided *Kelly*.

12   *Kelly* involved politically motivated conduct by officials in the

13   administration of New Jersey's then-Governor Chris Christie to cause significant traffic

14   gridlock for several days in Fort Lee, New Jersey--terminus of the George Washington

15   Bridge to Manhattan--by reducing the Bridge's toll plaza lanes accessed from Fort Lee

16   from three lanes to one, in retribution for the refusal of Fort Lee's mayor to endorse

17   Christie's bid for reelection.  The plan was executed under the guise of a traffic study;

18   its exposure as a sham led to the officials' criminal prosecution.

1     The officials were charged with wire fraud in violation of 18 U.S.C.

2     § 1343 (which prohibits schemes "for obtaining money or property"), fraud on a

3     federally funded entity (*i.e.*, the Port Authority, which administered the Bridge) in

4     violation of 18 U.S.C. § 666(a)(1)(A) (which prohibits fraudulently "obtain[ing] . . .

5     property" from such an entity), and conspiracy to commit those crimes.   After the

6     defendants were convicted and their convictions were affirmed on appeal, the Supreme

7     Court reversed.

8     The Court held that the defendants' conduct did not fall within the scope

9     of § 1343 or § 666(a)(1)(A) because their scheme did not aim to deprive the Port

10    Authority of money or property.   The Court noted that the federal fraud statutes are

11    "limited in scope to the protection of property rights," *Kelly*, 140 S. Ct. at 1571 (internal

12    quotation marks omitted), and do not "criminaliz[e] all acts of dishonesty," *id*.   Thus,

13    the government was required to prove, *inter alia*, that the object of the defendants'

14    fraud was money or property, *see id*. at 1571-72.   Instead, the Court concluded, the

15    *Kelly* defendants, by deciding the distribution of lanes for drivers on the toll road, had

16    exercised the government's regulatory rights of "'allocation, exclusion, and control.'"

17    *Id*. at 1573 (quoting *Cleveland v. United States*, 531 U.S. 12, 23 (2000)).   The Court stated

18    that such regulatory rights "do 'not create a property interest,'" *Kelly*, 140 S. Ct. at 1573

10

1    (quoting *Cleveland*, 531 U.S. at 23), and thus, "a scheme to alter such a regulatory

2    choice is not one to appropriate the government's property," *Kelly*, 140 S. Ct. at 1572.

3                The Court rejected the government's arguments that the property aspect

4    of § 1343 and § 666(a)(1)(A) was satisfied either because the physical lanes that the

5    defendants "'commandeer[ed]'" were government property, *id.*, or because their project

6    required expenditures of time and labor by Port Authority employees.  The Court held

7    that for conduct to be within those statutes, property must be more than an incidental

8    aspect of the fraud; it "must be an 'object of the fraud.'"  *Id.* at 1573 (quoting

9    *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)).  As the object of the defendants'

10   scheme was clearly to alter "a regulatory decision about the toll plaza's use" for

11   political retaliation, rather than to take the lanes from the government or to convert

12   them to non-public use, the lanes as property played no more than a "bit part in [the]

13   scheme."  *Kelly*, 140 S. Ct. at 1573.  Similarly, in contrast to a misuse of public

14   employees to renovate an official's home, the defendants merely altered a regulation;

15   "[e]very regulatory decision" involves some employee labor, and that expended by the

16   Port Authority employees was "only an incidental byproduct of the scheme."  *Id.*

17   at 1573-74.

11

1    C.  *The Parties' Positions on Remand in Light of* Kelly

2            In the present case, defendants successfully petitioned for certiorari, with

3    some support from the government:  "At the request of the Acting Solicitor General,

4    the Supreme Court granted the petitions" of defendants for certiorari, "vacated this

5    Court's judgment, and remanded the case for further consideration in light of *Kelly*."

6    (Government brief on remand at 2.)

7            Defendants on this remand renew their principal contention that the CMS

8    information at issue does not constitute "property" or a "thing of value" within the

9    meaning of the fraud and conversion statutes, and they contend that that conclusion

10   is supported by the Supreme Court's decision in *Kelly*.  Their opening brief on remand

11   urges that all of their convictions be reversed.

12           The government on remand, insofar as the substantive counts of

13   conviction are concerned, agrees with defendants that those counts cannot stand.  It

14   states that,

15           [i]n light of the Supreme Court's holding in *Kelly*, it is now
16           the position of the Department of Justice that in a case involving
17           confidential government information, that information typically
18           must have economic value in the hands of the relevant
19           government entity to constitute "property" for purposes of
20           18 U.S.C. §§ 1343 and 1348. . . .  A related, though not necessarily
21           identical, analysis applies when determining what confidential
22           information is a "thing of value" under 18 U.S.C. § 641.  The
23           Department has determined that the confidential information at
24           issue in this case does not constitute "property" or a "thing of

12

value" under the relevant statutes after *Kelly*. To be sure, this Court recognized that "CMS *does* have an economic interest in its confidential predecisional information" because the agency "invests time and resources into generating and maintaining the confidentiality of" that information, and leaks affect the "efficient use of its limited time and resources." *Blaszczak[ I ]*, 947 F.3d at 33. But in the Department's view, shaped by *Kelly*, the CMS employee time at issue in this case did not constitute "an object of the fraud," and thus the associated "labor costs could not sustain the conviction[s]" here. *Kelly*, 140 S. Ct. at 1573.

(Government brief on remand at 7-8 (emphasis in brief).) "Accordingly," the government states, "this Office is constrained to confess error at the direction of the Solicitor General's Office" (*id*. at 8; *see also id*. at 2 ("This brief was prepared in consultation with the Office of the Solicitor General to reflect the Department of Justice's post-*Kelly* position on the scope of 'property' under 18 U.S.C. §§ 1343 and 1348, and a 'thing of value' under 18 U.S.C. § 641, which this Office is constrained to follow.")). The government urges that we either "reverse . . . the convictions" for conversion of United States property (Counts Three, Thirteen, and Eighteen), wire fraud (Counts Nine and Fifteen), Title 18 securities fraud (Counts Ten and Sixteen), and conspiracy to commit wire fraud and Title 18 securities fraud (Count Two) (Government brief on remand at 8-9), or that we remand the matter to the district court in order to permit the government to have those eight counts dismissed pursuant to Federal Rule of Criminal Procedure 48(a) (Government response to brief of Court-appointed amicus curiae at 8).

13

1           The government argues, however, that the conspiracy convictions on

2    Counts One and Seventeen should be affirmed. Count One, on which Blaszczak,

3    Huber, and Olan were convicted, alleged that defendants' objectives were not only to

4    convert government property in violation of § 641, but also to commit Title 15

5    securities fraud and to defraud the United States in violation of 18 U.S.C. § 371. And

6    Count Seventeen, alleged only against Blaszczak, alleged that his objectives were both

7    conversion of government property and defrauding the United States. The government

8    acknowledges that "[i]n light of [its] confession of error, . . . the Government is

9    constrained to concede that the § 641 objects are legally invalid," but it argues that

10    "the § 371 defraud-clause objects were not affected by *Kelly* and remain legally valid."

11    (Government brief on remand at 10.) The government also concedes that the jury's

12    "general verdict[s]" on Counts One and Seventeen, and "the presence of both legally

13    invalid and legally valid objects gives rise to error" (*id.* (citing *Yates v. United States*,

14    354 U.S. 298 (1957))). However, it argues that the error is harmless in light of the

15    "overwhelming evidence" that Blaszczak conspired with Huber and Olan (the Deerfield

16    partners) to defraud the United States in connection with Deerfield's stock trading

17    (Count One), and that Blaszczak conspired with another client to defraud the United

18    States in connection with that client's stock trading (Count Seventeen).

14

1       In reply, defendants concur in the government's proposal to have the

2  substantive counts and Count Two dismissed.  Blaszczak, Huber, and Olan, in reply

3  to the government's contention that their conviction(s) on Counts One and Seventeen

4  should be affirmed, dispute the government's contention that any lack of clarity as to

5  the basis of the jury verdicts on these counts was harmless.  They argue that it is

6  instead likely that the jury based its conspiracy verdicts on the § 641 allegations, given

7  that the government ended its rebuttal summation by urging "the jury to 'take the jury

8  form and mark guilty on Count One, *because that is a conspiracy to steal government*

9  *information*.'" (Defendants' reply brief on remand at 13 (quoting trial transcript

10  (emphasis in brief)).)  They argue that the convictions on Counts One and Seventeen,

11  if not reversed, must at least be vacated.

12                                        II. DISCUSSION

13       For the reasons that follow, given the Supreme Court's decision in *Kelly*

14  and the prosecutorial discretion to which the Executive Branch of the government is

15  entitled, we grant the government's request to remand these cases to the district court

16  for dismissal of the seven substantive counts of conviction and the conspiracy

17  conviction in Count Two.  In light of the lack of clarity as to whether the jury's

1     verdicts of guilt on Counts One and Seventeen were based on findings of conspiracy

2     to violate § 641 or instead on conspiracy to defraud the government in violation of

3     § 371 (or in Count One on conspiracy to commit Title 15 securities fraud), we vacate

4     the judgments on Counts One and Seventeen and remand for such further proceedings

5     on these counts as may be appropriate.

6     A.  *The Government's Confession of Error in Light of* Kelly

7     "[O]ne of the core powers of the Executive Branch of the Federal

8     Government [is] the power to prosecute." *United States v. Armstrong*, 517 U.S. 456, 467

9     (1996). "'[S]ubject to constitutional constraints,'" *id*. at 464 (quoting *United States v.*

10    *Batchelder*, 442 U.S. 114, 125 (1979)), such as prohibitions against invidious

11    discrimination, *see generally Armstrong*, 517 U.S. at 464-65, or vindictive prosecution, *see*

12    *generally United States v. Goodwin*, 457 U.S. 368, 373-74 (1982), the United States

13    "Attorney General and United States Attorneys retain 'broad discretion' to enforce the

14    Nation's criminal laws," *Armstrong*, 517 U.S. at 464 (quoting *Wayte v. United States*, 470

15    U.S. 598, 607 (1985) (other internal quotation marks omitted)).

16                  In the ordinary case, "so long as the prosecutor has probable cause
17                   to believe that the accused committed an offense defined by
18                   statute, the decision whether *or not* to prosecute, and what charge
19                   to file or bring before a grand jury, generally rests entirely in his
20                   discretion."

1    *Armstrong*, 517 U.S. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)

2    (emphasis ours)).

3              This broad discretion rests largely on the recognition that the
4              decision to prosecute is particularly ill-suited to judicial review.
5              Such factors as the strength of the case, the prosecution's general
6              deterrence value, the Government's enforcement priorities, and the
7              case's relationship to the Government's overall enforcement plan
8              are not readily susceptible to the kind of analysis the courts are
9              competent to undertake.

10   *Wayte*, 470 U.S. at 607; *see also United States v. Knox*, 32 F.3d 733, 739 n.3 (3d Cir. 1994)

11   ("[A] prosecutor always has broad discretion to decide the circumstances that warrant

12   prosecution of a person for what the prosecutor fairly believes is unlawful conduct.

13   When the prosecutor decides to prosecute, . . . it is the exclusive function of the

14   judiciary to determine whether the conduct charged is unlawful *unless the prosecutor*

15   *then withdraws the prosecution*." (emphasis added)).

16              The Federal Rules of Criminal Procedure provide, as pertinent here, that

17   "[t]he government may, with leave of court, dismiss an indictment . . . ."  Fed. R.

18   Crim. P. 48(a).

19              The principal object of the "leave of court" requirement is
20              apparently to protect a defendant against prosecutorial harassment,
21              *e.g.*, charging, dismissing, and recharging, when the Government
22              moves to dismiss an indictment over the defendant's objection. . . .
23              But the Rule has also been held to permit the court to deny a
24              Government dismissal motion to which the defendant has
25              consented if the motion is prompted by *considerations clearly*
26              *contrary to the public interest*.

1    *Rinaldi v. United States*, 434 U.S. 22, 29-30 n.15 (1977) (emphasis added); *see generally*

2    *United States v. Cowan*, 524 F.2d 504, 509-11 (5th Cir. 1975) ("*Cowan*") (the "leave of

3    court" requirement was added by the Supreme Court to the originally proposed

4    version of Rule 48(a), which had required the government merely to give a statement

5    of its reasons for dismissing a prosecution), *cert. denied sub nom. Woodruff v. United*

6    *States*, 425 U.S. 971 (1976).

7            The government may elect to eschew or discontinue prosecutions for any

8    of a number of reasons.  Rarely will the judiciary overrule the Executive Branch's

9    exercise of these prosecutorial decisions.  For example, in *Petite v. United States*, 361

10   U.S. 529 (1960), the government, while not opposing the defendant's certiorari petition

11   challenging his prosecution and conviction on the ground of double jeopardy, informed

12   the Supreme Court that the Department of Justice ("Department" or "Justice

13   Department"), "wholly apart from the question of the legal validity of the claim of

14   double jeopardy," was considering whether the second prosecution of the defendant

15   was consistent with Department policy for the control of government litigation.  *Id.*

16   at 530.  Thereafter, the Solicitor General having announced a general policy against

17   multiple prosecutions arising out of a single transaction or against a federal

18   prosecution that would be duplicative of a state prosecution, *see id*. at 530-31, the

19   government moved for, and the Supreme Court granted, a "remand[] to the Court of

18

1    Appeals to vacate its judgment [of affirmance] and to direct the District Court to

2    vacate its judgment [of conviction] and to dismiss the indictment," *id*. at 531.

3            Even when a defendant has been tried, convicted, and sentenced in a

4    prosecution that, under the *Petite* policy, would not have been brought if the Justice

5    Department's internal procedures had been properly or timely followed, the courts

6    have granted the government's eventual motion to vacate the conviction and have the

7    indictment dismissed.  *See, e.g., Rinaldi*, 434 U.S. at 23, 29-30; *United States v. Houltin*,

8    553 F.2d 991, 991-92 (5th Cir. 1977).

9            In *Gaona-Romero v. Gonzales*, 497 F.3d 694 (5th Cir. 2007), a government

10   motion seeking termination of a proceeding reflected a change in a different Justice

11   Department policy.  The government moved to vacate a court of appeals decision

12   upholding the removal of an alien who had been convicted of a controlled substances

13   offense, but whose conviction had been vacated.  The government reviewed its policy

14   with regard to such cases, and decided to follow a revised Board of Immigration

15   Appeals ("BIA") interpretation of "conviction," *see* 8 U.S.C. § 1101(a)(48)(A), to exclude

16   convictions that were vacated on the basis of procedural or substantive error.  The

17   court of appeals granted the motion and "remand[ed] to the BIA so that the

18   government may follow through on its pledge to withdraw the charge of

19   removability."  *Id*. at 695.

1              In cases in which the government itself has come to the view that a given

2    defendant may not have been guilty of the crime of which he was convicted, the

3    government has similarly moved to discontinue or dismiss the prosecution.  For

4    example, in *United States v. Weber*, 721 F.2d 266 (9th Cir. 1983), after Weber and his

5    codefendants had been convicted and sentenced, the Assistant United States Attorney

6    who had prosecuted the case interviewed Weber, received new information, and

7    reexamined the evidence.  As a result he "develop[ed] a serious and substantial doubt

8    as to Weber's guilt," *id.* at 268, and the government moved under Rule 48(a) to

9    dismiss the indictment against Weber.  The district court, while stating that it had "no

10    doubt" as to the prosecutor's "good faith doubt regarding Weber's guilt," *id.*, denied

11    the motion, apparently believing such a motion could not be granted after the

12    defendant had been convicted, *see id.* at 269.

13              The court of appeals reversed, holding that "[s]eeking dismissal because

14    of the existence of such a reasonable doubt" as to the defendant's guilt is "not clearly

15    contrary to the manifest public interest." *Id.* (internal quotation marks omitted); *see*

16    *also United States v. DiMattina*, 571 F. App'x 50, 50 (2d Cir. 2014) ("Defendant Frank

17    DiMattina argues that his conviction for extortion is invalid because he did not 'obtain'

18    any property for purposes of the Hobbs Act.  The Government, in its brief on appeal,

19    agrees and concedes that the judgment must be vacated in all respects.  The

1  Government now seeks remand to the District Court 'so that [it] can move to dismiss

2  the indictment with prejudice under Rule 48(a) of the Federal Rules of Criminal

3  Procedure.' Appellee Br. 11. We agree that is the appropriate course of action.").

4      In *United States v. Smith*, 55 F.3d 157 (4th Cir. 1995) ("*Smith*"), Smith, who

5  had originally pleaded not guilty and was being tried with four codefendants, decided

6  mid-trial to plead guilty and agreed to testify against his codefendants. He testified

7  truthfully, but the codefendants were acquitted. The government then moved under

8  Rule 48(a) to dismiss the indictment against Smith, stating two reasons.

9      First, [it] pointed to the acquittal of Smith's four codefendants and
10  expressed the opinion that if Smith had not pleaded guilty, he,
11  too, certainly would have been acquitted. Second, the United
12  States Attorney pointed out that after pleading guilty Smith
13  cooperated with the government and testified truthfully. The
14  United States Attorney emphasized that dismissal promoted
15  credibility in future attempts to enlist defendants to plead guilty,
16  cooperate with the government, and truthfully testify in return for
17  lenient treatment. He summed up his reasons as follows:
18  "Obviously, it is not only in the public interest to do what is fair
19  and right, but it is also in the public's interest to encourage
20  persons with knowledge to cooperate with the United States."

21  *Id.* at 160. The district court, however, while finding no bad faith on the part of the

22  United States Attorney, denied the motion, based on the court's "own assessment" that

23  it "would be clearly contrary to [the] manifest public interest" to dismiss the

24  indictment against Smith given that "Smith's guilty plea and corroborating testimony

25  constituted substantial evidence of his guilt." *Id.*

The court of appeals reversed.  While noting that the district court's own decision was reviewable for abuse of discretion, it pointed out that the exercise of judicial discretion in this regard must respect the prosecutorial discretion conferred on the Executive Branch:

> The court's discretion must be exercised in conformity with Rule 48(a) and the construction that the Supreme Court has placed on the rule.  Because the discretion granted by Rule 48(a) involves the constitutional issue of the Separation of Powers Doctrine, a reviewing court must carefully scrutinize the district court's action.  In *Newman v. United States*, 382 F.2d 479, 480 (D.C.Cir. 1967), Chief Justice Burger, then a circuit judge, wrote:  "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought."

*Smith*, 55 F.3d at 158.

> "Rule [48(a)] was not promulgated to shift absolute power from the Executive to the Judicial Branch.  Rather, it was intended as a power to check power.  The Executive remains the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending prosecution should be terminated.  The exercise of its discretion with respect to the termination of pending prosecutions should not be judicially disturbed unless clearly contrary to manifest public interest.  In this way, the essential function of each branch is synchronized to achieve a balance that serves both practical and constitutional values."

*Smith*, 55 F.3d at 158-59 (quoting *Cowan*, 524 F.2d at 513).

> *The disposition of a government's motion to dismiss an indictment should be decided by determining whether the prosecutor acted in good faith at the time he moved for dismissal. A motion that is not motivated by bad faith is not clearly contrary to manifest public interest, and it must be granted. . . .* [T]he trial court has little discretion in considering a government motion to dismiss made pursuant to Federal Rule of Criminal Procedure 48(a). *It must grant the motion absent a finding of bad faith or disservice to the public interest. . . . The disservice to the public interest must be found, if at all, in the motive of the prosecutor.* Examples of disservice to the public interest include the prosecutor's acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled.

*Smith*, 55 F.3d at 159 (internal quotation marks omitted (emphases ours)); *see, e.g., Rinaldi*, 434 US. at 30 (regardless of the government's reasons for initiating or maintaining a prosecution, the "salient issue" as to its later decision to terminate it is whether the request to dismiss the indictment is "tainted with impropriety").

The *Smith* court of appeals reversed the denial of the government's Rule 48(a) motion, concluding that the district court's "own assessment of the public interest" and "[w]eighing [of] these interests d[id] not give adequate recognition to the Executive in the context of the Separation of Powers Doctrine as it exercises its duty in good faith to take care that the laws are faithfully executed." 55 F.3d at 160.

In *United States v. Fokker Services, B.V.*, 818 F.3d 733 (D.C. Cir. 2016) ("*Fokker*"), the government had entered into a deferred prosecution agreement ("DPA") with a defendant and had agreed not to prosecute certain persons. The district court regarded the DPA as an inappropriately "anemic[]" response to "egregious conduct"

over "a sustained period of time and for the benefit of one of our country's worst

enemies," and it refused to exclude DPA cooperation time from the speedy trial clock

as authorized by the Speedy Trial Act ("Act").  The court of appeals granted the

government's petition for mandamus:

> [T]he Act confers no authority in a court to withhold exclusion of time pursuant to a DPA based on concerns that the government should bring different charges or should charge different defendants.  Congress, in providing for courts to approve the exclusion of time pursuant to a DPA, acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions.  Nothing in the statute's terms or structure suggests any intention to subvert those constitutionally rooted principles so as to enable the Judiciary to *second-guess the Executive's exercise of discretion over the initiation and dismissal of criminal charges.*

*Id.* at 738 (emphasis added).

Finally, close to home, this Court honored the government's decision in

light of *Kelly* to end its pursuit of a § 641 prosecution in *United States v. Aytes*, No.

19-3981, Dkt. No. 70 (2d Cir. Apr. 13, 2021) ("*Aytes*").  Aytes, after a jury trial in 2018,

was found guilty of theft of government property in violation of § 641 for her

unauthorized taking from the Federal Deposit Insurance Corporation ("FDIC") of paper

and electronic copies of documents that detailed plans, in the event of a severe

financial crisis, for the rapid and orderly liquidation of four banks regulated by the

FDIC.  Aytes successfully moved pursuant to Federal Rule of Criminal Procedure 29

24

1    for a judgment of acquittal, *see United States v. Aytes*, No. 18 CR 132, 2019 WL 5579485

2    (E.D.N.Y. Oct. 29, 2019); the government, with the approval of the Solicitor General,

3    appealed.  While Aytes's appeal was pending, the Supreme Court decided *Kelly* and

4    granted certiorari in the present cases for reconsideration in light of *Kelly*; and the

5    government in the present cases, upon instructions from the Solicitor General,

6    confessed error and requested reversal of the convictions of--or dismissal of the

7    indictment counts against--the present defendants on the § 641-related and other

8    property-related counts.

9            The United States Attorney's Office that prosecuted Aytes, upon conferring

10   with the Solicitor General, was instructed that the § 641 charges against her were not

11   meaningfully distinguishable from the property-related charges in the present cases and

12   that the government should move to dismiss its appeal from Aytes's judgment of

13   acquittal.  *See Aytes*, No. 19-3981, Dkt. No. 65 (government motion, Apr. 12, 2021).

14   Accordingly, the government so moved; and this Court summarily granted the

15   government's motion and its appeal was dismissed, thereby ending pursuit against

16   Aytes of charges for theft of government regulatory information under § 641, *see Aytes*,

17   No. 19-3981, Dkt. No. 70 (order of dismissal, Apr. 13, 2021).

1               With these considerations in mind, we conclude that the government's

2     decision to seek the dismissal of the seven substantive counts convicting defendants

3     under §§ 1343, 1348, and 641, along with the conspiracy charges in Count 2, is

4     appropriate and owed deference.   Nonetheless, we are also mindful that the

5     government's confession of error "does not automatically govern an appellate court's

6     disposition of an appeal."  *United States v. Vasquez*, 85 F.3d 59, 60 (2d Cir. 1996)

7     (collecting cases); *see also Young v. United States*, 315 U.S. 257 (1942).

8               In *Young*--a 1942 case arising prior to the adoption of Rule 48(a) with

9     respect to the government's desire to dismiss a prosecution--a physician convicted of

10    failing to maintain records required by the Harrison Narcotics Act, 26 U.S.C. §§ 2551(a)

11    and (b), contended that his conduct fell beyond the record-keeping requirement.  The

12    government confessed error, and requested reversal and remand to the district court

13    with direction to dismiss that count of the indictment.  The Supreme Court declined

14    to reverse without considering the merits:

15               The public trust reposed in the law enforcement officers of
16          the Government requires that they be quick to confess error when,
17          in their opinion, a miscarriage of justice may result from their
18          remaining silent.  But such a confession does not relieve this Court
19          of the performance of the judicial function.  The considered
20          judgment of the law enforcement officers that reversible error has
21          been committed is entitled to great weight, but our judicial
22          obligations compel us to examine independently the errors
23          confessed.  *See Parlton v. United States*, 64 App.D.C. 169, 75 F.2d
24          772.  The public interest that a result be reached which promotes

1        a well-ordered society is foremost in every criminal proceeding.
2        That interest is entrusted to our consideration and protection as
3        well as that of the enforcing officers.  Furthermore, our judgments
4        are precedents, and the proper administration of the criminal law
5        cannot be left merely to the stipulation of parties.

6    *Young*, 315 U.S. at 258-59.

7        To the extent that this Court is required to address the merits of the

8    convictions on the counts as to which the government  confesses error and/or requests

9    a remand for dismissal, *see generally Young*, we conclude that in light of *Kelly*, §§ 1343,

10    1348, and 641 do not apply to the conduct that was at issue here.

11    B.    *The Confidential Information and the Timing of Agency Action Are Not CMS's*
12        *"Property"*

13        As indicated in Part I.B. above, the *Kelly* Court noted that the relevant

14    federal fraud statutes such as § 1343 are "limited in scope to the protection of

15    property rights" and do not "criminaliz[e] all acts of dishonesty," and that the

16    government therefore was required to prove, *inter alia*, that the object of the

17    defendants' fraudulent scheme was money or property, *Kelly*, 140 S. Ct. at 1571-72

18    (internal quotation marks omitted).  *Kelly* held that the defendants' conduct affecting

19    the operation of the Port Authority did not fall within the scope of § 1343 or

20    § 666(a)(1)(A) because "[t]he wire fraud statute thus prohibits only deceptive '"schemes

21    to deprive [*the victim* of] money or property.'"  140 S. Ct. at 1571 (quoting *McNally v.*

1     *United States*, 483 U.S. 350, 356 (1987)) (brackets in *Kelly*; emphasis ours); *see, e.g.*,

2     *Cleveland*, 531 U.S. at 15 ("the thing obtained must be property in the hands of the

3     victim"); and the objective of the *Kelly* defendants' scheme was neither to deprive the

4     Port Authority of its money or property nor to utilize for defendants' own purposes

5     that agency's employees' paid time, but rather to reallocate the Bridge's access lanes.

6     *Kelly* concluded that "a scheme to alter such a regulatory choice is not one to

7     appropriate the *government's* property," *Kelly*, 140 S. Ct. at 1572 (emphasis added).

8         In the present case the same is true with respect to the counts charging

9     various defendants with fraud in violation of §§ 1343 and 1348 or with conversion of

10     government property in violation of § 641. In contrast, as to the counts of the

11     indictment that charged violations of the Title 15 securities laws, the actual and

12     intended victims of the alleged frauds would have been investors in the market for

13     securities of the companies whose fortunes would be affected by the regulations

14     promulgated by CMS. Indeed, as noted by the Court-appointed amicus curiae, "[a]t

15     its core, this was a case about insider trading--an act already understood to be

16     wrongful under [Title 15]." (Brief of Court-appointed amicus curiae at 19.) But the

17     jury acquitted defendants on all of those Title 15 substantive counts; and in the

18     remaining substantive counts at issue here, on which the jury convicted--the fraud

1    sections, §§ 1343 and 1348, and the section prohibiting "conver[sion]" of "money," or

2    a "thing of value" from "the United States or any department or agency thereof,"

3    18 U.S.C. § 641--the purported victim would have been the government agency CMS.

4    Thus, defendants could not properly be convicted of violating §§ 1343, 1348, or 641

5    unless the objective of their schemes and conduct was money or property of CMS.

6          The Supreme Court in *Kelly* noted that it had previously established that

7    a government agency's "exercise of regulatory power . . . fails to meet the [federal

8    fraud] statutes' property requirement."   140 S. Ct. at 1568-69; *see id*. at 1572 (with

9    regard to "a deceptive scheme to influence, to his own benefit, [a governmental

10   entity's] issuance of gaming licenses," "this Court has already held that a scheme to

11   alter such a regulatory choice is not one to appropriate the government's *property*"

12   (citing *Cleveland*, 531 U.S. at 23) (emphasis added)).   No greater property interest was

13   involved in the CMS information at issue in the present case.

14          While confidential information may constitute property of a commercial

15   entity such as the publisher victim in *Carpenter v. United States*, 484 U.S. 19 (1987)--for

16   which confidential information was its "stock in trade, to be gathered at the cost of

17   enterprise, organization, skill, labor, and money, and *to be distributed and sold to those*

18   *who [would] pay money for it*," *id*. at 26 (internal quotation marks omitted; emphasis

29

1    ours)--the same is not true with respect to a regulatory agency such as CMS.  CMS

2    is not a commercial entity; it does not sell, or offer for sale, a service or a product.

3          CMS adopts regulations that affect, *inter alia*, business organizations or

4    health industry entities, whether the affected persons or entities favor the regulations

5    or not.  And while CMS seeks to maintain confidentiality as to its planned regulations-

6    -and the regulations can plainly have either a favorable or an adverse effect on certain

7    business entities' fortunes--a planned CMS regulation, even if disclosed to outsiders

8    prematurely, remains within the exclusive control of CMS.  And if it is prematurely

9    disclosed to others, the disclosure has no direct impact on the government's fisc,

10   although it might well impact CMS's subsequent regulatory choices.  CMS can adhere

11   to its planned regulation, or it can alter or abandon it; it can publish the regulation

12   at the time it had planned, or it can postpone or advance the announcement or the

13   regulation's effective date.  As the Supreme Court recognized in *Cleveland* and

14   emphasized in *Kelly*, the government's right to determine "who should get a benefit

15   and who should not  . . .  do[es] 'not create a property interest.'"  *Kelly*, 140 S. Ct.

16   at 1572 (quoting *Cleveland*, 531 U.S. at 23)).  The information reflecting such a decision

17   and the timing of that disclosure are regulatory in character and do not constitute

18   money or property of the victim; and they are not a "thing of value" to CMS that is

19   susceptible to being "convert[ed]," 18 U.S.C. § 641.

1        We disagree with the dissent's contention that the present decision

2  conflicts with this Court's precedent in *United States v. Girard*, 601 F.2d 69 (2d Cir.

3  1979).  That case involved a drug dealer's attempt to purchase confidential records of

4  the United States Drug Enforcement Administration ("DEA") as to what persons were

5  DEA informants in certain DEA investigations.  We ruled that such confidential

6  information was a "thing of value" to the DEA within the meaning of § 641.  *See* 601

7  F.2d at 71.  And logically so:  Such information has inherent value to the DEA in

8  investigations and preparation for prosecutions; its theft would interfere with those

9  operations, by allowing the targets of investigations to, for example, better conceal

10  their criminal conduct, hide their contraband, or flee from arrest, as well as by

11  imperiling the well-being of the undercover agents and confidential informants used

12  in those operations.  We cannot agree that such inherently valuable law enforcement

13  information is comparable to the regulatory information at issue in the present case,

14  which was the reimbursement rates that CMS would announce for certain health

15  services and the planned dates of the announcements.

16        In sum, in *Kelly*, the scheme sought to alter the agency's exercise of its

17  regulatory power.  In the present case, the goal of the conduct at issue was a step

18  removed from any attempt at alteration; defendants instead schemed to obtain and

19  promptly utilize advance information as to how the regulatory power would be

1   exercised by CMS.  As the conduct in *Kelly*--altering a regulation--does not constitute

2   a deprivation of government property, *a fortiori* merely obtaining advance information

3   as to what the agency's preferred regulation would be, and when it would be

4   announced, cannot properly be considered the agency's money or property or a thing

5   of value that could be "convert[ed]."

6          We respect the Executive's "decisions about *whether to initiate* charges,

7   whom to prosecute, which charges to bring, *and whether to dismiss charges once brought*."

8   *Fokker*, 818 F.3d at 737 (emphases added).  The jury found defendants not guilty on

9   any of the substantive counts alleging Title 15 securities fraud--the core of the case.

10  The government's election, in light of *Kelly*, not to pursue the case further as one for

11  conversion of, or fraud to obtain, government "property" is entitled to deference.  And

12  our independent review confirms that the dismissals requested by the government are

13  required following *Kelly*.  Accordingly, these cases will be remanded to the district

14  court for dismissal of the substantive counts and the Count Two conspiracy charges.

15  C.  *The Remaining Conspiracy Counts*

16         The only remaining counts of the indictment are Count One, on which

17  Blaszczak, Huber, and Olan were convicted of conspiring, in violation of 18 U.S.C.

18  § 371, to convert property belonging to the United States in violation of 18 U.S.C.

1    § 641, to commit Title 15 securities fraud, and to defraud the United States in

2    violation of § 371; and Count Seventeen, on which Blaszczak was convicted of

3    conspiring, in violation of 18 U.S.C. § 371, to violate § 641 and to defraud the United

4    States.

5          As to these counts, the jury was not given questions to answer that

6    would reveal which one or more of the alleged conspiratorial goals it found proven.

7    And since the government has confessed error as to charges that defendants' conduct

8    was within the scope of § 641, and it no longer seeks to sustain these conspiracy

9    convictions on the basis of § 641 property-conversion goals, the government

10   acknowledges that the verdicts on these counts are "'flawed'" (Government brief on

11   remand at 12 (quoting *Skilling v. United States*, 561 U.S. 358, 414 (2010))); *see id*. at 414

12   (quoting *Yates v. United States*, 354 U.S. 298 (1957) ("constitutional error occurs when

13   a jury is instructed on alternative theories of guilt and returns a general verdict that

14   may rest on a legally invalid theory")).

15         The government contends, however, that the convictions on Counts One

16   and Seventeen can be affirmed on the ground that the error was harmless.  We

17   disagree.  In harmless-error analysis, the government bears the burden of proof, *see*,

18   *e.g.*, *United States v. Vonn*, 535 U.S. 55, 62 (2002); *United States v. Groysman*, 766 F.3d

19   147, 155 (2d Cir. 2014); and it must sustain that burden beyond a reasonable doubt,

1    *see generally Neder v. United States*, 527 U.S. 1, 15-19 (1999) (conviction may be affirmed

2    if, after "a thorough examination of the record," the court "conclude[s] beyond a

3    reasonable doubt that the jury verdict would have been the same absent the error,"

4    *id.* at 19); *see United States v. Coppola*, 671 F.3d 220, 237-38 (2d Cir. 2012) (a *Yates* error

5    would be harmless where "the jury necessarily would have had to" convict defendant

6    on the basis of the valid ground).  Given the emphasis the government placed on theft

7    in its rebuttal summation to the jury, and the fact that the only substantive crimes on

8    which the jury returned verdicts of guilty were the alleged property crimes under

9    § 641, § 1343, and § 1348, we cannot conclude that the government has carried its

10   burden.  Despite the fact that a plurality of the indictment's counts alleged substantive

11   counts of Title 15 securities fraud--and "[a]t its core," that is what this case was about-

12   -the jury acquitted each defendant on every such count in which he was charged.  We

13   see no basis on which to infer that if there had been no charges of property crimes

14   or conspiratorial goals to commit property crimes, the jury would necessarily have

15   found that any of the defendants conspired to commit Title 15 securities fraud or to

16   defraud the United States.  We cannot conclude that the inclusion of § 641 conversion

17   as a goal of the conspiracies alleged in Counts One and Seventeen was an error that

18   was harmless.

34

1         On the other hand, we are not persuaded by defendants' argument that

2  the convictions on these counts should simply be reversed.  Counts One and

3  Seventeen allege § 371 conspiracies to defraud the United States; Count One alleges

4  an additional objective of committing Title 15 securities fraud.  Section 371

5  encompasses not just conspiracies to commit property crimes, but conspiracy to commit

6  "any offense against the United States" and any conspiracy to "defraud the United

7  States, or any agency thereof in any manner or for any purpose."  18 U.S.C. § 371;

8  *McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) (the defraud clause of § 371

9  "reaches conspiracies other than those directed at property interests").  The record

10  contained sufficient evidence for submission of these counts to the jury.

11         We conclude that the convictions on Counts One and Seventeen should

12  be vacated, and the cases against Blaszczak, Huber, and Olan are remanded for such

13  further proceedings as may be necessary on these counts, which may include a new

14  trial.

15                                 CONCLUSION

16         We have considered all of the parties' arguments in support of their

17  respective positions on this remand.  For the reasons discussed above, these cases are

1    remanded to the district court to permit the government to dismiss Counts Two,

2    Three, Nine, Ten, Thirteen, Fifteen, Sixteen, and Eighteen.    The convictions of

3    Blaszczak, Huber, and Olan on Count One and of Blaszczak on Count Seventeen are

4    vacated, and the cases are remanded to the district court for such further proceedings

5    on these two counts as may be appropriate.